# EXHIBIT A

## TO THE APPENDIX OF NON-FEDERAL AND UNPUBLISHED AUTHORITIES CITED IN COUPON'S OPPOSITION TO STOTTLEMIRE'S MOTION TO DISMISS

Westlaw.

Slip Copy                                                          Page 1
Slip Copy, 2007 WL 2345012 (E.D.Cal.)
**(Cite as: Slip Copy)**

**H**Filiti v. USAA Cas. Ins. Co.
E.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Jane Marie FILITI, Individually and on Behalf of All
Others Similarly Situated, Plaintiff,
v.
USAA CASUALTY INSURANCE COMPANY,
Foreign Corporation, and Does 1-50, Defendants.
**Civ. No. S-06-2694 WBS DAD.**

Aug. 16, 2007.

Daniel Albert Crawford, Robert J. Drexler, Jr.,
Quisenberry Law Firm, Los Angeles, CA, for
Plaintiff.
James R. McGuire, Morrison and Foerster LLP, San
Francisco, CA, for Defendants.

*ORDER RE: MOTION FOR RECONSIDERATION*

WILLIAM B. SHUBB, United States District Judge.
**\*1** Defendant moves, pursuant to Local Rule 78-
230(k), for reconsideration of this court's order
denying defendant's motion to dismiss. Plaintiff
opposes the motion.

I. *Factual and Procedural History*

In her complaint, plaintiff alleges that she purchased
an automobile policy from defendant.
(Compl.¶ 9.) In October 2004, plaintiff's car was
damaged. (*Id.* ¶ 10.)Plaintiff went to an auto body
repair shop of her choice and obtained a written
estimate for the cost to repair the damage to her car.
(*Id.* ¶ 11.)The labor rate included in the auto body
repair shop's cost estimate was $78.00 per hour. (*Id.*)
Plaintiff made a claim to defendant for the damage to
her vehicle, but defendant agreed only to pay a
$65.00 per hour labor rate stating that was the
prevailing labor rate for auto body repair shops in
plaintiff's geographic area. (*Id.* ¶¶ 10, 12, 13.)Plaintiff
paid the difference between the labor rate defendant
agreed to pay and the rate charged to her by the auto
body repair shop. (*Id.* ¶ 17.)

The complaint further alleges that defendant

breached the provisions of the insurance policy "by
denying [plaintiff's] insurance benefits and refusing
to pay the reasonable hourly labor rate for repairs,
and compelling their insureds to pay, or become
indebted for, the difference between that reasonable
rate and the rates that [defendant] actually paid."(*Id.*
¶ 69.)Plaintiff also alleges that defendant "tortiously
breached the implied covenant of good faith and fair
dealing arising from such automobile insurance
contracts by unreasonably denying auto repair
benefits ... which were due ..."(*Id.*)It is further alleged
defendant violated California's unfair competition
law ("UCL") (California Business and Professions
Code section 17200, *et seq.*) and requested a
preliminary and permanent injunction to enjoin
defendant from "underpaying insurance benefits."
(*Id.* ¶¶ 45-58.)

On March 26, 2007, defendant moved to dismiss
plaintiff's complaint pursuant to Federal Rules of
Civil Procedure 12(b)(6). At that time, the case was
assigned to Judge England. After briefing on the
motion was completed, Judge England recused
himself, and the case was assigned to this court. On
June 20, 2007 the court denied defendant's motion to
dismiss. Defendant filed a motion for reconsideration
on July 23, 2007.

II. *Discussion*

Reconsideration is an "extraordinary remedy, to be
used sparingly in the interests of finality and
conservation of judicial resources."*Kona Enters., Inc.
v. Estate of Bishop,* 229 F.3d 877, 890 (9th Cir.2000).
Reconsideration is appropriate only when the
"district court (1) is presented with newly discovered
evidence, (2) committed clear error or the initial
decision was manifestly unjust, or (3) if there is an
intervening change in controlling law."*Sch. Dist. No.
1J, Multnomah County v. ACandS, Inc.,* 5 F.3d 1255,
1263 (9th Cir.1993); *United States v. Westlands
Water Dist.,* 134 F.Supp.2d 1111, 1131
(E.D.Cal.2001) (citing *389 Orange St. Partners v.
Arnold,* 179 F.3d 656, 665 (9th Cir.1999)).

**\*2** Under Local Rule 78-230, motions for
reconsideration must also set forth, "what new or
different facts or circumstances are claimed to exist

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2345012 (E.D.Cal.)
(Cite as: Slip Copy)

Page 2

which did not exist or were not shown upon such prior motion, or what other grounds exist for the motion."E.D. Cal. L.R. 78-230(k). A motion for reconsideration must accomplish two goals to succeed, "[f]irst, a motion for reconsideration must demonstrate why the court should reconsider its prior motion. Second, the motion must set forth facts or law of 'a strongly convincing' nature to induce the court to reverse its prior decision."*Jacob v. U.S.*, 128 F.Supp.2d 638, 641 (D.Haw.2000) (citing *Decker Coal Co. v. Hartman*, 706 F.Supp. 745, 750 (D.Mont.1998) (citation omitted).

A. *Breach of Contract*

Defendant argues that this court's June 20, 2007 order failed to properly apply the Supreme Court's decision in *Bell Atl. Corp. v. Twombly*, ---U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (May 21, 2007). Specifically, defendant points out that in considering plaintiff's claim for breach of contract, this court held that:
Under the terms of the policy, defendant was obligated to pay the amount necessary to repair the damaged property, which means restoring it to its pre-accident operational safety, function and appearance. The court cannot conclude beyond doubt that under the allegations of the complaint there is no set of facts plaintiff could present to prove defendant breached that obligation.

(Order at 4:3-9) (quoting *Van Buskirk v. CNN, Inc.*, 284 F.3d 977, 980 (9th Cir.2002).) The "no set of facts" language to which this court referred was the traditional legal standard cited in the Ninth Circuit for 12(b)(6) motions to dismiss and is derived from the Supreme Court's decision in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.")

Defendant correctly points out that in *Bell Atlantic* the Supreme Court abrogated the 12(b)(6) motion to dismiss standard under *Conley*.The Court held that:
This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown on the face of the pleadings .... On such a focused and literal reading of *Conley's* "no set of facts," a wholly conclusory

statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of facts" to support recovery.

127 S.Ct. at 1968. The Court determined that *Conley's* "no set of facts" language "has earned its retirement" and that, "[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard."*Id.* at 1969.

Accordingly, *Bell Atlantic* requires that the complaint contain factual allegations sufficient, "to raise a right to relief above the speculative level."*Bell Atl.*, 127 S.Ct. at 1965-66, 1974. However, "a complaint attacked by a rule 12(b)(6) motion to dismiss does not need detailed factual allegations."*Id.* at 1964.Rather it must plead, "enough facts to state a claim to relief that is plausible on its face."*Id.* at 1974.Thus, a 12(b)(6) motion to dismiss should be granted when plaintiffs fail to "nudge [ ] their claims across the line from conceivable to plausible."*Id.*

*3 Defendant contends that plaintiff's complaint pleads insufficient facts to state a cause of action pursuant to the *Bell Atlantic* standard. Defendant argues that its contractual obligation was to restore plaintiff's car to its pre-accident condition, and that this duty was satisfied by offering to pay a labor rate of $65 per hour. (Def's Mot. for Recons. at 4.) Defendant claims that, "in order to demonstrate than an auto body repair labor rate of $65 per hour was insufficient to restore her car ... plaintiff would have to allege that no auto body repair shop in her area accepted that hourly rate."(*Id.* at 5.) *Bell Atlantic* does not establish such a heightened pleading standard.Rule 8 of the Federal Rules of Civil Procedure still requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."

The complaint alleges that plaintiff purchased an automobile insurance policy from defendant, that her car was subsequently damaged, and that defendant failed to pay the reasonable hourly rate of repair. (Opp. to Mot. for Recons. at 4.) Plaintiff alleges that the $65.00 per hour rate was "used by USAA as a basis for limiting the amount it would pay for labor, [and] was set arbitrarily, artificially, unlawfully and unfairly."(Compl.¶ 15.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2345012 (E.D.Cal.)
**(Cite as: Slip Copy)**

Applying the *Bell Atlantic* pleading standard, it is entirely *plausible* from the allegations of the complaint that the $65 per hour which defendant was willing to pay was insufficient to restore plaintiff's car to its pre-accident condition. Thus, even though the court erred in applying *Conley's* no set of facts standard, under *Bell Atlantic,* plaintiff has pled sufficient facts to state a *plausible* claim for breach of contract.

B. *Breach of Implied Covenant of Good Faith and Fair Dealing*

As discussed in the June 20, 2007 order, because the court finds that the complaint does state a claim for breach of contract, defendant's argument with respect to the claim for breach of the implied covenant also fails.

C. *UCL*

Also discussed in the previous order, plaintiff meets the "lost money or property" prong of the UCL in that she alleges lost insurance benefits due under her policy.

D. *Preliminary and Permanent Injunction*

In ruling on defendant's motion to dismiss plaintiff's request for a preliminary and permanent injunction, this court held that it could not "conclude beyond doubt" that plaintiff would be unable to establish Article III standing pursuant to requirements of *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). (Order 5: 22-28.) Re-examining defendant's motion under the *Bell Atlantic* standard, it is *plausible* that plaintiff will meet the requirements of *City of Los Angeles.* Plaintiff is still insured by defendant and thus would be likely to suffer the same kind of loss if her car was damaged in the future.

IT IS THEREFORE ORDERED that defendant's motion for reconsideration be, and the same hereby is, DENIED.

E.D.Cal.,2007.
Filiti v. USAA Cas. Ins. Co.
Slip Copy, 2007 WL 2345012 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

## TO THE APPENDIX OF NON-FEDERAL AND UNPUBLISHED AUTHORITIES CITED IN COUPON'S OPPOSITION TO STOTTLEMIRE'S MOTION TO DISMISS

LEXSEE



Analysis
As of: Apr 03, 2008

TERARECON, INC., Plaintiff, v. FOVIA, INC.; FOVIA MEDICAL, INC.;
KENNETH FINEMAN; ROGER KATEN; GEORGE BUYANOVSKY; IGOR
OKULIST; and JOSEF GOREK, Defendants. FOVIA, INC.; FOVIA MEDICAL,
INC.; and GEORGE BUYANOVSKY, Counterclaimants, v. TERARECON, INC.,
MOTOAKI SAITO; and ROBERT TAYLOR, Counterdefendants.

No. C 05-4407 CW

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

2006 U.S. Dist. LEXIS 48833

July 6, 2006, Decided
July 6, 2006, Filed

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Claim dismissed by TeraRecon, Inc. v. Fovia, Inc., 2006 U.S. Dist. LEXIS 71118 (N.D. Cal., Sept. 20, 2006)

**CORE TERMS:** trade secrets, counterclaim, misrepresentation, preempted, engine, futile, customer, leave to amend, misappropriation, unfair competition, conversion, Copyright Act, intangible, amend, prospective economic advantage, conversion claim, copyright law, copyright infringement, computer code, law claims, intentional interference, statute of limitations, counterdefendant, time-barred, parties contend, unfair business practices, contract claims, misrepresented, disregarded, imaging

**COUNSEL:** [*1] For Terarecon, Inc., Plaintiff: Kirke M. Hasson, Joanne H. Kim, Sharon L. O'Grady, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA; David H. Jaffer, Frank J Singer, Vernon H. Granneman, Pillsbury Winthrop Shaw Pittman LLP, Palo Alto, CA.

For Fovia, Inc., Fovia Medical, Inc., Kenneth Fineman, Roger Katen, George Buyanovsky, Igor Okulist, Josef Gorek, Defendants: Erik J. Olson, Paul Forrest Coyne, Morrison & Foerster LLP, Palo Alto, CA.

For George Buyanovsky, Counter-claimant: Erik J. Olson, Paul Forrest Coyne, Morrison & Foerster LLP, Palo Alto, CA.

For Igor Okulist, Josef Gorek, Fovia, Inc., Fovia Medical, Inc., Kenneth Fineman, Roger Katen, Counter-claimants: Erik J. Olson, Morrison & Foerster LLP, Palo Alto, CA.

For Motoaki Saito, Robert Taylor, Counter-defendants: Vernon H. Granneman, Pillsbury Winthrop Shaw Pittman LLP, Palo Alto, CA.

For Terarecon, Inc., Counter-defendant: Kirke M. Hasson, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA; Vernon H. Granneman, Pillsbury Winthrop Shaw Pittman LLP, Palo Alto, CA.

**JUDGES:** CLAUDIA WILKEN, United States District Judge.

**OPINION BY:** CLAUDIA WILKEN

**OPINION**

ORDER GRANTING COUNTERDEFENDANTS' MOTION TO DISMISS COUNTERCLAIMS [*2] AND GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT

Counterdefendants TeraRecon, Inc., Motokai Saito and Robert Taylor move to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the second, third and fourth claims for relief of the counterclaim filed by Counterclaimants Fovia, Inc., Fovia Medical, Inc. and George Buyanovsky. The Fovia parties oppose this motion. In addition, Plaintiff TeraRecon seeks leave to file its second amended complaint. Defendants Fovia, Inc., Fovia Medical, Inc., Kenneth Fineman, Roger Katen, George Buyanovsky, Igor Okulist and Josef Gorek oppose this motion in part. The matter was heard on May 12, 2006. Having considered all of the papers filed by the parties and oral argument on the motions, the Court grants the TeraRecon parties' motion to dismiss, with leave to amend, and grants the motion for leave to amend.

BACKGROUND

According to TeraRecon, it is a leader in advanced image processing and 3-D visualization techniques, providing imaging systems for medical and other visualization applications. In 1997, it created a volume rendering apparatus, now named Aquarius. TeraRecon has invested, and continues [*3] to invest, large amounts of time, effort and money in developing Aquarius. Fovia is TeraRecon's competitor; it develops and sells medical imaging applications that compete with TeraRecon's Aquarius. Fovia was formed by TeraRecon's former employees: Buyanovksy, Fineman, Katen, and Okulist. On October 28, 2005, TeraRecon filed this action against Fovia, Fovia Medical, its former employees, and Gorek, the fifth member of the Fovia management team, alleging copyright infringement, misappropriation of trade secrets and other State law claims.

In February, 2006, Fovia, Fovia Medical and Buyanovsky filed counterclaims against TeraRecon and two additional counterdefendants: Mitoaki Saito, TeraRecon's Chief Executive Officer, and Robert Taylor, TeraRecon's Chief Operating Officer. The counterclaims were for copyright infringement, unfair business practices, intentional interference with prospective economic advantage and negligent interference with prospective economic advantage. The Fovia parties allege that, before joining TeraRecon, Buyanovsky created a powerful software-based volume rendering engine that could perform perspective and parallel volume rendering. This engine is copyrightable [*4] subject matter under the Copyright Act. Shortly after Buyanovksy was hired, Saito asked him to develop and integrate perspective rendering into a TeraRecon hardware-based product or, alternatively, to produce a software-based perspective rendering engine. Saito wanted this done quickly, before the 87th Scientific Assembly and Annual Meeting of the Radiological Society of North America was held on November 24, 2001. This was impossible. After receiving pressure from Saito

and Taylor, Buyanovksy agreed to adapt his previously created software engine solely for demonstration purposes at the Radiological Society meeting. Buyanovksy did not grant TeraRecon rights to use his engine in TeraRecon products after the Radiological Society meeting. But TeraRecon continued to use Buyanovksy's engine, or derivatives thereof, in its commercial products without Buyanovksy's permission.

LEGAL STANDARD

I. Motion to Dismiss

A motion to dismiss for failure to state a claim will be denied unless it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1132 (9th Cir. 2002), [*5] *citing Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff or counterclaimant. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required." Fed. R. Civ. P. 8(e). These rules "do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds on which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

When granting a motion to dismiss, a court is generally required to grant a plaintiff, or counterclaimant, leave to amend, even if no request to amend the pleading was made, unless amendment [*6] would be futile. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990). In determining whether amendment would be futile, a court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990). Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading. *Id. at 296-97*.

II. Leave to Amend Complaint

Federal Rule of Civil Procedure 15(a) provides that leave of the court allowing a party to amend its pleading "shall be freely given when justice so requires." Leave to

amend lies within the sound discretion of the trial court, which discretion "must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (citations omitted). Thus, Rule 15's policy of favoring amendments [*7] to pleadings should be applied with "extreme liberality." *Id.*; *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

### DISCUSSION

#### I. Motion to Dismiss Second, Third and Fourth Counterclaims

After the TeraRecon parties filed their motion to dismiss, the Fovia parties filed a stipulation and proposed order granting them leave to file their first amended counterclaims. The Court signed the stipulation and proposed order. The Fovia parties contend that these revisions addressed and cured the issues raised in the motion to dismiss. The TeraRecon parties disagree and pursue their motion to dismiss with prejudice the second, third and fourth counterclaims.

#### A. Unfair Competition in Violation of California Business and Professions Code § 17200

Both parties acknowledge that the Copyright Act preempts State law claims for unfair competition arising out of conduct encompassed by the Copyright Act. *See, e.g., Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys.*, 7 F.3d 1434, 1439-44 (9th Cir. 1993). But, as the Ninth Circuit has held, "If a state law claim includes an 'extra element' that makes the right asserted [*8] qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005). The Fovia parties contend that they have plead the additional elements of affirmative misrepresentation and misleading promises and thus their unfair competition claim is not preempted. The TeraRecon parties disagree, arguing that the alleged misrepresentations are nothing more than a re-characterization of the Fovia parties' copyright claims and that the misrepresentations are not sufficiently plead. In addition, the TeraRecon parties argue that the Fovia parties' "reverse passing off" and "appropriation" allegations do not support a claim under § 17200 and that the Fovia parties do not state a valid claim as to Saito and Taylor.

#### 1. Misrepresentation and False Promises

The amended counterclaim alleges:

> TeraRecon's regular practice of using images rendered by the Buyanovsky Engine in its marketing materials, thereby

improperly implying that they were created by TeraRecon's products constitutes an unfair business practice in violation of California Business and Professions Code § 17200 [*9] .

TeraRecon's regular practice of falsely representing that its 3D volume rendering software taken from the Buyanovsky Engine is exclusively its own product, was created exclusively by its own employees and does not incorporate the work of others constitutes an unfair business practice in violation of California Business and Professions Code § 17200.

Amended Counterclaim (ACC) P 162-63.

A claim for copyright infringement need not contain an element of deceit or misrepresentation. *See* 17 U.S.C. § 102. The Fovia parties argue that therefore they have alleged an extra element and the Copyright Act does not preempt their unfair competition claim. *See Valente-Kritzer Video v. Pinckney*, 881 F.2d 772, 776 (9th Cir. 1989) ("VKV does allege the element of misrepresentation that distinguishes this claim from one based on copyright."). It is not that simple. Courts do not automatically conclude that, if misrepresentation or deceit is alleged, a claim is not preempted by the Copyright Act. *See Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir. 1984) (finding that insofar as the State [*10] law claims for unfair competition and misrepresentation "are restatements of the copyright infringement claims, they are preempted by federal copyright law"). Rather, the Court must determine if the State law claim is equivalent to any of the exclusive rights within the general scope of copyright as specified by 17 U.S.C. § 106. *Valente-Kritzer Video*, 881 F.2d at 776. Section 106 grants the copyright owner exclusive rights of reproduction, production of derivative works, distribution, and display. *See* 17 U.S.C. § 106. As noted above, to survive preemption, the State claim must protect rights which are qualitatively different from copyright rights and "must have an 'extra element' which changes the nature of the action." *Valente-Kritzer Video*, 881 F.2d at 776.

The cases that the Fovia parties cite include an extra element, which changed the nature of the action. For example, in *Valente-Kritzer Video*, the plaintiff alleged that the defendant intentionally misrepresented its intent to perform a contract. The court found that the fraud cause of action, based on the allegation that the defendant misrepresented [*11] its intent to perform a contract, "is not substantially equivalent to a claim for copyright infringement." *Id.* In *Dielsi v. Falk*, 916 F. Supp. 985 (C.D. Cal. 1996), the alleged misrepresentation was

also more than copying and distributing copyrighted work and passing it off as one's own. There, the plaintiff alleged that the defendants fraudulently promised that they would honor his copyrighted work and compensate him for it, while concealing from him that they were developing a television show based on his work. _Id. at 991._ The court stated that it was "a close case, because Plaintiff's misrepresentation causes of action stray dangerously close to restating copyright claims." _Id._ But, the court concluded that, under _Valente-Kritzer Video,_ the plaintiff added an additional element, i.e., that the defendants fraudulently promised not to violate his authorship rights.

Here, the Fovia parties do not allege that the TeraRecon parties fraudulently promised to honor Buyanovsky's right to his engine. They state in their opposition that TeraRecon obtained the engine by Saito's misrepresentations to Buyanovsky regarding the limited uses to which [*12] the engine would be put to use. As the TeraRecon parties point out, however, the paragraphs in the amended counterclaims on which the Fovia parties rely do not allege facts to support a claim of false promise.

The Fovia parties' unfair competition claim, founded on allegations that the TeraRecon parties misrepresented that TeraRecon's 3-D volume rendering software is exclusively its own product and that images in TeraRecon's marketing materials were created by its own product, does not address rights which are qualitatively different from copyright rights. Still at issue is the copyright owner's exclusive rights of reproduction, production of derivative works, distribution, and display. _See_ 17 U.S.C. § 106; _Wharton v. Columbia Pictures Industries, Inc.,_ 907 F. Supp. 144, 146 (D. Md. 1995) (holding that the plaintiff's misrepresentation claim was "equivalent" to the right to prepare derivative works because it concerned the central allegation that the defendants plagiarized his copyrighted screenplay and thus the claim was preempted); _Aagard v. Palomar Builders, Inc.,_ 344 F. Supp. 2d 1211 (E.D. Cal. 2004) (California unfair [*13] competition claims were preempted by federal copyright law to extent they asserted that defendant had reproduced and distributed claimant's architectural plans as her own). The alleged misrepresentation claims do not add an extra element which changes the nature of the action. _See Valente-Kritzer Video,_ 881 F.2d at 776. Therefore, they cannot be the basis for a violation of California Business and Professions Code § 17200, and the claim will be dismissed with leave to amend.

Even if the allegations of misrepresentation as currently plead were not preempted by federal copyright law, the Fovia parties would be required to amend the allegation regarding TeraRecon's false representations because the allegation fails to satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); _see Vess v. Ciba-Geigy Corp. USA,_ 317 F.3d 1097, 1103-05 (9th Cir. 2003). [*14] In _Vess,_ the plaintiff argued that Rule 9(b) did not apply to the claims he brought under the California Consumer Remedies Act and California's unfair business practice laws because those claims do not require a showing of fraud. The Ninth Circuit found that he was correct that fraud is not an essential element of his State law claims, but he was "not correct in concluding that his averments of fraud therefore escape the requirements of the rule." 317 F.3d at 1103. The court stated,

> This circuit has not analyzed the application of Rule 9(b) in a case where fraud is not an essential element of the claim, and where allegations of both fraudulent and non-fraudulent conduct are made in the complaint. Two of our sister circuits have provided such an analysis, however, and we now join them in holding that in a case where fraud is not an essential element of a claim, only allegations ("averments") of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a). As the Fifth Circuit wrote:

> Where averments of fraud are made in a claim [*15] in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to _disregard_ averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.

_Id._ at 1104-05 (quoting _Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,_ 238 F.3d 363, 368 (5th Cir. 2001)). (emphasis added).

_Vess_ is controlling. The misrepresentation allegations must be disregarded because they are not alleged with the required specificity. Without those allegations, a claim for unfair business practices has not been stated, and would be dismissed. If the Fovia parties want their misrepresentation and false promise allegations to be considered, they must be replead to give the TeraRecon parties notice of the particular misconduct alleged so that they can defend against the charge and not just deny that

they have done anything wrong. *Id.* at 1106. As the Ninth Circuit instructs, "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). [*16]

### 2. Reverse Passing Off

The TeraRecon parties contend that the Fovia parties' "reverse passing off" allegations do not support a claim under § 17200. The Ninth Circuit explains that reverse passing off, or reverse palming off, occurs with the direct misappropriation of the services or goods of another. *Summit Mach. Tool Mfg. Corp.*, 7 F.3d at 1437. The Fovia parties state that they have not asserted a Lanham Act claim for reverse passing off. Regardless, to the extent that they allege reverse passing off, their unfair competition counterclaims are preempted. (see *Aagard*, 344 F. Supp. 2d at 1217 ("Reverse palming off claims are preempted unless they allege bodily appropriation and the claimant seeks more than mere monetary damages.").

### 3. Misappropriation

The TeraRecon parties also contend that the Fovia parties' misappropriation allegations do not support a claim for unfair competition under § 17200. According to the amended counterclaim, the TeraRecon parties have a regular practice of depriving Fovia and Fovia Medical of the value of their products and services by misappropriating the engine created by Buyanovsky and incorporating it into TeraRecon's commercially [*17] distributed products. ACC P 161. The Fovia parties do not address whether their misappropriation allegations are preempted or whether the allegations support a claim for unfair competition. They point to these allegations only to show wrongful conduct by Saito and Taylor. It appears that this allegation would also be preempted and thus could not support an unfair competition claim. *See Summit Mach. Tool Mfg. Corp.*, 7 F.3d at 1441 (noting that, in the cases finding that a claim for misappropriation is not preempted, "the extra element tends to be apparent").

### 4. Saito and Taylor

The TeraRecon parties contend that the amended counterclaim fails to state a claim under § 17200 against Saito and Taylor because it describes no conduct by either Saito or Taylor and because the claim is time-barred.

The Fovia parties point to allegations in the complaint of wrongful conduct by Saito and Taylor. As noted above, the Fovia parties allege that Saito and Taylor misappropriated the engine. It is also alleged that Saito and Taylor "misrepresented TeraRecon's rights relating to the Buyanovsky Engine to the medical imaging community and to Fovia and Fovia Medical's prospective custom-

ers." ACC [*18] P 171. These allegations, however, fail for the reasons stated above: a claim based on misappropriation of the engine appears to be preempted and the alleged misrepresentations must be disregarded, pursuant to *Vess*, because they are not alleged with the required specificity.

This unfair competition claim against Saito and Taylor, however, is not time-barred. A claim can be dismissed as time-barred only where it is evident on the face of the complaint that the claim is necessarily barred. *See, e.g., Mertens v. Hewitt Associates*, 948 F.2d 607, 613 (9th Cir. 1991), *aff'd*, 508 U.S. 248, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993) (dismissing "on statute of limitations grounds is improper where the complaint merely shows that the action may have been barred") (inner quotation omitted). The statute of limitations on a claim under § 17200 is four years, and it begins "to run on the date the cause of action accrued, not on the date of discovery." *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002); Cal. Bus. & Prof. Code § 17208. Thus, a delay in discovering that TeraRecon was allegedly using the engine [*19] without permission does not save the claim from the time bar. It is not clear from the complaint exactly when TeraRecon incorporated and used the engine in its products. It is only alleged that TeraRecon did so after the Radiological Society meeting, because Buyanovsky allegedly did not grant TeraRecon rights to use the engine in its products after the conference. Because it is not clear on the face of the complaint that this counterclaim is time-barred, the Court need not address whether the statute of limitations is tolled as to claims asserted against officers and directors of a corporation when the corporation commences litigation.

### B. Intentional Interference with Prospective Economic Advantage

The Fovia parties state that they have revised their third counterclaim for intentional interference with prospective economic advantage to cure all the alleged pleading defects the TeraRecon parties raised in their motion to dismiss. The amended counterclaim now alleges that TeraRecon, Saito and Taylor have intentionally interfered with the Fovia parties' business relationships "through improper means, including by making false and misleading statements to Fovia and Fovia Medical's prospective [*20] customers that Fovia and Fovia Medical have copied TeraRecon's software, have misused TeraRecon's trade secrets, and no longer have the right, authority and license to use, produce and distribute their medical imaging products. TeraRecon, Saito and Taylor have also misrepresented TeraRecon's rights relating to the Buyanovsky Engine to the medical imag-

ing community and to Fovia and Fovia Medical's prospective customers." ACC P 170.

As the TeraRecon parties note, this allegation does not satisfy the requirements of Rule 9(b). Rule 9(b) "requires that a plaintiff plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant." In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746, 752 (N.D. Cal. 1997). The Fovia parties contend that Rule 8(a), not Rule 9(b), applies to intentional interference claims and, thus, they have meet their pleading requirements. Citing a case from a Florida District Court, the Fovia parties state that Rule 9(b)'s heightened pleading requirement is limited to claims of common law and statutory fraud. See Lockheed Martin Corp. v. Boeing Co., 2005 U.S. Dist. LEXIS 15365, 2005 WL 729685, *2 (M.D. Fla. [*21] Mar. 21, 2005). That is incorrect. As discussed above, even where fraud is not a necessary element of a claim, where a party alleges that the other party engaged in some fraudulent and some non-fraudulent conduct, the allegations of fraud must be plead with particularity or be disregarded. Vess, 317 F.3d at 1103-04.

In Meridian Project Systems, Inc. v. Hardin Construction Co., 404 F. Supp. 2d 1214, 1220 (E.D. Cal. 2005), the defendant brought a counterclaim for intentional interference with prospective economic advantage based on the plaintiff's alleged misrepresentations to prospective customers that it had infringed the plaintiff's copyright. The court found that, while fraud was not an element of an intentional interference with prospective economic advantage claim, the counterclaim had alleged that the counterdefendant engaged in fraudulent conduct, i.e., the allegedly false statement that the counterclaimant violated the counterdefendant's copyright. Thus, the court applied Rule 9(b) to the allegations that the counterdefendant made intentional misrepresentations. Some of the allegations passed muster under Rule 9(b) "because they described [*22] the who, what, where, when and how of the alleged misrepresentations." Id. at 1220. The allegations that did not satisfy the requirements of Rule 9(b) were disregarded in determining whether a claim was stated.

Without the intentional misrepresentation allegations that do not meet the specificity requirements of Rule 9(b), the Fovia parties allege that the TeraRecon parties interfered with their business relationships through "improper means." Although the Rules do not require the Fovia parties to describe in detail these "improper means," they must provide the TeraRecon parties fair notice of what their claim is and the grounds on which it rests. They do not. Therefore, the third counterclaim is also dismissed with leave to amend.

C. Negligent Interference with Prospective Economic Advantage

The Fovia parties amended their fourth claim to delete Saito and Taylor and to add specific allegations of negligence. As they note, however, this claim also alleges that TeraRecon made misleading statements to prospective customers, in addition to misrepresenting its rights relating to the engine. Those allegations, like the similar allegations discussed above, are not plead [*23] with the specificity required by Rule 9(b) and thus must be disregarded. See Vess, 317 F.3d at 1105. Without those allegations, the counterclaim only states that TeraRecon has negligently interfered with Fovia and Fovia Medical's prospective business relationships. Conclusory allegations are insufficient to defeat a motion to dismiss for failure to state a claim. Epstein v. Wash. Energy Co., 83 F.3d 1136, 1140 (9th Cir. 1996). Thus, the fourth counterclaim is also dismissed with leave to amend.

II. Motion for leave to amend complaint

Plaintiff TeraRecon seeks leave to file its proposed second amended complaint. The proposed second amended complaint would add new claims for relief, amend claims for relief already plead and omit some claims against one of the defendants. According to Plaintiff TeraRecon, the proposed second amended complaint also corrects certain errors and clarifies ambiguous language.

Recognizing the liberal policy favoring amendment under Rule 15, Defendants state that they do not object to Plaintiff TeraRecon's amended factual allegations. Nor do Defendants object to Plaintiff TeraRecon's proposed amended claims for declaratory [*24] relief and interference with prospective economic advantage. But Defendants contend that the conversion claim is futile and that the trade secrets misappropriation, section 17200 and contract claims are futile in part; thus, Defendants argue that Plaintiff TeraRecon's motion for leave to amend should be denied in part.

The Supreme Court has identified four factors relevant to whether a motion for leave to amend should be denied: undue delay, bad faith or dilatory motive, futility of amendment and prejudice to the opposing party. Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). Here, only futility is at issue. As Defendants note, "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995). The Ninth Circuit instructs that "a proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988); see also SAES

_Getters S.p.A. v. Aeronex, Inc.,_ 219 F. Supp. 2d 1081, 1086 (S.D. Cal. 2002) [*25] ("an amendment is 'futile' only if it would clearly be subject to dismissal").

A. Conversion

Plaintiff TeraRecon seeks to allege that Defendants unlawfully converted its property rights in its trade secrets. It defines its trade secrets as including the computer code, confidential information concerning its customers and potential customers, business plans and other corporate planning documents, and products plans. Defendants argue that Plaintiff TeraRecon's proposed conversion claim is futile for three reasons: (1) conversion does not apply to intellectual or intangible property; (2) the claim is preempted by the Copyright Act; and (3) the claim is preempted by California's Trade Secret Act.

1. Intangible property

Citing _Olschewski v. Hudson,_ 87 Cal. App. 282, 286, 262 P. 43 (1927), Defendants contend that the tort of conversion applies only to tangible, certain and definite property. The Ninth Circuit, however, has found otherwise. _Kremen v. Cohen,_ 337 F.3d 1024 (9th Cir. 2003). As Defendants acknowledge, the court in _Kremen_ found that a claim for conversion of an internet domain name can be brought under California law. Defendants assert that the court's [*26] holding was limited to its finding that a domain name could be unlawfully converted because it was a well-defined interest and because the connection between the domain names and an electronic domain name server database was sufficient to satisfy any merger requirement under California law. The court's holding in _Kremen,_ however, was not so limited. After a detailed analysis of conversion of intangibles, the court concluded:

> In short, California does not follow the Restatement's strict requirement that some document must actually represent the owner's intangible property right. On the contrary, courts routinely apply the tort to intangibles without inquiring whether they are merged in a document and, while it's often possible to dream up some document the intangible is connected to in some fashion, it's seldom one that represents the owner's property interest. To the extent _Olschewski_ endorses the strict merger rule, it is against the weight of authority. That rule cannot be squared with a jurisprudence that recognizes conversion of music recordings, radio shows, customer lists, regulatory filings, confidential information and even domain names. . . . Assuming _arguendo_ [*27] that California

retains some vestigial merger requirement, it is clearly minimal, and at most requires only some connection to a document or tangible object.

_Id._ at 1033. Here, Plaintiff TeraRecon meets that minimal requirement; Plaintiff TeraRecon's computer code, confidential information concerning its contracts with customers, business plans and product plan are reflected in or have the necessary connection to paper and electronic documents.

Furthermore, as Plaintiff TeraRecon notes, _Kremen_ is not the only case to distinguish _Olschewski,_ the main case Defendants rely upon. In _Palm Springs-La Quinta Development Co. v. Kieberk Corp.,_ 46 Cal. App. 2d 234, 115 P.2d 548 (1941), the court upheld a conversation claim for intangible information in a customer list when some of the index cards on which the information was recorded were destroyed, allowing damages for both the value of the cards and the value of the intangible information lost. The court explained that the defendant in _Olschewski_ "was charged with selling the good-will of a business in a specified district" and that the court "merely held that was an intangible property right which [*28] is not susceptible of conversion." 46 Cal. App. 2d at 240.

Defendants' argument that Plaintiff TeraRecon's conversion claim is futile because conversion does not apply to intellectual or intangible property fails.

2. Preemption by copyright law

As discussed above, a State law claim is preempted by federal copyright law unless it contains an additional element that changes the nature of the action so that it is qualitatively different from a copyright infringement claim. Defendants contend that Plaintiff TeraRecon's conversion claim is directed to the copying or use of the computer code, which is protected by the Copyright Act, and thus it is preempted. Plaintiff TeraRecon's conversion claim, however, encompasses more than just its computer code. As mentioned above, Plaintiff TeraRecon alleges that Defendants have also converted its business plans and customer information, materials that are outside the scope of the Copyright Act. The Court finds that Plaintiff TeraRecon has sufficiently alleged the additional elements of its conversion claim to defeat Defendants' preemption argument.

Defendants' argument that Plaintiff TeraRecon's conversion claim is futile because [*29] it is preempted by copyright law also fails.

3. Preemption by California's Trade Secret Statute
Defendants argue that to the extent it is premised on the

use of any trade secret information, Plaintiff TeraRecon's proposed conversion claim is precluded by California's trade secret statute, which preempts all common law claims that are based on misappropriation of a trade secret. *See Digital Envoy, Inc. v. Google, Inc., 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005).* Plaintiff TeraRecon notes that it did not incorporate by reference its allegation that its proprietary materials are trade secrets in its proposed claim for conversion and that, for this claim, it does not allege such. Plaintiff TeraRecon states that this is an alternative theory, which it is allowed to plead.

Defendants' argument that Plaintiff TeraRecon's conversion claim is futile because it is preempted by California's Trade Secret Act also fails. The Court concludes that Plaintiff TeraRecon's claim for conversion is not futile.

### B. Breach of Contract Claim

Plaintiff TeraRecon states that its proposed amendments to its breach of contract claims clarify those claims by asserting separate claims [*30] against separate Defendants. Defendants respond that they do not seek to prevent amendment of Plaintiff TeraRecon's proposed breach of contract claims insofar as they allege that Buyanovsky, Fineman, Katen and Okulist were prohibited from using or disclosing Plaintiff TeraRecon's trade secrets after termination of their employment. Nor do Defendants object to the amendments to the extent that they focus solely on the use of trade secrets to solicit Plaintiff TeraRecon's customers. But, to the extent Plaintiff TeraRecon alleges that the individual Defendants breached their agreements with Plaintiff TeraRecon by competing against Plaintiff TeraRecon, Defendants contend that those claims are barred by <u>California Business and Professions Code § 16600</u>, which provides that a contract "by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Defendants argue that Plaintiff TeraRecon fails to restrict its claims exclusively to those based on the use of trade secrets, and, because those restrictions are not explicitly incorporated into the amendments, the amendments are futile.

As Plaintiff TeraRecon [*31] notes, however, its proposed amended pleading clarifies that it is not alleging breach based solely on Defendants' competition with Plaintiff TeraRecon. Nowhere in the amended claims does Plaintiff TeraRecon allege that Defendants breached their employment contracts by competing with Plaintiff TeraRecon after leaving Plaintiff TeraRecon's employ. Furthermore, Defendants provide no authority to support their argument that "legal restrictions must be explicitly incorporated into the amendments or the amendments are futile." The Court finds that Plaintiff

TeraRecon's amended breach of contract claims are not futile.

### C. Trade Secrets Misappropriation Claim

Plaintiff TeraRecon's first amended complaint alleged trade secrets, "including but not limited to, the Computer Code." Plaintiff TeraRecon now seeks to amend its complaint to allege that its trade secrets include "Computer Code; confidential information concerning TeraRecon's customers and potential customers, including TeraRecon's contractual relations with GEMS IT, Siemens, and others; business plans and other corporate planning documents; and product plans."

Defendants contend that Plaintiff TeraRecon's amendment would be futile [*32] because it adds new trade secrets claims that are time-barred. As discussed above, a claim is barred by the statute of limitations as a matter of law if it is untimely on the face of the pleadings. The statute of limitations for a claim under California's Trade Secret Act is three years. <u>Cal. Civ. Code § 3426.6.</u> According to Defendants, the complaint alleges that the statute of limitations began to run in January, 2003, when Fineman resigned, allegedly taking Plaintiff TeraRecon's laptop, containing its trade secrets, with him. Plaintiff TeraRecon's original complaint, filed in 2005 before the statute of limitations expired, mentioned only the computer code and not any other trade secrets. Now, after three years have passed, Plaintiff TeraRecon attempts to add other trade secrets.

As Plaintiff TeraRecon notes, however, Defendants' argument fails to address the relation back doctrine addressed in Plaintiff TeraRecon's motion for leave to amend. There is no dispute that these amended claims arise "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." <u>Fed. R. Civ. P. 15(c)</u> [*33] . Therefore, the amendments relate back to the date of the original complaint. *See, e.g., <u>Kern Oil & Refining Co. v. Tenneco Oil Co., 840 F.2d 730 (9th Cir. 1988).</u>* Even if these are new trade secrets, as Defendants contend, these added claims would not be time-barred.

The Court finds that Plaintiff TeraRecon's amended trade secrets misappropriation claim would not be futile.

### D. § 17200 Claim

Plaintiff TeraRecon seeks to eliminate the "pattern" language, which is not required by § 17200, and to incorporate by reference the general allegations of trade secret misappropriation. Defendants state that they do not object to the proposed amended claim to the extent that it is based solely on an alleged breach of fiduciary duty. But, to the extent that Plaintiff TeraRecon's proposed amendment to its § 17200 claim relies on factual

allegations of copyright infringement or trade secret mis-appropriation, Defendants contend that the claim is pre-empted by both federal copyright law and California's trade secret law. That may be; however, that does not make Plaintiff TeraRecon's amendment futile. As stated above, denial of an amendment as futile is appropriate only if no [*34] set of facts can be proved under the amendment which would constitute a valid claim. *Miller, 845 F.2d at 214*. Plaintiff TeraRecon states that Defendants have committed acts, alleged in the complaint, that violate California's Unfair Competition Law. As long as one of those alleged acts is not preempted, then Plaintiff TeraRecon's amendment to this claim is not futile. Because not all of the alleged acts are preempted, the Court finds that Plaintiff TeraRecon's amended § 17200 claim is not futile. ·

CONCLUSION

For the foregoing reasons, the Court GRANTS the TeraRecon parties' motion to dismiss counterclaims (Docket No. 23). The Fovia parties' second, third and fourth claims for relief are dismissed with leave to amend. They must file their second amended counter-claims within fourteen days from the date of this order. Plaintiff TeraRecon's motion for leave to amend its complaint (Docket No. 27) is also GRANTED.

IT IS SO ORDERED.

Dated: July 6, 2006

CLAUDIA WILKEN

United States District Judge

# EXHIBIT C

## TO THE APPENDIX OF NON-FEDERAL AND UNPUBLISHED AUTHORITIES CITED IN COUPON'S OPPOSITION TO STOTTLEMIRE'S MOTION TO DISMISS

LEXSEE


Caution
As of: Apr 03, 2008

**INTEL CORPORATION, Plaintiff and Respondent, v. KOUROSH KENNETH HAMIDI, Defendant and Appellant.**

**No. S103781.**

**SUPREME COURT OF CALIFORNIA**

**30 Cal. 4th 1342; 71 P.3d 296; 1 Cal. Rptr. 3d 32; 2003 Cal. LEXIS 4205; 20 I.E.R. Cas. (BNA) 65; 148 Lab. Cas. (CCH) P59,756; 2003 Cal. Daily Op. Service 5711; 2003 Daily Journal DAR 7181**

**June 30, 2003, Decided**
**June 30, 2003, Filed**

**PRIOR HISTORY:** Superior Court of Sacramento County, No. 98AS05067, John R. Lewis, Judge.
Intel Corp. v. Hamidi, 94 Cal. App. 4th 325, 114 Cal. Rptr. 2d 244, 2001 Cal. App. LEXIS 3107 (Cal. App. 3d Dist., 2001)

**DISPOSITION:** The judgment of the Court of Appeal is reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company sued defendant, a former employee, claiming that by communicating with its employees over its electronic mail (e-mail) system defendant committed the tort of trespass to chattels. The trial court granted the company's motion for summary judgment and enjoined defendant from any further mailings. The Court of Appeal, Third District, California, affirmed. The instant court granted defendant's petition for review.

**OVERVIEW:** On six occasions over almost two years, defendant sent e-mails criticizing the company's employment practices to numerous current employees on the company's e-mail system. Defendant breached no computer security barriers in order to communicate with the company's employees. He offered to, and did, remove from his mailing list any recipient who so wished. Defendant's communications caused neither physical damage nor functional disruption to the company's com-

puters, nor did they deprive the company of the use of its computers. The contents of the messages, however, caused discussion among employees and managers. The instant court concluded that the company did not present undisputed facts demonstrating an injury to its personal property, or to its legal interest in that property, that supported, under California tort law, an action for trespass to chattels. Regarding constitutional considerations, the principal of a right not to listen, founded in personal autonomy, could not justify the sweeping injunction issued against all communication to the company's addresses, for such a right, logically, could be exercised only by, or at the behest of, the recipient himself or herself.

**OUTCOME:** The judgment of the court of appeal was reversed.

**CORE TERMS:** trespass, chattel, message, e-mail, computer system, unwanted, electronic, injunction, internet, personal property, mail, actionable, possessor's, recipient, site, web, server, injunctive relief, unsolicited, mailing, network, unauthorized, sending, italics, bulk, cause of action, functioning, impairment, spam, intermeddling

**LexisNexis(R) Headnotes**

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

*Torts > Intentional Torts > Conversion > General Overview*
[HN1]Under California law, the tort of trespass to chattels does not encompass, and should not be extended to encompass, an electronic communication that neither damages the recipient computer system nor impairs its functioning. Such an electronic communication does not constitute an actionable trespass to personal property, i.e., the computer system, because it does not interfere with the possessor's use or possession of, or any other legally protected interest in, the personal property itself.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2]The reviewing court reviews a grant of summary judgment de novo; the reviewing court must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. Cal. Code Civ. Proc. § 437c(c).

*Torts > Intentional Torts > Conversion > Elements*
[HN3]The tort of trespass to chattels allows recovery for interferences with possession of personal property not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered.

*Torts > Damages > Compensatory Damages > Property Damage > Loss of Use*
*Torts > Intentional Torts > Conversion > Elements*
*Torts > Intentional Torts > Conversion > Remedies*
[HN4]Though not amounting to conversion, the defendant's interference must, to be actionable as a trespass to chattels, have caused some injury to the chattel or to the plaintiff's rights in it. Under California law, trespass to chattels lies where an intentional interference with the possession of personal property has proximately caused injury. In cases of interference with possession of personal property not amounting to conversion, the owner has a cause of action for trespass or case, and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use. In modern American law generally, trespass remains as an occasional remedy for minor interferences, resulting in some damage, but not sufficiently serious or sufficiently important to amount to the greater tort of conversion.

*Torts > Intentional Torts > Conversion > General Overview*
[HN5]Dispossession alone, without further damages, is actionable as a trespass to chattels, but other forms of interference require some additional harm to the personal property or the possessor's interests in it. The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected. Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference.

*Torts > Intentional Torts > Conversion > Elements*
[HN6]While a harmless use or touching of personal property may be a technical trespass to chattels, an interference (not amounting to dispossession) is not actionable, under modern California and broader American law, without a showing of harm.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Torts > Premises Liability & Property > Trespass > Elements*
[HN7]In order to obtain injunctive relief, the plaintiff must ordinarily show that the defendant's wrongful acts threaten to cause irreparable injuries, ones that cannot be adequately compensated in damages.

*Torts > Intentional Torts > Conversion > General Overview*
[HN8]While one may have no right temporarily to use another's personal property, such use is actionable as a trespass only if it "has proximately caused injury." In the absence of any actual damage the action will not lie. Short of dispossession, personal injury, or physical damage, intermeddling is actionable only if the chattel is impaired as to its condition, quality, or value, or the possessor is deprived of the use of the chattel for a substantial time. In particular, an actionable deprivation of use must be for a time so substantial that it is possible to estimate

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

the loss caused thereby. A mere momentary or theoretical deprivation of use is not sufficient unless there is a dispossession.

*Torts > Intentional Torts > Conversion > General Overview*
[HN9]Employees are not chattels (at least not in the legal sense of the term).

*Real Property Law > Torts > Nuisance > Defenses > General Overview*
*Real Property Law > Torts > Trespass to Real Property*
*Torts > Premises Liability & Property > Trespass > Defenses > General Overview*
[HN10]Under California law, intangible intrusions on land, including electromagnetic transmissions, are not actionable as trespasses (though they may be as nuisances) unless they cause physical damage to the real property.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN11]While a private refusal to transmit another's electronic speech generally does not implicate the First Amendment, because no governmental action is involved, the use of government power, whether in enforcement of a statute or ordinance or by an award of damages or an injunction in a private lawsuit, is state action that must comply with First Amendment limits.

SUMMARY:

CALIFORNIA OFFICIAL REPORTS SUMMARY

A computer company brought an action against a former employee seeking an injunction to prevent him from sending further e-mails to plaintiff's employees. Defendant had used plaintiff's internal e-mail system, which was connected to the Internet, to send e-mails to between 8,000 and 35,000 employees on six specific occasions, and he refused to stop when plaintiff requested that he do so. The trial court granted summary judgment for plaintiff and issued a permanent injunction on a theory of trespass to chattels. (Superior Court of Sacramento County, No. 98ASO5067, John R. Lewis, Judge.) The Court of Appeal, Third Dist., No. CO33076, affirmed.

The Supreme Court reversed the judgment of the Court of Appeal. The court held that the tort of trespass to chattels does not encompass, and should not be extended to encompass, defendant's electronic communications, which neither damaged nor impaired the function-

ing of plaintiff's computer system. In the absence of any actual damage, a cause of action for trespass to chattels will not lie; a mere momentary or theoretical deprivation of use is not sufficient unless there is a dispossession. Thus, plaintiff's complaint was about the content of defendant's messages rather than the functioning of the company's e-mail system. Further, the consequential economic damage that plaintiff claimed to have suffered, i.e., the loss of productivity caused by plaintiff's employees reading and reacting to defendant's messages and plaintiff's efforts to block the messages, did not constitute an actionable trespass to plaintiff's personal property. (Opinion by Werdegar, J., with Kennard and Moreno, JJ., and Perren, J.,* concurring. Concurring opinion by Kennard, J. (see p. 1366). Dissenting opinion by Brown, J. (see p. 1367). Dissenting opinion by Mosk, J., with George, C.J., concurring (see p. 1385).)

* Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
+ Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

HEADNOTES

CALIFORNIA        OFFICIAL        REPORTS
HEADNOTES
Classified by California Digest of Official Reports

(1)Summary Judgment § 26--Appellate Review--Scope. --An appellate court reviews a trial court's grant of summary judgment de novo. The reviewing court must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.

(2)Trespass § 3--Trespass to Chattels--Elements--Requirement of Actual Damage--Request for Injunctive Relief. --To constitute a trespass to chattels, there must be an interference that proximately causes some injury to the chattel or the plaintiffs rights to it. The owner may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use. Some actual injury must have occurred in order for a trespass to chattels to be actionable. Sufficient legal protection of the possessor's interest in the mere inviolability of his or her chattel is afforded by his or her privilege to use reasonable force to protect possession against even harmless interference. While a harmless use or touching of personal property may be a technical trespass, an interference, not amounting to dispossession, is

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

not actionable without a showing of harm. Further, the fact that the relief sought is injunctive does not excuse a showing of injury, whether actual or threatened; in order to obtain injunctive relief, the plaintiff must show that the defendant's wrongful acts threaten to cause irreparable injuries, one that cannot be adequately compensated in damages.

**(3)Trespass § 9--Actions--Pleading-Request for Injunctive Relief--Required Showing.** --In actions for trespass to real property, in which damage to the property is not an element of the cause of action, the extraordinary remedy of injunction cannot be invoked without showing the likelihood of irreparable harm.

**(4a)(4b)(4c)(4d)Telecommunications § 5--Actions-- Computer Company Seeking Injunction to Prevent Former Employee from Using Internal E-mail System Under Theory of Trespass to Chattels: Trespass § 3-- Personal Property.** --In an action brought by a computer company to prevent a former employee from sending e-mails to plaintiff's employees, the trial court erred in issuing a permanent injunction on a theory of trespass to chattels. Defendant had used plaintiff's internal e-mail system, which was connected to the Internet, to send e-mails to between 8,000 and 35,000 employees on six specific occasions. The tort of trespass to chattels does not encompass, and should not be extended to encompass, defendant's electronic communications, which neither damaged nor impaired the functioning of plaintiff's computer system. In the absence of any actual damage, a cause of action for trespass to chattels will not lie; a mere momentary or theoretical deprivation of use is not sufficient unless there is a dispossession. The evidence also failed to show that a request by any of plaintiff's employees to be removed from defendant's mailing list was not honored. Thus, plaintiffs complaint was about the content of defendant's messages rather than the functioning of the company's e-mail system. Further, the consequential economic damage that plaintiff claimed to have suffered, i.e., the loss of productivity caused by plaintiff's employees reading and reacting to defendant's messages and plaintiff's efforts to block the messages, did not constitute an actionable trespass to plaintiff's personal property. Finally, the constitutional right to personal autonomy could not justify the trial court's sweeping injunction, since that is a right that may only be exercised by the individual recipient of the communication.

**(5)Telecommunications § 12-Telephones--Actions-- Automated Searching of Telephone Carriers System for Authorization Codes as Trespass to Chattels: Trespass § 3--Personal Property.** --Evidence of automated searching of a telephone carrier's system for authorization codes supported a cause of action for trespass

to chattels. The requisite injury for maintenance of this cause of action was demonstrated by the fact that the defendant's automated dialing program overburdened the plaintiff's system, denying some subscribers access to phone lines.

**(6)Telecommunications § 5--Actions--Sending Spam Through Internet Service Provider's Equipment and Unauthorized Robotic Data Collection as Trespass to Chattels: Trespass § 3--Personal Property.** --Sending unsolicited commercial bulk e-mail, also known as spam, through an Internet service provider's equipment may constitute trespass. In order to demonstrate trespass to chattels, the plaintiff must show some injury, i.e., some interference with the efficient functioning of its computer equipment. Unauthorized robotic data collection from a company's Internet Web site may also be a trespass on the company's computer system, when this activity has a deleterious impact on the functioning of the Web site's computer system. A basic element of trespass to chattels must be physical harm to the chattel or some obstruction of its basic function.

**(7)Trespass § 9-Actions--Pleading--Necessity of Alleging Physical Damage--Electromagnetic Transmissions.** --Intangible intrusions on land, including electromagnetic transmissions, are not actionable as trespasses (though they may be as nuisances) unless they cause physical damage to the real property.

**(8)Constitutional Law § 59--First Amendment-- Freedom of Speech--Governmental Regulation-- Exercise of Government's Power Through Judicial Action.** --While a private refusal to transmit another's electronic speech generally does not implicate the constitutional right to freedom of speech (U.S. Const., 1st Amend.), because no governmental action is involved, the use of government power, whether in enforcement of a statute or ordinance or by an award of damages or an injunction in a private lawsuit, is state action that must comply with First Amendment limits.

COUNSEL: Philip H. Weber; Dechert, William M. McSwain, Richard L. Berkman, F. Gregory Lastowka; Levy, Ram & Olson, Karl Olson and Erica L. Craven for Defendant and Appellant.

Mark A. Lemley and Deirdre K. Mulligan for Professors of Intellectual Property and Computer Law as Amicus Curiae on behalf of Defendant and Appellant.

Lee Tien and Deborah Pierce for Electronic Frontier Foundation as Amicus Curiae on behalf of Defendant and Appellant.

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

Jennifer Stisa Granick for the Stanford Law School Center for Internet and Society as Amicus Curiae on behalf of Defendant and Appellant.

Ann Brick and Christopher A. Hansen for American Civil Liberties Union Foundation of Northern California, Inc., and American Civil Liberties Union Foundation as Amici Curiae on behalf of Defendant and Appellant.

Robert M. O'Neil and J. Joshua Wheeler for The Thomas Jefferson Center for the Protection of Free Expression as Amicus Curiae on behalf of Defendant and Appellant.

Atshuler, Berzon, Nussbaum, Rubin & Demain, Stephen P. Berzon, Scott A. Kronland and Stacey M. Leyton for the Service Employees International Union, AFL-CIO as Amicus Curiae on behalf of Defendant and Appellant.

Morrison & Foerster, Linda E. Shostak, Michael A. Jacobs, Kurt E. Springmann and Paul A. Friedman for Plaintiff and Respondent.

Steptoe & Johnson, Stewart A. Baker and W. Chelsea Chen for the US Internet Service Provider Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Richard A. Epstein for California Employment Law Council, California Manufacturers & Technology Association, eBay, Inc., Information Technology Industry Council, National Association of Manufacturers, Semiconductor Industry Association and Silicon Valley Manufacturing Group as Amici Curiae on behalf of Plaintiff and Respondent.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Proskauer Rose, Mark Theodore, Arthur F. Silbergeld, Niloofar Nejat-Bina and Adam C. Abrahms for Labor Policy Association, Inc., United States Chamber of Commerce and California Chamber of Commerce as Amici Curiae on behalf of Plaintiff and Respondent.

**JUDGES:** (Opinion by Werdegar, J., with Kennard and Moreno, JJ., and Perren, J., [*] concurring. Concurring opinion by Kennard, J. (see p. 1366). Dissenting opinion by Brown, J. (see p. 1367). Dissenting opinion by Mosk, J., [*] with George, C. J., concurring (see p. 1385).)

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**OPINION BY:** WERDEGAR--

**OPINION**

[***36] [*1346] **WERDEGAR, J.**

[**299] Intel Corporation (Intel) maintains an electronic mail system, connected to the Internet, through which messages between employees and those outside the company can be sent and received, and permits its employees to make reasonable nonbusiness use of this system. On six occasions over almost two years, Kourosh Kenneth Hamidi, a former Intel employee, sent e-mails criticizing Intel's employment practices to numerous current employees on Intel's electronic mail system. Hamidi breached no computer security barriers in order to communicate with Intel employees. He offered to, and did, remove from his mailing list any recipient who so wished. Hamidi's communications to individual Intel employees caused neither physical damage nor functional disruption to the company's computers, nor did they at any time deprive Intel of the use of its computers. The contents of the messages, however, caused discussion among employees and managers.

On these facts, Intel brought suit, claiming that by communicating with its employees over the company's e-mail system Hamidi committed the tort of [*1347] trespass to chattels. [**300] The trial court granted Intel's motion for summary judgment and enjoined Hamidi from any further mailings. A divided Court of Appeal affirmed.

After reviewing the decisions analyzing unauthorized electronic contact with computer systems as potential trespasses to chattels, we conclude that [HN1] under California law the tort does not encompass, and should not be extended to encompass, an electronic communication that neither damages the recipient computer system nor impairs its functioning. Such an electronic communication does not constitute an actionable trespass to personal property, i.e., the computer system, because it does not interfere with the possessor's use or possession of, or any other legally protected interest in, the personal property itself. (See _Zaslow v. Kroenert_ (1946) 29 Cal.2d 541, 551 [176 P.2d 1]; _Ticketmaster Corp. v. Tickets.com, Inc._ (C.D.Cal., Aug. 10, 2000, No. 99CV7654) 2000 U.S. Dist. LEXIS 12987 at *17, 2000 WL 1887522, p. *4; Rest.2d Torts, § 218.) The consequential economic damage Intel claims to have suffered, i.e., loss of productivity caused by employees reading and reacting to Hamidi's messages and company efforts to block

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

the messages, is not an injury to the company's interest in its computers--which worked as intended and were unharmed by the communications--any more than the personal distress caused by reading an unpleasant letter would be an injury to the recipient's mailbox, or the loss of privacy caused by an intrusive telephone call would be an injury to the recipient's telephone equipment.

Our conclusion does not rest on any special immunity for communications by electronic mail; we do not hold that [***37] messages transmitted through the Internet are exempt from the ordinary rules of tort liability. To the contrary, e-mail, like other forms of communication, may in some circumstances cause legally cognizable injury to the recipient or to third parties and may be actionable under various common law or statutory theories. Indeed, on facts somewhat similar to those here, a company or its employees might be able to plead causes of action for interference with prospective economic relations (see _Guillory v. Godfrey_ (1955) 134 Cal. App. 2d 628, 630-632 [286 P.2d 474] [defendant berated customers and prospective customers of plaintiffs' cafe with disparaging and racist comments]), interference with contract (see _Blender v. Superior Court_ (1942) 55 Cal. App. 2d 24, 25-27 [130 P.2d 179] [defendant made false statements about plaintiff to his employer, resulting in plaintiff's discharge]) or intentional infliction of emotional distress (see _Kiseskey v. Carpenters' Trust for So. California_ (1983) 144 Cal. App. 3d 222, 229-230 [192 Cal. Rptr. 492] [agents of defendant union threatened life, health, and family of employer if he did not sign agreement with union].) And, of course, as with any other means of publication, third party subjects of e-mail communications may under appropriate facts make claims for [*1348] defamation, publication of private facts, or other speech-based torts. (See, e.g., _Southridge Capital Management v. Lowry_ (S.D.N.Y. 2002) 188 F. Supp. 2d 388, 394-396 [allegedly false statements in e-mail sent to several of plaintiff's clients support actions for defamation and interference with contract].) Intel's claim fails not because e-mail transmitted through the Internet enjoys unique immunity, but because the trespass to chattels tort--unlike the causes of action just mentioned--may not, in California, be proved without evidence of an injury to the plaintiff's personal property or legal interest therein.

Nor does our holding affect the legal remedies of Internet service providers (ISP's) against senders of unsolicited commercial bulk e-mail (UCE), also known as "spam." (See _Ferguson v. Friendfinders, Inc._ (2002) 94 Cal.App.4th 1255, 1267 [115 Cal. Rptr. 2d 258].) A series of federal district court decisions, beginning with _CompuServe, Inc. v. Cyber Promotions, Inc._ (S.D.Ohio 1997) 962 F. Supp. 1015, has approved the use of trespass to chattels as a theory of spammers' liability to

ISP's, based upon evidence that the vast quantities of mail sent by spammers both overburdened the ISP's own computers and made the entire computer system harder to use for recipients, the ISP's customers. (See _id._ at pp. 1022-1023.) In those cases, discussed in greater detail below, the underlying complaint was that the extraordinary _quantity_ of UCE impaired the computer system's functioning. In the present case, the claimed injury is located in the disruption [**301] or distraction caused to recipients by the _contents_ of the e-mail messages, an injury entirely separate from, and not directly affecting, the possession or value of personal property.

FACTUAL     AND     PROCEDURAL
BACKGROUND

(1) [HN2]We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. ( _Galanty v. Paul Revere Life Ins. Co._ (2000) 23 Cal.4th 368, 374 [97 Cal. Rptr. 2d 67, 1 P.3d 658]; _Norgart v. Upjohn Co._ (1999) 21 Cal.4th 383, 404 [87 Cal. Rptr. 2d 453, 981 P.2d 79]; Code Civ. Proc., § 437c, subd. (c).) The pertinent undisputed facts are as follows.

Hamidi, a former Intel engineer, together with others, formed an organization named Former and Current Employees of [***38] Intel (FACE-Intel) to disseminate information and views critical of Intel's employment and personnel policies and practices. FACE-Intel maintained a Web site (which identified Hamidi as Webmaster and as the organization's spokesperson) containing such material. In addition, over a 21-month period Hamidi, on [*1349] behalf of FACE-Intel, sent six mass e-mails to employee addresses on Intel's electronic mail system. The messages criticized Intel's employment practices, warned employees of the dangers those practices posed to their careers, suggested employees consider moving to other companies, solicited employees' participation in FACE-Intel, and urged employees to inform themselves further by visiting FACE-Intel's Web site. The messages stated that recipients could, by notifying the sender of their wishes, be removed from FACE-Intel's mailing list; Hamidi did not subsequently send messages to anyone who requested removal.

Each message was sent to thousands of addresses (as many as 35,000 according to FACE-Intel's Web site), though some messages were blocked by Intel before reaching employees. Intel's attempt to block internal transmission of the messages succeeded only in part; Hamidi later admitted he evaded blocking efforts by using different sending computers. When Intel, in March 1998, demanded in writing that Hamidi and FACE-Intel stop sending e-mails to Intel's computer system, Hamidi asserted the organization had a right to communicate

with willing Intel employees; he sent a new mass mailing in September 1998.

The summary judgment record contains no evidence Hamidi breached Intel's computer security in order to obtain the recipient addresses for his messages; indeed, internal Intel memoranda show the company's management concluded no security breach had occurred. [1] Hamidi stated he created the recipient address list using an Intel directory on a floppy disk anonymously sent to him. Nor is there any evidence that the receipt or internal distribution of Hamidi's electronic messages damaged Intel's computer system or slowed or impaired its functioning. Intel did present uncontradicted evidence, however, that many employee recipients asked a company official to stop the messages and that staff time was consumed in attempts to block further messages from FACE-Intel. According to the FACE-Intel Web site, moreover, the messages had prompted discussions between "[e]xcited and nervous managers" and the company's human resources department.

1    To the extent, therefore, that Justice Mosk suggests Hamidi breached the security of Intel's internal computer network by "circumvent[ing]" Intel's "security measures" and entering the company's "intranet" (dis. opn. of Mosk, J., *post*, at p. 1386), the evidence does not support such an implication. An "intranet" is "a network based on TCP/IP protocols (an internet) belonging to an organization, usually a corporation, accessible only by the organization's members, employees, or others with authorization." ( [as of June 30, 2003].) Hamidi used only a part of Intel's computer network accessible to outsiders.

Intel sued Hamidi and FACE-Intel, pleading causes of action for trespass to chattels and nuisance, and seeking both actual damages and an injunction    [*1350] against further e-mail messages. Intel later voluntarily dismissed its nuisance claim and waived its demand for damages. The trial court entered default against FACE-Intel upon that organization's failure to answer. The court then granted [**302] Intel's motion for summary judgment, permanently enjoining Hamidi, FACE-Intel, and their agents "from sending unsolicited e-mail to addresses on Intel's computer systems." Hamidi appealed; FACE-Intel did not. [2]

2    For the first time, in this court, Intel argues Hamidi's appeal is moot because, as FACE-Intel's agent, Hamidi is bound, whatever the outcome of his own appeal, by the unappealed injunction against FACE-Intel. But as Hamidi points out in response, he could avoid the unappealed injunc-

tion simply by resigning from FACE-Intel; his own appeal is therefore not moot.

[***39] The Court of Appeal, with one justice dissenting, affirmed the grant of injunctive relief. The majority took the view that the use of or intermeddling with another's personal property is actionable as a trespass to chattels without proof of any actual injury to the personal property; even if Intel could not show any damages resulting from Hamidi's sending of messages, "it showed he was disrupting its business by using its property and therefore is entitled to injunctive relief based on a theory of trespass to chattels." The dissenting justice warned that the majority's application of the trespass to chattels tort to "unsolicited electronic mail that causes no harm to the private computer system that receives it" would "expand the tort of trespass to chattel in untold ways and to unanticipated circumstances."

We granted Hamidi's petition for review. [3]

3    We grant both parties' requests for notice of legislative history materials relating to California laws on spam and on injunctions in labor dispute cases. Hamidi's further request for notice of the "undisputed" fact that "e-mail messages that travel into computer equipment consist of electromagnetic waves" is denied as irrelevant.

DISCUSSION

I. *Current California Tort Law*

(2) Dubbed by Prosser the "little brother of conversion," [HN3]the tort of trespass to chattels allows recovery for interferences with possession of personal property "not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered." (Prosser & Keeton, Torts (5th ed. 1984) § 14, pp. 85-86.)

[HN4]Though not amounting to conversion, the defendant's interference must, to be actionable, have caused some injury to the chattel or to the plaintiff's rights in it. Under California law, trespass to chattels "lies where an intentional interference with the possession of personal property *has proximately* [*1351] *caused injury.*" ( *Thrifty-Tel, Inc. v. Bezenek (1996) 46 Cal.App.4th 1559, 1566 [54 Cal. Rptr. 2d 468]*, italics added.) In cases of interference with possession of personal property not amounting to conversion, "the owner has a cause of action for trespass or case, *and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use.*" ( *Zaslow v. Kroenert, supra, 29 Cal.2d at p. 551* , italics added; accord, *Jordan v. Talbot (1961) 55 Cal.2d 597, 610 [12 Cal. Rptr. 488, 361 P.2d 20]*.) In modern American law generally, "[t]respass remains as an occasional remedy for minor

interferences, *resulting in some damage,* but not sufficiently serious or sufficiently important to amount to the greater tort" of conversion. (Prosser & Keeton, Torts, *supra,* § 15, p. 90, italics added.)

The Restatement, too, makes clear that some actual injury must have occurred in order for a trespass to chattels to be actionable. Under section 218 of the Restatement Second of Torts, [HN5]dispossession alone, without further damages, is actionable (see *id.,* par. (a) & com. d, pp. 420-421), but other forms of interference require some additional harm to the personal property or the possessor's interests [***40] in it. (*Id.,* pars. (b)-(d).) "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. *Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical [**303] condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected as stated in Clause (c).* Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference." (*Id.,* com. e, pp. 421-422, italics added.)

The Court of Appeal (quoting 7 Speiser et al., American Law of Torts (1990) Trespass, § 23:23, p. 667) referred to " 'a number of very early cases [showing that] any unlawful interference, however slight, with the enjoyment by another of his personal property, is a trespass.' " [HN6]But while a harmless use or touching of personal property may be a technical trespass (see Rest.2d Torts, § 217), an interference (not amounting to dispossession) is not *actionable,* under modern California and broader American law, without a showing of harm. As already discussed, this is the rule embodied in the Restatement (Rest.2d Torts, § 218) and adopted by California law [*1352] ( *Zaslow v. Kroenert, supra,* 29 Cal.2d at p. 551; *Thrifty-Tel, Inc. v. Bezenek, supra,* 46 Cal.App.4th at p. 1566).

In this respect, as Prosser explains, modern day trespass to chattels differs both from the original English writ and from the action for trespass to land: "Another departure from the original rule of the old writ of trespass concerns the necessity of some actual damage to the chattel before the action can be maintained. Where the defendant merely interferes without doing any harm--as where, for example, he merely lays hands upon the plain

tiff's horse, or sits in his car--there has been a division of opinion among the writers, and a surprising dearth of authority. *By analogy to trespass to land there might be a technical tort in such a case . . . . Such scanty authority as there is, however, has considered that the dignitary interest in the inviolability of chattels, unlike that as to land, is not sufficiently important to require any greater defense than the privilege of using reasonable force when necessary to protect them. Accordingly it has been held that nominal damages will not be awarded, and that in the absence of any actual damage the action will not lie.*" (Prosser & Keeton, Torts, *supra,* § 14, p. 87, italics added, fns. omitted.)

Intel suggests that the requirement of actual harm does not apply here because it sought only injunctive relief, as protection from future injuries. But as Justice Kolkey, dissenting below, observed, "[t]he fact the relief sought is injunctive does not excuse a showing of injury, whether actual or threatened." Indeed, [HN7]in order to obtain injunctive relief the plaintiff must ordinarily show that the defendant's wrongful acts threaten to cause *irreparable* injuries, ones that cannot be adequately compensated in damages. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 782, p. 239.(3)) Even in an action for trespass to real property, in which damage to the property is not an [***41] element of the cause of action, "the extraordinary remedy of injunction" cannot be invoked without showing the likelihood of irreparable harm. ( *Mechanics' Foundry v. Ryall (1888) 75 Cal. 601, 603 [17 P. 703];* see *Mendelson v. McCabe (1904) 144 Cal. 230, 232-233 [77 P. 915]* [injunction against trespass to land proper where continued trespasses threaten creation of prescriptive right and repetitive suits for damages would be inadequate remedy].(4a)) A fortiori, to issue an injunction without a showing of likely irreparable injury in an action for trespass to chattels, in which injury to the personal property or the possessor's interest in it *is* an element of the action, would make little legal sense.

The dispositive issue in this case, therefore, is whether the undisputed facts demonstrate Hamidi's actions caused or threatened to cause damage to Intel's computer system, such as to entitle Intel to judgment as a matter of law. To review, the undisputed [*1353] evidence revealed no actual or threatened damage to Intel's computer hardware or software and no interference with its ordinary and intended operation. Intel was not dispossessed of its computers, nor did Hamidi's messages prevent Intel from using its computers for any measurable length of time. Intel presented no evidence its system [**304] was slowed or otherwise impaired by the burden of delivering Hamidi's electronic messages. Nor was there any evidence transmission of the messages imposed

any marginal cost on the operation of Intel's computers. In sum, no evidence suggested that in sending messages through Intel's Internet connections and internal computer system Hamidi used the system in any manner in which it was not intended to function or impaired the system in any way. Nor does the evidence show the request of any employee to be removed from FACE-Intel's mailing list was not honored. The evidence did show, however, that some employees who found the messages unwelcome asked management to stop them and that Intel technical staff spent time and effort attempting to block the messages. A statement on the FACE-Intel Web site, moreover, could be taken as an admission that the messages had caused "[e]xcited and nervous managers" to discuss the matter with Intel's human resources department.

Relying on a line of decisions, most from federal district courts, applying the tort of trespass to chattels to various types of unwanted electronic contact between computers, Intel contends that, while its computers were not damaged by receiving Hamidi's messages, its interest in the "physical condition, quality or value" (Rest.2d Torts, § 218, com. e, p. 422) of the computers was harmed. We disagree. The cited line of decisions does not persuade us that the mere sending of electronic communications that assertedly cause injury only because of their contents constitutes an actionable trespass to a computer system through which the messages are transmitted. Rather, the decisions finding electronic contact to be a trespass to computer systems have generally involved some actual or threatened interference with the computers' functioning.

(5) In _Thrifty-Tel, Inc. v. Bezenek, supra, 46 Cal.App.4th at pages 1566-1567_ (Thrifty-Tel), the California Court of Appeal held that evidence of automated searching of a telephone carrier's system for authorization codes supported a cause of action for trespass to chattels. The defendant's automated dialing program "overburdened the [plaintiff's] system, denying some subscribers access to phone lines" (id [***42]  . at p. 1564 ), showing the requisite injury.

(6) Following _Thrifty-Tel_, a series of federal district court decisions held that sending UCE through an ISP's equipment may constitute trespass to the ISP's computer system. The lead case, _CompuServe, Inc. v. Cyber Promotions, Inc., supra, 962 F. Supp. 1015, 1021-1023_ (CompuServe), was followed [*1354] by Hotmail Corp. v. Van$ Money Pie, Inc. (N.D.Cal., Apr. 16, 1998, No. C 98-20064 JW) 1998 U.S. Dist. LEXIS 10729, page *7, _America Online, Inc. v. IMS_ (E.D.Va. 1998) 24 F. Supp. 2d 548, 550-551, and _America Online, Inc. v. LCGM, Inc._ (E.D.Va. 1998) 46 F. Supp. 2d 444, 451-452.

In each of these spamming cases, the plaintiff showed, or was prepared to show, some interference with the efficient functioning of its computer system. In CompuServe, the plaintiff ISP's mail equipment monitor stated that mass UCE mailings, especially from nonexistent addresses such as those used by the defendant, placed "a tremendous burden" on the ISP's equipment, using "disk space and drain[ing] the processing power," making those resources unavailable to serve subscribers. (_CompuServe, supra, 962 F. Supp._ at p. 1022.) Similarly, in _Hotmail Corp. v. Van$ Money Pie, Inc., supra_, 1998 U.S. Dist. LEXIS 10729 at page *7, the court found the evidence supported a finding that the defendant's mailings "fill[ed] up Hotmail's computer storage space and threaten[ed] to damage Hotmail's ability to service its legitimate customers." _America Online, Inc. v. IMS_, decided on summary judgment, was deemed factually indistinguishable from _CompuServe_; the court observed that in both cases the plaintiffs "alleged that processing the bulk e-mail cost them time and money and burdened their equipment." (_America Online, Inc. v. IMS, supra, 24 F. Supp. 2d_ at p. 550.) The same court, in _America Online, Inc. v. LCGM, Inc., supra_, 46 F. Supp. 2d at page 452, simply followed _CompuServe_ and its earlier _America Online_ decision, quoting the former's explanation that UCE burdened the computer's processing power and memory.

[**305] Building on the spamming cases, in particular _CompuServe_, three even more recent district court decisions addressed whether unauthorized robotic data collection [4] from a company's publicly accessible Web site is a trespass on the company's computer system. (_e Bay, Inc. v. Bidder's Edge, Inc._, 100 F. Supp. 2d 1058, 1069-1072 (eBay); _Register.com, Inc. v. Verio, Inc._ (S.D.N.Y. 2000) 126 F. Supp. 2d 238, 248-251; _Ticketmaster Corp. v. Tickets.com, Inc., supra_ 2000 U.S. Dist. LEXIS 12987 at *17, 2000 WL 1887522 at *4.) The two district courts that found such automated data collection to constitute a trespass relied, in part, on the deleterious impact this activity could have, especially if replicated by other searchers, on the functioning of a Web site's computer equipment.

4    Data search and collection robots, also known as "Web bots" or "spiders," are programs designed to rapidly search numerous Web pages or sites, collecting, retrieving, and indexing information from these pages. Their uses include creation of searchable databases, Web catalogues and comparison shopping services. (_e Bay, Inc. v. Bidder's Edge, Inc._, (N.D.Cal. 2000) 100 F. Supp. 2d 1058, 1060-1061; O'Rourke, _Property Rights and Competition on the Internet: In Search of an Appropriate Analogy_ (2001) 16 Berkeley Tech. L.J. 561, 570-571; Quilter, _The Continuing Ex-_

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

*pansion of Cyberspace Trespass to Chattels* (2002) 17 Berkeley Tech. L.J. 421, 423-424.)

In the leading case, *eBay*, the defendant Bidder's Edge (BE), operating an auction aggregation site, accessed the eBay Web site about 100,000 times [*1355] per day, accounting for between 1 and 2 percent of the information requests received by eBay and [***43] a slightly smaller percentage of the data transferred by eBay. (*eBay, supra,* 100 F. Supp. 2d at pp. 1061, 1063.) The district court rejected eBay's claim that it was entitled to injunctive relief because of the defendant's unauthorized presence alone, or because of the incremental cost the defendant had imposed on operation of the eBay site ( *id. at pp.* 1065-1066), but found sufficient proof of *threatened* harm in the potential for others to imitate the defendant's activity: "If BE's activity is allowed to continue unchecked, it would encourage other auction aggregators to engage in similar recursive searching of the eBay system such that eBay would suffer irreparable harm from reduced system performance, system unavailability, or data losses." ( *Id. at* p. 1066.) Again, in addressing the likelihood of eBay's success on its trespass to chattels cause of action, the court held the evidence of injury to eBay's computer system sufficient to support a preliminary injunction: "If the court were to hold otherwise, it would likely encourage other auction aggregators to crawl the eBay site, potentially to the point of denying effective access to eBay's customers. If preliminary injunctive relief were denied, and other aggregators began to crawl the eBay site, there appears to be little doubt that the load on eBay's computer system would qualify as a substantial impairment of condition or value." ( *Id. at* pp. 1071-1072.)

Another district court followed *eBay* on similar facts--a domain name registrar's claim against a Web hosting and development site that robotically searched the registrar's database of newly registered domain names in business leads--in *Register.com, Inc. v. Verio, Inc., supra,* 126 F. Supp. 2d at pages 249-251. Although the plaintiff was unable to measure the burden the defendant's searching had placed on its system ( *id. at* pp. 249-250), the district court, quoting the declaration of one of the plaintiff's officers, found sufficient evidence of threatened harm to the system in the possibility the defendant's activities would be copied by others: " 'I believe that if Verio's searching of Register.com's WHOIS database were determined to be lawful, then every purveyor of Internet-based services would engage in similar conduct.' " ( *Id. at* p. 250.) Like eBay, the court observed, Register.com had a legitimate fear "that its servers will be flooded by search robots." ( *Id. at* p. 251.)

In the third decision discussing robotic data collection as a trespass, *Ticketmaster Corp. v. Tickets.com, Inc., supra,* 2000 U.S. District LEXIS 12987, 2000 WL 1887522 (*Ticketmaster*), the court, distinguishing *eBay*, found *insufficient* evidence of harm to the chattel to constitute an actionable trespass: "A basic element of trespass to chattels must be physical harm to the chattel (not present here) or some obstruction of its basic function (in the court's opinion not sufficiently [*1356] shown here). . . . The [**306] comparative use [by the defendant of the plaintiff's computer system] appears very small and there is no showing that the use interferes to any extent with the regular business of [the plaintiff]. . . . *Nor here is the specter of dozens or more parasites joining the fray, the cumulative total of which could affect the operation of [the plaintiff's] business.*" (*Id.* at *17, p. *4, italics added.(4b))

In the decisions so far reviewed, the defendant's use of the plaintiff's computer system was held sufficient to support an action for trespass when it actually did, or threatened to, interfere with the intended functioning of the system, as by significantly reducing its available memory and processing power. In *Ticketmaster, supra,* 2000 U.S. Dist. LEXIS 12987, 2000 WL 1887522, the one case where no such effect, actual or threatened, had been demonstrated, the court found insufficient evidence of harm to support a trespass [***44] action. These decisions do not persuade us to Intel's position here, for Intel has demonstrated neither any appreciable effect on the operation of its computer system from Hamidi's messages, nor any likelihood that Hamidi's actions will be replicated by others if found not to constitute a trespass.

That Intel does not claim the type of functional impact that spammers and robots have been alleged to cause is not surprising in light of the differences between Hamidi's activities and those of a commercial enterprise that uses sheer quantity of messages as its communications strategy. Though Hamidi sent thousands of copies of the same message on six occasions over 21 months, that number is minuscule compared to the amounts of mail sent by commercial operations. The individual advertisers sued in *America Online, Inc. v. IMS, supra,* 24 F. Supp. 2d at page 549, and *America Online, Inc. v. LCGM, Inc., supra,* 46 F. Supp. 2d at page 448, were alleged to have sent more than 60 million messages over 10 months and more than 92 million messages over seven months, respectively. Collectively, UCE has reportedly come to constitute about 45 percent of all e-mail. (Hansell, *Internet Is Losing Ground in Battle Against Spam,* N.Y. Times (Apr. 22, 2003) p. A1, col. 3.) The functional burden on Intel's computers, or the cost in time to individual recipients, of receiving Hamidi's occasional advocacy messages cannot be compared to the burdens and costs caused ISP's and their customers by the ever-rising deluge of commercial e-mail.

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

Intel relies on language in the *eBay* decision suggesting that unauthorized use of another's chattel is actionable even without any showing of injury: "Even if, as [defendant] BE argues, its searches use only a small amount of eBay's computer system capacity, BE has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use another's personal property." ( [*1357] *eBay, supra,* 100 F. Supp. 2d at p. 1071.) But as the *eBay* court went on immediately to find that the defendant's conduct, if widely replicated, *would* likely impair the functioning of the plaintiff's system ( *id.* at pp. 1071-1072), we do not read the quoted remarks as expressing the court's complete view of the issue. In isolation, moreover, they would not be a correct statement of California or general American law on this point. [HN8]While one may have no *right* temporarily to use another's personal property, such use is actionable as a trespass only if it "has proximately caused injury." ( *Thrifty-Tel, supra,* 46 Cal.App.4th at p. 1566.) "[I]n the absence of any actual damage the action will not lie." (Prosser & Keeton, Torts, *supra,* § 14, p. 87.) Short of dispossession, personal injury, or physical damage (not present here), intermeddling is actionable only if "the chattel is impaired as to its condition, quality, or value, or [P] . . . the possessor is deprived of the use of the chattel for a substantial time." (Rest.2d Torts, § 218, pars. (b), (c).) In particular, an actionable deprivation of use "must be for a time so substantial that it is possible to estimate the loss caused thereby. A mere momentary or theoretical deprivation of use is not sufficient unless there is a dispossession . . . ." (*Id.,* com. i, p. 423.) That Hamidi's messages temporarily used some portion of the Intel computers' processors or storage is, therefore, not enough; Intel must, [**307] but does not, demonstrate some measurable loss from the use of its computer system. [5]

5 In the most recent decision relied upon by Intel, *Oyster Software, Inc. v. Forms Processing, Inc.* (N.D.Cal., Dec. 6, 2001, No. C-00-0724 JCS)at 2001 U.S. Dist. LEXIS 22520, *37-*38, 2001 WL 1736382, pages *12-*13, a federal magistrate judge incorrectly read *eBay* as establishing, under California law, that mere unauthorized use of another's computer system constitutes an actionable trespass. The plaintiff accused the defendant, a business competitor, of copying the metatags (code describing the contents of a Web site to a search engine) from the plaintiff's Web site, resulting in diversion of potential customers for the plaintiff's services. (*Id.* at pp. *1-*2.) With regard to the plaintiff's trespass claim (the plaintiff also pleaded causes of action for, inter alia, misappropriation, copyright and trademark in-

fringement), the magistrate judge concluded that *eBay* imposed no requirement of actual damage and that the defendant's conduct was sufficient to establish a trespass "simply because [it] amounted to 'use' of Plaintiff's computer." (*Id.* at p. *40 at p. *13.) But as just explained, we do not read *eBay, supra,* 100 F. Supp. 2d 1058, as holding that the actual injury requirement may be dispensed with, and such a suggestion would, in any event, be erroneous as a statement of California law.

[***45] In addition to impairment of system functionality, *CompuServe* and its progeny also refer to the ISP's loss of business reputation and customer goodwill, resulting from the inconvenience and cost that spam causes to its members, as harm to the ISP's legally protected interests in its personal property. (See *CompuServe, supra,* 962 F. Supp. 2d at p. 1023; *Hotmail Corp. v. Van$ Money Pie, Inc., supra,*1998 U.S. Dist. LEXIS 10729 at p. *7; *America Online, Inc. v. IMS, supra,* 24 F. Supp. 2d at p. 550.) Intel argues that its own interest in employee productivity, assertedly disrupted by Hamidi's messages, is a comparable protected interest in its computer system. We disagree.

[*1358] Whether the economic injuries identified in *CompuServe* were properly considered injuries to the ISP's possessory interest in its personal property, the type of property interest the tort is primarily intended to protect (see Rest.2d Torts, § 218 & com. e, pp. 421-422; Prosser & Keeton, Torts, *supra,* § 14, p. 87), has been questioned. [6] "[T]he court broke the chain between the trespass and the harm, allowing indirect harms to CompuServe's business interests--reputation, customer goodwill, and employee time--to count as harms to the chattel (the server)." (Quilter, *The Continuing Expansion of Cyberspace Trespass to Chattels, supra,* 17 Berkeley Tech. L.J. at pp. 429-430.) "[T]his move cuts trespass to chattels free from its moorings of dispossession or the equivalent, allowing the court free reign [*sic*] to hunt for 'impairment.' " (Burk, *The Trouble with Trespass* (2000) 4 J. Small & Emerging Bus.L. 27, 35.) But even if the loss of goodwill identified in *CompuServe* were the type of injury that would give rise to a trespass to chattels claim under California law, Intel's position would not follow, for Intel's claimed injury has even less connection to its personal property than did CompuServe's.

6 In support of its reasoning, the *CompuServe* court cited paragraph (d) of section 218 of the Restatement Second of Torts, which refers to harm "to some person or thing in which the possessor has a legally protected interest." As the comment to this paragraph explains, however, it is intended to cover personal injury to the posses-

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

sor or another person in whom the possessor has a legal interest, or injury to "other chattel or land" in which the possessor of the chattel subject to the trespass has a legal interest. (Rest.2d Torts, § 218, com. j, p. 423.) No personal injury was claimed either in *CompuServe* or in the case at bar, and neither the lost goodwill in *CompuServe* nor the loss of employee efficiency claimed in the present case is chattel or land.

CompuServe's customers were annoyed because the system was inundated with unsolicited commercial messages, making its use for personal communication more difficult and costly. ( *CompuServe, supra*, 962 F. Supp. at p. 1023.) Their complaint, which allegedly led some to cancel their [***46] CompuServe service, was about *the functioning of CompuServe's electronic mail service.* Intel's workers, in contrast, were allegedly distracted from their work not because of the frequency or quantity of Hamidi's messages, but because of assertions and opinions the messages conveyed. Intel's complaint is thus about *the contents of the messages* rather than the functioning of the company's e-mail system. Even accepting *CompuServe's* economic injury rationale, therefore, Intel's position represents a further extension of the trespass to chattels tort, fictionally recharacterizing [**308] the allegedly injurious effect of a communication's *contents* on recipients as an impairment to the device which transmitted the message.

This theory of "impairment by content" (Burk, *The Trouble with Trespass, supra,* 4 J. Small & Emerging Bus. L. at p. 37) threatens to stretch trespass [*1359] law to cover injuries far afield from the harms to possession the tort evolved to protect. Intel's theory would expand the tort of trespass to chattels to cover virtually any unconsented-to communication that, solely because of its content, is unwelcome to the recipient or intermediate transmitter. As the dissenting justice below explained, " 'Damage' of this nature--the distraction of reading or listening to an unsolicited communication--is not within the scope of the injury against which the trespass-to-chattel tort protects, and indeed trivializes it. After all, '[t]he property interest protected by the old action of trespass was that of possession; and this has continued to affect the character of the action.' (Prosser & Keeton on Torts, *supra,* § 14, p. 87.) Reading an e-mail transmitted to equipment designed to receive it, in and of itself, does not affect the possessory interest in the equipment. [P] Indeed, if a chattel's receipt of an electronic communication constitutes a trespass to that chattel, then not only are unsolicited telephone calls and faxes trespasses to chattel, but unwelcome radio waves and television signals also constitute a trespass to chattel every time the viewer inadvertently sees or hears the unwanted program." We agree. While unwelcome communications,

electronic or otherwise, can cause a variety of injuries to economic relations, reputation and emotions, those interests are protected by other branches of tort law; in order to address them, we need not create a fiction of injury to the communication system.

Nor may Intel appropriately assert a *property* interest in its employees' time. "The Restatement test clearly speaks in the first instance to the impairment of the chattel. . . . But [HN9]employees are not chattels (at least not in the legal sense of the term)." (Burk, *The Trouble with Trespass, supra,* 4 J. Small & Emerging Bus. L. at p. 36.) Whatever interest Intel may have in preventing its employees from receiving disruptive communications, it is not an interest in personal property, and trespass to chattels is therefore not an action that will lie to protect it. Nor, finally, can the fact Intel staff spent time attempting to block Hamidi's messages be bootstrapped into an injury to Intel's possessory interest in its computers. To quote, again, from the dissenting opinion in the Court of Appeal: "[I]t is circular to premise the damage element of a tort solely upon the steps taken to prevent the damage. Injury can only be established by the completed tort's consequences, not by the cost of the steps taken to avoid the injury and prevent the tort; otherwise, we can create injury for every supposed tort."

Intel connected its e-mail system to the Internet and permitted its employees to make use of this connection both for business and, to a reasonable extent, for their own purposes. In doing so, the company [***47] necessarily contemplated the employees' receipt of unsolicited as well as solicited communications from other companies and individuals. That some communications [*1360] would, because of their contents, be unwelcome to Intel management was virtually inevitable. Hamidi did nothing but use the e-mail system for its intended purpose--to communicate with employees. The system worked as designed, delivering the messages without any physical or functional harm or disruption. These occasional transmissions cannot reasonably be viewed as impairing the quality or value of Intel's computer system. We conclude, therefore, that Intel has not presented undisputed facts demonstrating an injury to its personal property, or to its legal interest in that property, that support, under California tort law, an action for trespass to chattels.

## II. *Proposed Extension of California Tort Law*

We next consider whether California common law should be *extended* to cover, as a trespass to chattels, an otherwise harmless electronic communication whose contents are objectionable. We decline to so expand California law. Intel, of course, was not the recipient of Hamidi's messages, but rather [**309] the owner and possessor of computer servers used to relay the mes-

sages, and it bases this tort action on that ownership and possession. The property rule proposed is a rigid one, under which the sender of an electronic message would be strictly liable to the owner of equipment through which the communication passes--here, Intel--for any consequential injury flowing from the *contents* of the communication. The arguments of amici curiae and academic writers on this topic, discussed below, leave us highly doubtful whether creation of such a rigid property rule would be wise.

Writing on behalf of several industry groups appearing as amici curiae, Professor Richard A. Epstein of the University of Chicago urges us to excuse the required showing of injury to personal property in cases of unauthorized electronic contact between computers, "extending the rules of trespass to real property to all interactive Web sites and servers." The court is thus urged to recognize, for owners of a particular species of personal property, computer servers, the same interest in inviolability as is generally accorded a possessor of land. In effect, Professor Epstein suggests that a company's server should be its castle, upon which any unauthorized intrusion, however harmless, is a trespass.

Epstein's argument derives, in part, from the familiar metaphor of the Internet as a physical space, reflected in much of the language that has been used to describe it: "cyberspace," "the information superhighway," e-mail "addresses," and the like. Of course, the Internet is also frequently called simply the "Net," a term, Hamidi points out, "evoking a fisherman's chattel." A major component of the Internet is the World Wide "Web," a [*1361] descriptive term suggesting neither personal nor real property, and "cyberspace" itself has come to be known by the oxymoronic phrase "virtual reality," which would suggest that any real property "located" in "cyberspace" must be "virtually real" property. Metaphor is a two-edged sword.

Indeed, the metaphorical application of real property rules would not, by itself, transform a physically harmless electronic intrusion on a computer server into a trespass. (7) That is because, [HN10]under California law, intangible intrusions on land, including electromagnetic transmissions, are not actionable as trespasses (though they may be as nuisances) unless they cause physical damage to the real [***48] property. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 936-937 [55 Cal. Rptr. 2d 724, 920 P.2d 669].(4c)) Since Intel does not claim Hamidi's electronically transmitted messages physically damaged its servers, it could not prove a trespass to land even were we to treat the computers as a type of real property. Some further extension of the conceit would be required, under which the electronic signals Hamidi sent would be recast as tangible intruders, perhaps as tiny messengers rushing through the

"hallways" of Intel's computers and bursting out of employees' computers to read them Hamidi's missives. But such fictions promise more confusion than clarity in the law. (See *eBay, supra* , 100 F. Supp. 2d at pp. 1065-1066 [rejecting eBay's argument that the defendant's automated data searches "should be thought of as equivalent to sending in an army of 100,000 robots a day to check the prices in a competitor's store"].)

The plain fact is that computers, even those making up the Internet, are--like such older communications equipment as telephones and fax machines--personal property, not realty. Professor Epstein observes that "[a]lthough servers may be moved in real space, they cannot be moved in cyberspace," because an Internet server must, to be useful, be accessible at a known address. But the same is true of the telephone: to be useful for incoming communication, the telephone must remain constantly linked to the same number (or, when the number is changed, the system must include some forwarding or notification capability, a qualification that also applies to computer addresses). Does this suggest that an unwelcome message delivered through a telephone or fax machine should be viewed as a trespass to a type of real property? We think not: As already discussed, the contents of a telephone communication may cause a variety of injuries and may be the basis for a variety of tort actions (e.g., defamation, intentional infliction of emotional distress, invasion of privacy), [**310] but the injuries are not to an [*1362] interest in property, much less real property, and the appropriate tort is not trespass. [7]

[7] The tort law discussion in Justice Brown's dissenting opinion similarly suffers from an overreliance on metaphor and analogy. Attempting to find an actionable trespass, Justice Brown analyzes Intel's e-mail system as comparable to the exterior of an automobile (dis. opn. of Brown, J., *post*, at p. 1367), a plot of land (*id.* at p. 1377), the interior of an automobile (*id.* at p. 1379), a toothbrush (*id.* p. at 1382), a head of livestock (*id.* at pp. 1382-1383), and a mooring buoy (*id.* at pp. 1383-1384), while Hamidi is characterized as a vandal damaging a school building (*id.* at p. 1381) or a prankster unplugging and moving employees' computers (*id.* at p. 1383). These colorful analogies tend to obscure the plain fact that this case involves communications equipment, used by defendant to communicate. Intel's e-mail system was equipment designed for speedy communication between employees and the outside world; Hamidi communicated with Intel employees over that system in a manner entirely consistent with its design; and Intel objected not because of an offense against the integrity or dig-

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

nity of its computers, but because the communications themselves affected employee-recipients in a manner Intel found undesirable. The proposal that we extend trespass to chattels to cover any communication that the owner of the communications equipment considers annoying or distracting raises, moreover, concerns about control over the flow of information and views that would not be presented by, for example, an injunction against chasing another's cattle or sleeping in her car.

More substantively, Professor Epstein argues that a rule of computer server inviolability will, through the formation or extension of a market in computer-to-computer access, create "the right social result." In most circumstances, he predicts, [***49] companies with computers on the Internet will continue to authorize transmission of information through e-mail, Web site searching, and page linking because they benefit by that open access. When a Web site owner does deny access to a particular sending, searching, or linking computer, a system of "simple one-on-one negotiations" will arise to provide the necessary individual licenses.

Other scholars are less optimistic about such a complete propertization of the Internet. Professor Mark Lemley of the University of California, Berkeley, writing on behalf of an amici curiae group of professors of intellectual property and computer law, observes that under a property rule of server inviolability, "each of the hundreds of millions of [Internet] users must get permission in advance from anyone with whom they want to communicate and anyone who owns a server through which their message may travel." The consequence for e-mail could be a substantial reduction in the freedom of electronic communication, as the owner of each computer through which an electronic message passes could impose its own limitations on message content or source. As Professor Dan Hunter of the University of Pennsylvania asks rhetorically: "Does this mean that one must read the 'Terms of Acceptable Email Usage' of every email system that one emails in the course of an ordinary day? If the University of Pennsylvania had a policy [*1363] that sending a joke by email would be an unauthorized use of its system, then under the logic of [the lower court decision in this case], you would commit 'trespass' if you emailed me a . . . cartoon." (Hunter, *Cyberspace as Place and the Tragedy of the Digital Anticommons* (2003) 91 Cal. L.Rev. 439, 508-509.)

Web site linking, Professor Lemley further observes, "would exist at the sufferance of the linked-to party, because a Web user who followed a 'disapproved' link would be trespassing on the plaintiff's server, just as sending an e-mail is trespass under the [lower] court's theory." Another writer warns that "[c]yber-trespass theory will curtail the free flow of price and product infor-

mation on the Internet by allowing website owners to tightly control who and what may enter and make use of the information housed on its Internet site." (Chang, *Bidding on Trespass: eBay, Inc. v. Bidder's Edge, Inc. and the Abuse of Trespass Theory in Cyberspace Law* (2001) 29 AIPLA Q.J. 445, 459.) A leading scholar of Internet law and policy, Professor Lawrence Lessig of Stanford University, has criticized Professor Epstein's theory of the computer server as quasi-real property, previously put forward in the *eBay* case (*eBay, supra,* 100 F. Supp. 2d 1058), on the ground that it ignores the costs to society in the loss of network benefits: "eBay benefits greatly from a network that is open [**311] and where access is free. It is this general feature of the Net that makes the Net so valuable to users and a source of great innovation. And to the extent that individual sites begin to impose their own rules of exclusion, the value of the network as a network declines. If machines must negotiate before entering any individual site, then the costs of using the network climb." (Lessig, The Future of Ideas: The Fate of the Commons in a Connected World (2001) p. 171; see also Hunter, *Cyberspace as Place and the Tragedy of the Digital Anticommons, supra,* 91 Cal. L.Rev. at p. 512 ["If we continue to mark out anticommons claims in cyberspace, not only will we preclude better, more innovative uses of cyberspace resources, but we will lose sight of what might be possible"].)

We discuss this debate among the amici curiae and academic writers only to note its existence and contours, not to attempt its resolution. Creating an absolute property [***50] right to exclude undesired communications from one's e-mail and Web servers might help force spammers to internalize the costs they impose on ISP's and their customers. But such a property rule might also create substantial new costs, to e-mail and e-commerce users and to society generally, in lost ease and openness of communication and in lost network benefits. In light of the unresolved controversy, we would be acting rashly to adopt a rule treating computer servers as real property for purposes of trespass law.

[*1364]    The Legislature has already adopted detailed regulations governing UCE. (Bus. & Prof. Code, §§ 17538.4, 17538.45; see generally *Ferguson v. Friendfinders, Inc., supra,* 94 Cal.App.4th 1255 .) It may see fit in the future also to regulate noncommercial e-mail, such as that sent by Hamidi, or other kinds of unwanted contact between computers on the Internet, such as that alleged in *eBay, supra,* 100 F. Supp. 2d 1058. But we are not persuaded that these perceived problems call at present for judicial creation of a rigid property rule of computer server inviolability. We therefore decline to create an exception, covering Hamidi's unwanted electronic messages to Intel employees, to the general rule that a trespass to chattels is not actionable if it does not involve

actual or threatened injury to the personal property or to the possessor's legally protected interest in the personal property. No such injury having been shown on the undisputed facts, Intel was not entitled to summary judgment in its favor.

### III. *Constitutional Considerations*

Because we conclude no trespass to chattels was shown on the summary judgment record, making the injunction improper on common law grounds, we need not address at length the dissenters' constitutional arguments. A few clarifications are nonetheless in order.

Justice Mosk asserts that this case involves only "a private entity seeking to enforce private rights against trespass." (Dis. opn. of Mosk, J., *post*, at p. 1395.) But the injunction here was issued by a state court. **(8)** [HN11]While a private refusal to transmit another's electronic speech generally does not implicate the First Amendment, because no governmental action is involved (see *Cyber Promotions, Inc. v. America Online, Inc.* (E.D.Penn. 1996) 948 F. Supp. 436, 441-445 [spammer could not force private ISP to carry its messages]), the use of government power, whether in enforcement of a statute or ordinance *or by an award of damages or an injunction in a private lawsuit*, is state action that must comply with First Amendment limits. ( *Cohen v. Cowles Media Co.* (1991) 501 U.S. 663, 668 [115 L. Ed. 2d 586, 111 S. Ct. 2513]; *NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 916, fn. 51 [73 L. Ed. 2d 1215, 102 S. Ct. 3409]; *New York Times v. Sullivan* (1964) 376 U.S. 254, 265 [11 L. Ed. 2d 686, 84 S. Ct. 710].) Nor does the nonexistence of a "constitutional right to trespass" (dis. opn. of Mosk, J., *post*, at p. 1395) make an injunction in this case per se valid. **(4d)** Unlike, for example, the trespasser-to-land defendant in *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244 [121 Cal. Rptr. 2d 810], Hamidi himself had no tangible presence on Intel property, instead speaking from his own home through his [*1365] computer. [**312] He no more invaded Intel's property than does a protester holding a sign or shouting through a bullhorn outside corporate headquarters, posting a letter through the mail, or telephoning to complain of a corporate practice. (See [***51] *Madsen v. Women's Health Center* (1994) 512 U.S. 753, 765 [129 L. Ed. 2d 593, 114 S. Ct. 2516] [injunctions restraining such speakers must "burden no more speech than necessary to serve a significant government interest"].) [8]

[8]   Justice Brown would distinguish *Madsen v. Women's Health Center, supra*, on the ground that the operators of the health center in that case would not have been entitled to "drive[] [the protesters] from the public streets," whereas Intel was entitled to block Hamidi's messages as best it

could. (Dis. opn. of Brown, J., *post*, at p. 1370, fn. 1.) But the health center operators *were* entitled to block protesters' messages--as best they could--by closing windows and pulling blinds. That a property owner may take physical measures to prevent the transmission of others' speech into or across the property does not imply that a court order enjoining the speech is not subject to constitutional limitations.

Justice Brown relies upon a constitutional "right not to listen," rooted in the listener's "personal autonomy" (dis. opn. of Brown, J., *post*, at p. 1374), as compelling a remedy against Hamidi's messages, which she asserts were sent to "unwilling" listeners (*id.* at p. 1369). Even assuming a corporate entity could under some circumstances claim such a personal right, here the intended and actual recipients of Hamidi's messages were individual Intel employees, rather than Intel itself. The record contains no evidence Hamidi sent messages to any employee who notified him such messages were unwelcome. In any event, such evidence would, under the dissent's rationale of a right not to listen, support only a *narrow* injunction aimed at protecting individual recipients who gave notice of their rejection. (See *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 72 [77 L. Ed. 2d 469, 103 S. Ct. 2875] [government may not act on behalf of all addressees by generally prohibiting mailing of materials related to contraception, where those recipients who may be offended can simply ignore and discard the materials]; *Martin v. City of Struthers* (1943) 319 U.S. 141, 144 [87 L. Ed. 1313, 63 S. Ct. 862] [anticanvassing ordinance improperly "substitutes the judgment of the community for the judgment of the individual householder"]; cf. *Rowan v. U.S. Post Office Dept.* (1970) 397 U.S. 728, 736 [25 L. Ed. 2d 736, 90 S. Ct. 1484] ["householder" may exercise "individual autonomy" by refusing delivery of offensive mail].) The principle of a right not to listen, founded in personal autonomy, cannot justify the sweeping injunction issued here against all communication to Intel addresses, for such a right, logically, can be exercised only by, or at the behest of, the recipient himself or herself.

[*1366] DISPOSITION

The judgment of the Court of Appeal is reversed.

Kennard, J., Moreno, J., and Perren, J., [*] concurred.

[*]   Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCUR BY: KENNARD**

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

## CONCUR

### KENNARD, J.

I concur.

Does a person commit the tort of trespass to chattels by making occasional personal calls to a mobile phone despite the stated objection of the person who owns the mobile phone and pays for the mobile phone service? Does it matter that the calls are not made to the mobile phone's owner, but to another person who ordinarily uses that phone? Does it matter that the person to whom the calls are made has not objected to them? Does it matter that the calls do not damage the mobile phone [***52] or reduce in any significant way its availability or usefulness?

The majority concludes, and I agree, that using another's equipment to communicate with a third person who is an authorized user of the equipment and who does not object to the communication is trespass to chattels only if the communications damage the equipment or in some significant way impair its usefulness or availability.

[**313] Intel Corporation has my sympathy. Unsolicited and unwanted bulk e-mail, most of it commercial, is a serious annoyance and inconvenience for persons who communicate electronically through the Internet, and bulk e-mail that distracts employees in the workplace can adversely affect overall productivity. But, as the majority persuasively explains, to establish the tort of trespass to chattels in California, the plaintiff must prove either damage to the plaintiff's personal property or actual or threatened impairment of the plaintiff's ability to use that property. Because plaintiff Intel has not shown that defendant Kourosh Kenneth Hamidi's occasional bulk e-mail messages to Intel's employees have damaged Intel's computer system or impaired its functioning in any significant way, Intel has not established the tort of trespass to chattels.

This is not to say that Intel is helpless either practically or legally. As a practical matter, Intel need only instruct its employees to delete messages from Hamidi without reading them and to notify Hamidi to remove their workplace e-mail addresses from his mailing lists. Hamidi's messages promised to remove recipients from the mailing list on request, and there is no [*1367] evidence that Hamidi has ever failed to do so. From a legal perspective, a tort theory other than trespass to chattels may provide Intel with an effective remedy if Hamidi's messages are defamatory or wrongfully interfere with Intel's economic interests. (See maj. opn., *ante*, at p. 1347.) Additionally, the Legislature continues to study the problems caused by bulk e-mails and other dubious uses of modern communication technologies and may

craft legislation that accommodates the competing concerns in these sensitive and highly complex areas.

Accordingly, I join the majority in reversing the Court of Appeal's judgment.

**DISSENT BY:** MOSK; BROWN

## DISSENT

### BROWN, J., Dissenting.

Candidate A finds the vehicles that candidate B has provided for his campaign workers, and A spray paints the water soluble message, "Fight corruption, vote for A" on the bumpers. The majority's reasoning would find that notwithstanding the time it takes the workers to remove the paint and the expense they incur in altering the bumpers to prevent further unwanted messages, candidate B does not deserve an injunction unless the paint is so heavy that it reduces the cars' gas mileage or otherwise depreciates the cars' market value. Furthermore, candidate B has an obligation to permit the paint's display, because the cars are driven by workers and not B personally, because B allows his workers to use the cars to pick up their lunch or retrieve their children from school, or because the bumpers display B's own slogans. I disagree.

Intel Corporation has invested millions of dollars to develop and maintain a computer system. It did this not to act as a public forum but to enhance the productivity of its employees. Kourosh Kenneth Hamidi sent as many as 200,000 e-mail messages to Intel employees. The time required to review and delete Hamidi's messages diverted employees from productive tasks and undermined the utility of the computer system. "There may . . . be situations in which the value to the owner of a particular [***53] type of chattel may be impaired by dealing with it in a manner that does not affect its physical condition." (Rest.2d Torts, § 218, com. h, p. 422.) This is such a case.

The majority repeatedly asserts that Intel objected to the hundreds of thousands of messages solely due to their content, and proposes that Intel seek relief by pleading content-based speech torts. This proposal misses the point that Intel's objection is directed not toward Hamidi's message but his use of Intel's property to display his message. Intel has not sought to prevent Hamidi from expressing his ideas on his Web site, through private mail (paper or electronic) to employees' homes, or through any other means like picketing or billboards. But as counsel for Intel explained during oral [*1368] argument, the company objects to Hamidi's using Intel's property to advance his message.

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

Of course, Intel deserves an injunction even if its objections are based entirely on the e-mail's content. Intel is entitled, for example, to allow employees use of the Internet to check stock market tables or weather forecasts without incurring any concomitant obligation to allow access to pornographic Web sites. ( [**314] *Loving v. Boren* (W.D.Okla. 1997) 956 F. Supp. 953, 955.) A private property owner may choose to exclude unwanted mail for any reason, including its content. ( *Rowan v. U.S. Post Office Dept.* (1970) 397 U.S. 728, 738 [25 L. Ed. 2d 736, 90 S. Ct. 1484] (*Rowan*); *Tillman v. Distribution Systems of America Inc.* (App. Div. 1996) 224 A.D.2d 79 [648 N.Y.S.2d 630, 635] (*Tillman*).)

The majority refuses to protect Intel's interest in maintaining the integrity of its own system, contending that (1) Hamidi's mailings did not physically injure the system; (2) Intel receives many unwanted messages, of which Hamidi's are but a small fraction; (3) Intel must have contemplated that it would receive some unwanted messages; and (4) Hamidi used the e-mail system for its intended purpose, to communicate with employees.

Other courts have found a protectible interest under very similar circumstances. In *Thrifty-Tel v. Bezenek* (1996) 46 Cal.App.4th 1559 [54 Cal. Rptr. 2d 468] (*Thrifty-Tel*), the Court of Appeal found a trespass to chattels where the defendants used another party's access code to search for an authorization code with which they could make free calls. The defendants' calls did not damage the company's system in any way; they were a minuscule fraction of the overall communication conducted by the phone network; and the company could have reasonably expected that some individuals would attempt to obtain codes with which to make free calls (just as stores expect shoplifters). Moreover, had the defendants succeeded in making free calls, they would have been using the telephone system as intended. ( *Id.* at p. 1563.)

Because I do not share the majority's antipathy toward property rights and believe the proper balance between expressive activity and property protection can be achieved without distorting the law of trespass, I respectfully dissent.

## THE INSTANT FINDING OF A TRESPASS CONFORMS THE LAW ON ELECTRONIC MAIL TO THAT OF OTHER FORMS OF COMMUNICATION

The majority endorses the view of the Court of Appeal dissent, and reviews a finding of a trespass in this case as a radical decision that will endanger [*1369] almost every other form of expression. Contrary to these concerns, the Court of Appeal decision belongs not to a nightmarish future but to an unremarkable past--a long line of cases protecting the right of an individual [***54] not to receive an unwanted message after having expressed that refusal to the speaker. It breaks no new legal

ground and follows traditional rules regarding communication.

It is well settled that the law protects a person's right to decide to whom he will speak, to whom he will listen, and to whom he will not listen. ( *Martin v. City of Struthers* (1943) 319 U.S. 141, 149 [87 L. Ed. 1313, 63 S. Ct. 862] (*Martin*) [noting the "constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributors"].) As the United States Supreme Court observed, "we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes" ( *Frisby v. Schultz* (1988) 487 U.S. 474, 485 [101 L. Ed. 2d 420, 108 S. Ct. 2495]), whether the unwanted speech comes in the form of a door-to-door solicitor (see *Martin,* at pp. 147-148), regular "snail" mail ( *Rowan, supra,* 397 U.S. 728), radio waves ( *FCC v. Pacifica Foundation* (1978) 438 U.S. 726 [57 L. Ed. 2d 1073, 98 S. Ct. 3026]), or other forms of amplified sound ( *Kovacs v. Cooper* (1949) 336 U.S. 77 [93 L. Ed. 513, 69 S. Ct. 448]). (See *Frisby v. Schultz,* at p. 485.)

Of course, speakers have rights too, and thus the result is a balancing: speakers have the right to initiate speech but the listener has the right to refuse to listen or to terminate the conversation. This simple policy thus supports Hamidi's right to send e-mails initially, but not after Intel expressed its objection.

*Watchtower Bible and Tract Society v. Village of Stratton* (2002) 536 U.S. 150 [153 L. Ed. 2d 205, 122 S. Ct. 2080] does not compel a contrary result. *Watchtower* follows *Martin, supra,* 319 U.S. 141, in holding that the government may not bar a speaker from a homeowner's door, *but the homeowner surely may.* The *Martin* [**315] court invalidated an ordinance that banned all door-to-door soliciting (in that case the speech was the noncommercial ideas of a religious sect), even at homes where the residents wished to hear the speech. This exclusion "substitute[d] the judgment of the community for the judgment of the individual householder." ( *Martin,* at p. 144.) Instead, the court authorized the property owner to indicate his desire not to be disturbed. "This or any similar regulation leaves the decision as to whether distributers of literature may lawfully call at a home where it belongs--with the homeowner himself." ( *Id.* at p. 148.) A speaker is entitled to speak with willing listeners but not unwilling ones. [*1370] "A city can punish those who call at a home *in defiance of the previously expressed will of the occupant* . . . ." (*Ibid.,* italics added.) *Watchtower, supra,* 536 U.S. 150, reaffirmed the listener's complete autonomy to accept or reject offered speech.

*Martin* further recognized that the decisions regarding whether to accept a particular message must be made

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

by a nongovernmental actor, but not necessarily by every single potential listener on an individual level. "No one supposes . . . that the First Amendment prohibits a state from preventing the distribution of leaflets in a church against the will of the *church authorities*." (*Martin, supra*, 319 U.S. at p. 143, italics added.) Unanimity among the congregation is not required. (See also *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244 [121 Cal. Rptr. 2d 810] (*Church of Christ*).) The Supreme Court reaffirmed this rule in *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551 [33 L. Ed. 2d 131, 92 S. Ct. 2219] (*Lloyd*) and [***55] *Hudgens v. NLRB* (1976) 424 U.S. 507 [47 L. Ed. 2d 196, 96 S. Ct. 1029], where private shopping mall owners validly excluded speakers from their malls. The owners could make this decision, even though they were not the "intended and actual recipients of [the speakers'] messages." (Maj. opn., *ante*, at p. 1365.) The owners had no obligation to obtain the agreement of every individual store within the mall, or of every employee within every store in the mall. [1]

    1   The majority distinguishes *Church of Christ* on its facts, by asserting that a former church member could be barred from church property because she had a "tangible presence" on the church's property. (Maj. opn., *ante*, at p. 1364.) But the majority does not refute the legal point that "the mere judicial enforcement of neutral trespass laws by the private owner of property does not alone render it a state actor." (*CompuServe, Inc. v. Cyber Promotions, Inc.* (S.D. Ohio 1997) 962 F. Supp. 1015, 1026 (*CompuServe*).)

    The First Amendment does not shield Hamidi's speech, and the majority's authorities do not suggest it does. On the contrary, the high court recognized that the First Amendment does not preclude generally applicable laws, even where they incidentally restrict speech. (*Cohen v. Cowles Media Co.* (1991) 501 U.S. 663, 669 [115 L. Ed. 2d 586, 111 S. Ct. 2513].) There is thus no right to intrude upon privately owned property simply to generate speech. (*Ibid.*)

    The majority cites *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L. Ed. 2d 686, 84 S. Ct. 710], as well as *N.A.A.C.P. v. Claiborne Hardware Co.* (1982) 458 U.S. 886 [73 L. Ed. 2d 1215, 102 S. Ct. 3409], and *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753 [129 L. Ed. 2d 593, 114 S. Ct. 2516], none of which is apposite. In these cases, speakers enjoyed First Amendment protection when they spoke to the public through a newspaper advertisement (with the newspaper's consent) or a pro-

test on a public street, a traditional public forum. (*Schneider v. State* (1939) 308 U.S. 147 [84 L. Ed. 155, 60 S. Ct. 146].) If Hamidi had similarly expressed his anti-Intel feelings in a newspaper advertisement or from a public street, these authorities would be on point. By contrast, nothing in *New York Times* entitles a computer hacker to alter an online newspaper's content so that it expresses the hacker's opinions against the paper's wishes.

    Intel's right to use reasonable force (see maj. opn., *ante*, at p. 1352), to prevent interference with its property distinguishes this case from the majority's United States Supreme Court precedents. Whereas Intel could attempt to block the unwanted messages, Sullivan, who claimed to have been libeled by the newspaper, could not have burned the newspapers to prevent their publication, nor could the targets of the public protesters in *Claiborne Hardware* or *Madsen* have driven them from the public streets where they were speaking. Contrariwise, Intel, as the majority does not dispute, would have been allowed to suppress Hamidi's messages if it had been able to do so.

    [*1371] This rule applies not only to real property but also to chattels like a computer system. In *Loving v. Boren, supra*, 956 F. Supp. at page 955, the court held that the University [**316] of Oklahoma could restrict the use of its computer system to exclude pornographic messages, notwithstanding the contrary preferences of any individual faculty member (or student). Intel may similarly control the use of its own property, regardless of any specific employee's contrary wishes. (See also Bus. & Prof. Code, § 17538.4, subd. (h).) In any event, Hamidi had ample opportunity in his preobjection e-mails to direct employees to his Web site or request the employees' private e-mail addresses. He thus continues to use the internal Intel network to speak to an unreceptive audience. [2]

    2   Hamidi required employees to take affirmative steps to remove themselves from the mailing list. Not only might some employees have declined to do so because such removal might involve a greater burden than simply deleting the unwanted message, but they also might reasonably have assumed that such requests could be counterproductive. (Whang, *An Analysis of California's Common and Statutory Law Dealing with Unsolicited Commercial Electronic Mail: An Argument for Revision* (2000) 37 San Diego L.Rev. 1201, 1205-1206 (Whang).) " 'Don't respond [to spam]! Don't ask them to "take you off a list." People

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

who respond--even negatively--are viewed as Grade A targets. You will probably get more junk than ever.' " ( *Id.* at p. 1206 & fn. 24, quoting Campbell, *Waging War on Internet Spammers*, Toronto Star (Aug. 26, 1999) p. L5.)

[***56] Accordingly, all that matters is that Intel exercised the right recognized in *Martin* to exclude unwanted speech. The instant case is considerably easier than *Lloyd* and *Hudgens* in light of the severe infringement on Intel's autonomy. Whereas the mall owners had been asked merely to allow others to speak, Intel, through its server, must itself actively "participate in the dissemination of an ideological message by displaying it on ... private property in a manner and for the express purpose that it be observed and read ... ." ( *Wooley v. Maynard* (1977) 430 U.S. 705, 713 [51 L. Ed. 2d 752, 97 S. Ct. 1428].)

The principle that a speaker's right to speak to a particular listener exists for only so long as the listener wishes to listen applies also to mail delivery. ( *Rowan, supra,* 397 U.S. 728.) In *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60 [77 L. Ed. 2d 469, 103 S. Ct. 2875] (*Bolger*), the court struck down a law barring the mailing of information regarding contraception because the *government* was deciding which messages could be delivered. But *Bolger* cited *Rowan* with approval--a case that upheld the procedure by which *private parties* could refuse to receive specific materials. "[A] [*1372] sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail." ( *Rowan, supra,* 397 U.S.at p. 736.) Citing *Martin, supra,* 319 U.S. 141, *Rowan* held "a mailer's right to communicate must stop at the mailbox of an unreceptive addressee. [¶] ... [¶] To hold less would tend to license a form of trespass." ( *Rowan, at* pp.736-737, italics added.) Furthermore, *Bolger* expressly contemplated that some family members would exclude materials on behalf of others; the right to accept or reject speech thus belonged to the household, not each individual member. ( *Bolger, at* p. 73.)

The pertinent precedent for an anti-spam case is *Rowan,* which involved private action, not *Bolger,* which involved governmental action. " '[H]ere we are not dealing with a governmental agency which seeks to preempt in some way the ability of a publisher to contact a potential reader; rather, we are dealing with a reader who is familiar with the publisher's product, and who is attempting to prevent the unwanted dumping of this product on his property.' " ( *CompuServe, supra,* 962 F. Supp. at p. 1027, quoting *Tillman, supra,* 648 N.Y.S.2d at p. 635.)

*Rowan* further held the recipient could reject a message for any subjective reason, including annoyance or discomfort at its content. ( *Rowan, supra,* 397 U.S. at p.

738.) A private actor thus has no obligation to hear all messages just because he chooses to hear some. A homeowner's desire to receive letters from relatives or friends does not compel him to accept offensive solicitations. It is therefore possibly true but certainly immaterial that Intel might have expected that some unwanted messages would be sent to its employees. A store that opens its doors to the public should reasonably expect some individuals will attempt to shoplift, but the store does [**317] not thereby incur an obligation to accept their presence and the disruption they cause.

[***57] If we did create an "accept one, accept all" rule, whereby a party's acceptance of outside mail abrogates the right to exclude any messages, the result would likely be less speech, not more. Courts have recognized the seeming paradox that permitting the exclusion of speech is necessary to safeguard it. "It is ironic that if defendants were to prevail on their First Amendment arguments, the viability of electronic mail as an effective means of communication for the rest of society would be put at risk." ( *CompuServe, supra,* 962 F. Supp. at p. 1028.) The Court of Appeal below likewise observed that employers' tolerance for reasonable personal use of computers "would vanish if they had no way to limit such personal usage of company equipment." (Cf. [*1373] *Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241, 256 [41 L. Ed. 2d 730, 94 S. Ct. 2831] [compulsory fair reply law would deter newspaper from speaking to avoid forced expression of disagreeable speech].) Furthermore, merely *permitting* exclusion may be insufficient absent a mechanism for enforcement. If spamming expands to a new volume of activity, "[t]he cost increases that would result from a massive increase in volume could even lead many sites to discontinue supporting standard e-mail altogether. Within a few years, e-mail may no longer be the near-universal method for communicating with people via the Internet that it is today." (Sorkin, *Technical and Legal Approaches to Unsolicited Electronic Mail* (2001) 35 U.S.F. L.Rev. 325, 338-339, fn. omitted (Sorkin).)

The majority expresses its agreement with the dissent below, which found that if the lost productivity of Intel's employees serves as the requisite injury, "then every unsolicited communication that does not further the business's objectives (including telephone calls) interferes with the chattel. ... [¶] ... [¶] ... Under Intel's theory, even lovers' quarrels could turn into trespass suits by reason of the receipt of unsolicited letters or calls from the jilted lover. Imagine what happens after the angry lover tells her fiance not to call again and violently hangs up the phone. Fifteen minutes later the phone rings. Her fiance wishing to make up? No, trespass to chattel." But just as private citizens may deny access to door-to-door solicitors or mailers, they may also maintain the integrity

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

of their phone system from callers they wish to exclude. A telephone, no less than an envelope, may be an instrument of trespass. (See *Thrifty-Tel, Inc., supra*, 46 Cal.App.4th at pp. 1566-1567.)

Individuals may not commandeer the communications systems of unwilling listeners, even if the speakers are jilted lovers who wish to reconcile. (*People v. Miguez* (Crim. Ct. 1990) 147 Misc. 2d 482 [556 N.Y.S.2d 231].) [3] The *Miguez* defendant repeatedly left messages [4] on the complainant's answering machine and pager, "interrupting him in his professional capacity as a doctor." (*Id.* at p. 232.) It was the *disruptive volume* (not the specific content) of calls from which the complainant was entitled to relief. Similarly, an individual could not lawfully telephone a police department 28 times in 3 hours and 20 minutes to inquire about a civil matter where the police told him not to call because he was disrupting police operations. [***58] (*People v. Smith* (App.Div. 1977) 89 Misc. 2d 789 [392 N.Y.S.2d 968, 969-970].)

> 3  New York further proscribes such conduct as criminal. (*People v. Miguez, supra*, 556 N.Y.S.2d 231.)
> 4  Some of the messages reflected a desire to reconcile: " ' "Please don't hurt me anymore. You've hurt me enough, I still love you." ' " A later call stated, " ' "Eddie I want to give you my number; even if you don't call me, I want you to have it." ' " (*People v. Miguez, supra*, 556 N.Y.S.2d. at p. 232.)

The law on faxes is even stricter. As faxes shift the costs of speech from the speaker to the listener, senders of commercial e-mail must obtain prior [*1374] consent from the recipient. (47 U.S.C. § 227.) Likewise, the users of automated telephone dialers also must obtain prior consent where they result in costs to the recipient. (47 U.S.C. § 227(b)(1)(A)(iii); *Missouri ex. rel. Nixon v. American Blast Fax, Inc.* (8th Cir. 2003) 323 F.3d 649, 657 (*Blast Fax*).) Because e-mail permits mass unwanted communications without the sender's having to bear the costs of postage or [**318] labor, there is a much greater incentive for sending unwanted e-mail, and thus the potential volume of unwanted e-mail may create even greater problems for recipients than the smaller volume of unwanted faxes. (*Whang, supra*, 37 an Diego L.Rev. at p. 1216 & fn. 112.) In any event, honoring the wishes of a party who requests the cessation of unwanted telecommunications, whether by phone, fax or e-mail, does nothing more than apply *Martin* to today's technology. (Shannon, *Combating Unsolicited Sales Calls: The "Do-Not-Call" Approach to Solving the Telemarketing Problem* (2001) 27 J. Legis. 381, 394.)

Therefore, before the listener objects, the speaker need not fear he is trespassing. Afterwards, however, the First Amendment principle of respect for personal autonomy compels forbearance. "The Court has traditionally respected the right of a householder to bar, by order or notice, [speakers] from his property. See *Martin v. City of Struthers, supra,* .... In this case *the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings* from that mailer." (*Rowan, supra*, 397 U.S. at p. 737, italics added.) Speakers need not obtain affirmative consent before speaking, and thus have no reason to fear unexpected liability for trespass, but they must respect the decisions of listeners once expressed. The First Amendment protects the right not to listen just as it protects the right to speak.

### THE TRIAL COURT CORRECTLY ISSUED THE INJUNCTION

Intel had the right to exclude the unwanted speaker from its property, which Hamidi does not dispute; he does not argue that he has a right to force unwanted messages on Intel. The instant case thus turns on the question of whether Intel deserves a remedy for the continuing violation of its rights. I believe it does, and as numerous cases have demonstrated, an injunction to prevent a trespass to chattels is an appropriate means of enforcement.

The majority does not find that Hamidi has an affirmative right to have Intel transmit his messages, but denies Intel any remedy. Admittedly, the case would be easier if precise statutory provisions supported relief, but in the rapidly changing world of technology, in which even technologically savvy providers like America Online and CompuServe are one step behind spammers, the Legislature will likely remain three or four steps behind. In [*1375] any event, the absence of a statutory remedy does not privilege Hamidi's interference with Intel's property. Nor are content-based speech torts adequate for violations of property rights unrelated to the speech's content. In any event, the possibility of another avenue for relief does not preclude an injunction for trespass to chattels.

The majority denies relief on the theory that Intel has failed to establish the requisite actual injury. As discussed, *post*, however, the injunction was properly [***59] granted because the rule requiring actual injury pertains to damages, not equitable relief, and thus courts considering comparable intrusions have provided injunctive relief without a showing of actual injury. Furthermore, there was actual injury as (1) Intel suffered economic loss; (2) it is sufficient for the injury to impair the chattel's utility to the owner rather than the chattel's market value; and (3) even in the absence of any injury to the owner's utility, it is nevertheless a trespass where one party expropriates for his own use the resources paid for by another.

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

*Harmless Trespasses to Chattels May Be Prevented*

Defendant Hamidi used Intel's server in violation of the latter's demand to stop. This unlawful use of Intel's system interfered with the use of the system by Intel employees. This misconduct creates a cause of action. "[I]t is a trespass to damage goods or destroy them, *to make an unpermitted use of them,* or to move them from one place to another." (Prosser & Keeton on Torts (5th ed. 1984) Trespass to Chattels, § 14, p. 85, fns. omitted & italics added.) "[T]he unlawful taking away of another's personal property, the seizure of property upon a wrongful execution, and *the appropriation of another's property to one's own use, even for a temporary purpose,* constitute trespasses, although [**319] a mere removal of property without injuring it is not a trespass *when done by one acting rightfully.*" (7 Speiser et al., American Law of Torts (1990) Trespass, § 23:23, p. 667, fns. omitted & italics added (*Speiser*).)

Regardless of whether property is real or personal, it is beyond dispute that an individual has the right to have his personal property free from interference. There is some division among authorities regarding the available remedy, particularly whether a harmless trespass supports a claim for nominal damages. The North Carolina Court of Appeal has found there is no damage requirement for a trespass to chattel. (See *Hawkins v. Hawkins* (N.C.Ct.App. 1991) 101 N.C. App. 529 [400 S.E.2d 472, 475].) "A trespass to goods is actionable *per se* without any proof of actual damage. Any unauthorized touching or moving of an object is actionable at the suit of the possessor of it, even though no harm ensues. " (Salmond & Heuston, The Law of Torts [*1376] (21st ed. 1996) Trespass to Goods § 6.2, p. 95, fns. omitted.) Several authorities consider a harmless trespass to goods actionable per se only if it is intentional. (Winfield & Jolowicz on Torts (10th ed. 1975) Trespass to Goods, p. 403 (Winfield & Jolowicz); Clerk & Lindsell on Torts (17th ed. 1995) ¶ 13-159, p. 703.) The Restatement Second of Torts, section 218, which is less inclined to favor liability, likewise forbids unauthorized use and recognizes the inviolability of personal property. However, the Restatement permits the owner to *prevent the injury* beforehand, or *receive compensation* afterward, but not to *profit from the trespass* through the remedy of damages unrelated to actual harm, which could result in a windfall. ( *Thrifty-Tel, supra,* 46 Cal.App.4th at p. 1569; Whang, *supra*, 37 San Diego L.Rev. at p. 1223.) "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection *by an action for nominal damages* for harmless intermeddlings with the chattel. ... Sufficient legal protection of the possessor's interest in the mere *inviolability of his chattel* is afforded by his *privilege to use reasonable force* to protect his possession

against *even harmless interference.*" (Rest.2d Torts, § 218, com. e, pp. 421-422, italics added.) Accordingly, the protection of land and chattels may differ on the question of nominal damages unrelated to [***60] actual injury. The authorities agree, however, that (1) the chattel is inviolable, (2) the trespasser need not tolerate even harmless interference, and (3) the possessor may use reasonable force to prevent it. Both California law and the Restatement authorize reasonable force regardless of whether the property in question is real or personal. (Civ. Code, § 51; Rest.2d Torts, § 77.)

The law's special respect for land ownership supports liability for damages even without actual harm. (Speiser, *supra,* § 23:1, p. 592.) By contrast, one who suffers interference with a chattel may *prevent* the interference before or during the fact, *or recover actual damages* (corresponding to the harm suffered), but at least according to the Restatement, may not recover damages in excess of those suffered. But the Restatement expressly refutes defendant's assertion that only real property is inviolable. From the modest distinction holding that only victims of a trespass to land may profit in the form of damages exceeding actual harm, defendant offers the position that only trespasses to land may be *prevented.* The law is to the contrary; numerous cases have authorized injunctive relief to safeguard the inviolability of personal property.

The law favors prevention over posttrespass recovery, as it is permissible to use reasonable force to retain possession of a chattel but not to recover it after possession has been lost. (See 1 Dobbs, The Law of Torts (2001) §§ 76, 81, pp. 170, 186; see also [*1377] *Deevy v. Tassi* (1942) 21 Cal.2d 109, 118-119 [130 P.2d 389].) Notwithstanding the general rule that injunctive relief requires a showing of irreparable injury (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 782, p. 239), Witkin also observes there are exceptions to this rule where injunctive relief is appropriate; these include repetitive trespasses. (*Id.,* § 784, p. 242.) The first case cited in that section, *Mendelson v. McCabe* (1904) 144 Cal. 230 [77 P. 915] (*Mendelson*), is apposite to our analysis.

[**320] In entering McCabe's property, Mendelson exceeded the scope of the consent he received to do so. McCabe had granted Mendelson the right to pass through his property on condition that Mendelson close the gates properly, which he did not do. ( *Mendelson, supra,* 144 Cal. at pp. 231-232.) McCabe "did not allege that any actual damage had been caused by the acts of [Mendelson] ... in leaving the gates open." ( *Id.* at p. 232.) After finding that Mendelson planned to continue his conduct over McCabe's objection, we authorized injunctive relief. ( *Id.* at pp. 233-234.) Our analysis in *Mendelson* applies here as well. "The right to an injunction is not always defeated by the mere absence of substantial damage from

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

the acts sought to be enjoined. The acts of the plaintiff in leaving the gates open, if persisted in as he threatens, will constitute a continual invasion of the right of the defendant to maintain the gates ... . Moreover, the only remedy, other than that of an injunction, for the injury arising from such continued trespass, would be an action against the plaintiff for damages upon each occasion when he left the gates open. The damage in each case would be very small, probably insufficient to defray the expenses of maintaining the action not recoverable as costs. Such remedy is inadequate and would require numerous petty suits, which it is not the policy of the law to encourage." ( *Id.* at pp. 232-233.)

Our decision thus noted that injunctive relief was proper, regardless of actual injury, (1) if it is necessary to protect the trespassee's right to control his property, or (2) if suits for damages are impractical, because no individual suit would be worthwhile. [***61] Accordingly, we reiterated the rule that " '[a] trespass of a continuing nature, whose constant recurrence renders the remedy at law inadequate, unless by a multiplicity of suits, affords sufficient ground for relief.' " ( *Mendelson, supra, 144 Cal.* at p. 233.) Both *Mendelson* grounds support an injunction here.

"Injunction is a proper remedy against threatened repeated acts of trespass ... particularly where the probable injury resulting therefrom will be [*1378] 'beyond any method of pecuniary estimation,' and for this reason irreparable." [5] ( *Uptown Enterprises v. Strand* (1961) 195 Cal. App. 2d 45, 52 [15 Cal. Rptr. 486]; see also *ibid.* [an otherwise lawful "entry for the purpose of harassing the owner, giving his business a bad reputation ... or unjustifiably interfering with the business relations between him and his patrons is unauthorized, wrongful and actionable"].) Although *Mendelson* and *Uptown Enterprises* concerned real property, the principles of safeguarding a party's possessory interest in property and of not encouraging repetitive litigation apply no less to trespasses to chattels. Accordingly, several courts have issued injunctive relief to prevent interference with personal property.

[5]  The majority asserts Intel was not deprived of its computers "for any measurable length of time" (maj. opn., *ante,* at p. 1353), which supposedly fits this case within the rule that a " 'mere momentary or theoretical' " deprivation is insufficient to establish a trespass to chattel (maj. opn., *ante,* at p. 1357). There is a chasm between the two descriptions. The time needed to identify and delete 200,000 e-mail messages is not capable of precise estimation, but it is hardly theoretical or momentary. Most people have no idea of how many words they spoke yesterday, but that does not render the figure de minimis.

In 1996, the Appellate Division of the New York Supreme Court considered the claim of plaintiff Tillman, who sought to enjoin the unwanted delivery of a newspaper onto his property. ( *Tillman, supra,* 648 N.Y.S.2d 630.) He offered no specific critique of the newspaper's content, observing only " '[t]here is no reason that we have to clean up [defendant's] mess.' " ( *Id.* at p. 632.) Citing *Rowan, Martin,* and *Lloyd,* the court rejected the defendants' argument "that there is nothing a homeowner can do to stop the dumping on his or her property of pamphlets or newspapers, no matter how offensive they might be," and instead upheld Tillman's right to prevent the mail's delivery, regardless of whether his objection was due to the quantity (volume) or quality (content) of the messages. ( *Tillman,* at p. 636.) In authorizing injunctive relief, the *Tillman* court found no need to quantify the actual damage created by the delivery; it merely [**321] noted that the homeowner should not be forced either "to allow such unwanted newspapers to accumulate, or to expend the time and energy necessary to gather and to dispose of them." ( *Ibid.* ) Subsequent courts have extended this policy to the delivery of e-mail as well.

The *CompuServe* court followed *Tillman* in authorizing an injunction to prevent the delivery of unwanted e-mail messages. ( *CompuServe, supra,* 962 F. Supp. 1015.) The majority summarily distinguishes *CompuServe* and its progeny by noting there the "plaintiff showed, or was prepared to show, some interference with the efficient functioning of its computer system." (Maj. opn., *ante,* at p. 1354.) But although *CompuServe* did note the impairment imposed by the defendant's unsolicited e-mail, this was not part of its [*1379] holding. Just before beginning its analysis, the court summarized its ruling without mentioning impairment. "[T]his Court holds [***62] that where defendants engaged in a course of conduct of transmitting a substantial volume of electronic data in the form of unsolicited e-mail to plaintiff's proprietary computer equipment, where defendants continued such practice after repeated demands to cease and desist, and where defendants deliberately evaded plaintiff's affirmative efforts to protect its computer equipment from such use, plaintiff has a viable claim for trespass to personal property and is entitled to injunctive relief to protect its property." ( *CompuServe, supra,* 962 F. Supp. at p. 1017.) The cited criteria apply fully to Hamidi's conduct. Likewise, the conclusion of *CompuServe*'s analysis fully applies here: "Defendants' intentional use of plaintiff's proprietary computer equipment exceeds plaintiff's consent and, indeed, continued after repeated demands that defendants cease. Such use is an actionable trespass to plaintiff's chattel." ( *Id.* at p. 1027.)

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

Post-*CompuServe* case law has emphasized that unauthorized use of another's property establishes a trespass, even without a showing of physical damage. "Although eBay appears unlikely to be able to show a substantial interference at this time, such a showing is not required. Conduct that does not amount to a substantial interference with possession, but which consists of intermeddling with or use of another's personal property, is sufficient to establish a cause of action for trespass to chattel." (*e Bay, Inc. v. Bidder's Edge, Inc.* (N.D.Cal. 2000) 100 F. Supp. 2d 1058, 1070.) [6] "While the *eBay* decision could be read to require an interference that was more than negligible, ... this Court concludes that *eBay*, in fact, imposes no such requirement. Ultimately, the court in that case concluded that the defendant's conduct was sufficient to establish a cause of action for trespass not because the interference was 'substantial' but simply because the defendant's conduct amounted to 'use' of Plaintiff's computer." (*Oyster Software, Inc. v. Forms Processing, Inc.* (N.D.Cal., Dec. 6, 2001, No. C-00-0724 JCS) 2001 WL1736382 at *13.) An intruder is not entitled to sleep in his neighbor's car, even if he does not chip the paint.

> [6]   The majority asserts *eBay* does require impairment, because the opinion noted that the *wide replication* of the defendant's conduct would *likely* impair the functioning of the plaintiff's system. (Maj. opn., *ante*, at pp. 1354-1355.) Of course, the "wide replication" of Hamidi's conduct would likely impair Intel's operating system. Accordingly, a diluted "likely impairment through wide replication" standard would favor Intel, not Hamidi.

Hamidi concedes Intel's legal entitlement to block the unwanted messages. The problem is that although Intel has resorted to the cyberspace version of reasonable force, it has so far been unsuccessful in determining how to resist the unwanted use of its system. Thus, while Intel has the legal [*1380] right to exclude Hamidi from its system, it does not have the physical ability. It *may* forbid Hamidi's use, but it *cannot* prevent it.

To the majority, Hamidi's ability to outwit Intel's cyber defenses justifies denial of Intel's claim to exclusive use of its property. Under this reasoning, it is not right but might that determines the extent of a party's possessory interest. Although the world often works this way, the legal system should not.

### [**322] *Intel Suffered Injury*

Even if *CompuServe* and its progeny deem injury a prerequisite for injunctive relief, such injury occurred here. Intel suffered not merely an affront to its dignitary interest in ownership but tangible economic loss. Fur-

thermore, notwithstanding [***63] the majority's doubts, it is entirely consistent with the Restatement and case law to recognize a property interest in the subjective utility of one's property. Finally, case law further recognizes as actionable the loss that occurs when one party maintains property for its own use and another party uses it, even if the property does not suffer damage as a result.

#### *Intel suffered economic loss*

Courts have recognized the tangible costs imposed by the receipt of unsolicited bulk e-mail (UBE). [7] Approximately 10 percent of the cost of Internet access arises from the delivery of UBE, because networks must expand to ensure their functioning will not be disturbed by the unwanted messages and must design software to reduce the flood of spam. (Whang, *supra*, 37 San Diego L.Rev. at pp. 1203 & fn. 10, 1207 & fn. 37.) Especially where bulk e-mailers mask the true content of their messages in the "header" (as Hamidi did), there is a shift in costs from sender to recipient that resembles " 'sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone.' " (*Ferguson v. Friendfinders* (2002) 94 Cal.App.4th 1255, 1268 [115 Cal. Rptr. 2d 258] (*Ferguson*), quoting *State v. Heckel* (2001) 143 Wn.2d 824 [24 P.3d 404, 410] (*Heckel*).) E-mail may be cheaper and more efficient than [*1381] other means of communication, but "[t]here is no constitutional requirement that the incremental cost of sending massive quantities of unsolicited [messages] must be borne by the recipients." (*CompuServe, supra*, 962 F. Supp. at p. 1026.)

> [7]   There is considerable debate regarding whether "spam" encompasses only unsolicited commercial e-mail (UCE) or all UBE, regardless of its commercial nature. (Sorkin, *supra*, 35 U.S.F. L.Rev at pp. 333-335.) Because parties object to spam due to its volume rather than the sender's motivation, UBE is a preferable definition. (*Id.* at p. 335.) Moreover, as our decision in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939 [119 Cal. Rptr. 2d 296, 45 P.3d 243] made plain, there is no bright-line distinction between commercial and noncommercial speech. (See also *City of Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410, 419 [123 L. Ed. 2d 99, 113 S. Ct. 1505].)

The *Ferguson* court noted the tangible economic loss to employers created by unwanted e-mail. "Individuals who receive UCE can experience increased Internet access fees because of the time required to sort, read, discard, and attempt to prevent future sending of UCE. If the individual undertakes this process at work, *his or her employer suffers the financial consequences of the wasted time.*" (*Ferguson, supra*, 94 Cal.App.4th at p.

1267, italics added.) *CompuServe* likewise observed the recipient of unwanted e-mail must "sift through, *at his expense,* all of the messages in order to find the ones he wanted or expected to receive." ( *CompuServe, supra,* 962 F. Supp. at p. 1023, italics added.) Unwanted messages also drain the equipment's processing power, and slow down the transfers of electronic data. ( *Id.* at pp. 1022, 1028.)

The economic costs of unwanted e-mail exist even if Intel employees, unlike CompuServe subscribers, do not pay directly for the time they spend on the Internet. No such *direct* costs appear here, only the opportunity costs of lost time. But for Intel, "time is money" nonetheless. One justification for the strict rule against unsolicited faxes is that they "shift[] costs to the recipients who are forced to contribute ink, paper, wear on their fax machines, *as well as personnel time."* ( *Blast Fax, supra,* 323 F.3d at p. 652, italics added.) ( *In re Johnny M.* (2002) 100 Cal.App.4th 1128 [123 Cal. Rptr. 2d 316] [vandalism that diverted salaried employees from ordinary [***64] duties caused economic loss through lost work product].)

Courts have also recognized the harm produced by unwanted paper mail. Mail sent in violation of a request to stop creates the *"burdens* of scrutinizing the mail for objectionable material and possible harassment." ( *Rowan, supra,* 397 U.S. at p. 735, italics added.) The *Tillman* court thus held a newspaper could not compel unwilling [**323] recipients *"to spend their own time or money* unwillingly participating in the distribution process by which a newspaper travels from the printing press to its ultimate destination, i.e., disposal." ( *Tillman, supra,* 648 N.Y.S.2d at p. 636, italics added.) [8]

8  Citing to *Bolger, supra,* 463 U.S. at page 72, for the proposition that the Constitution imposes on recipients the burden of disposing of unwanted mail, is inapposite because, as explained in part I, *ante, Bolger* involved the *government's* objections to the delivery, not the objection of a non-governmental actor like Intel, which, under *Rowan, supra,* 397 U.S at pages 736-738, may exclude unwanted mail.

Although Hamidi claims he sent only six e-mails, he sent them to between 8,000 and 35,000 employees, thus sending from 48,000 to·210,000 messages. Since it is the effect on Intel that is determinative, it is the number of [*1382] messages received, not sent, that matters. In any event, Hamidi *sent* between 48,000 and 210,000 messages; the "six" refers only to the number of distinct texts Hamidi sent. Even if it takes little time to determine the author of a message and then delete it, this process, multiplied hundreds of thousands of times, amounts to a substantial loss of employee time, and thus work prod-

uct.  If Intel received 200,000 messages, and each one could be skimmed and deleted in six seconds, it would take approximately 333 hours, or 42 business days, to delete them all. In other words, if Intel hired an employee to remove all unwanted mail, it would take that individual two entire months to finish. (Cf. *Tubbs v. Delk* (Mo.Ct.App.  1996) 932 S.W.2d 454, 456 *(Tubbs)* [deprivation of access to chattel for " 'less than five minutes' " constitutes actionable trespass, although found justified there].)

*Intel's injury is properly related to the chattel*

The majority does not dispute that Intel suffered a loss of work product as a matter of fact, so much as it denies that this loss may constitute the requisite injury as a matter of law. According to the majority, the reduced utility of the chattel to the owner does not constitute a sufficiently cognizable injury, which exists only where the chattel itself suffers injury, i.e., its "market value" falls. The Restatement and related case law are to the contrary.

The Restatement recognizes that the measure of impairment may be subjective; a cognizable injury may occur not only when the trespass reduces the chattel's market value but also when the trespass affects its value to the owner. "In the great majority of cases, the actor's intermeddling with the chattel impairs the value of it to the possessor, as distinguished from the mere affront to his dignity as possessor, only by some impairment of the physical condition of the chattel. There may, however, be situations in which the *value to the owner* of a particular type of chattel may be impaired by dealing with it in a manner that does not affect its·physical condition." (Rest.2d Torts, § 218, com. h , p. 422, italics added.)

The Restatement goes on to explain that A's using B's toothbrush could extinguish its value to B. The brushing constitutes a trespass by impairing the brush's subjective value to the owner rather than its market value. (Rest.2d Torts, § 218, com. h, p. 422 [***65]  .) Moreover, there can be a trespass even though the chattel is used as intended--to brush teeth--if it is used by an unwanted party.

As the Court of Appeal's opinion below indicated, interference with an owner's ability to use the chattel supports a trespass. The opinion recalled [*1383] the rule, which·dates back almost 400 years, holding that chasing an owner's animal amounts to a trespass to chattels. (See, e.g., *Farmer v. Hunt* (1610) 123 Eng.Rep. 766; Winfield & Jolowicz, *supra,* Trespass to Goods, p. 403.) These authorities do not require injury or damage *to the, animal;* the interference with the *owner's use of the animal* suffices to create a trespass. (Winfield & Jolowicz, p. 40.) Interference is actionable if it "deprives the possessor of the use of that chattel." (Fleming, The Law of

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

Torts (9th ed. 1998) Trespass, § 4.1, p. 598.) Moreover, such interference need not *permanently deny* the owner the ability to use the chattel--mere *delay* is enough. (See *Tubbs, supra,* 932 S.W.2d at p. 456.)

[**324] A contemporary version of this interference would occur if a trespasser unplugged the computers of the entire Intel staff and moved them to a high shelf in each employee's office or cubicle. The computers themselves would suffer no damage, but all 35,000 employees would need to take the time to retrieve their computers and restart them. This would reduce the computers' utility to Intel, for, like the chased animals, they would not be available for immediate use. If the chasing of a few animals supports a trespass, then so does even minimal interference with a system used by 35,000 individuals.

*CompuServe* is in accord, as it observed how a bundle of unwanted messages decreased the utility of the server. (*CompuServe, supra,* 962 F. Supp. at p. 1023.) Here, Intel maintains a possessory interest in the efficient and productive use of its system--which it spends millions of dollars to acquire and maintain. Hamidi's conduct has impaired the system's optimal functioning for Intel's business purposes. As the Restatement supports liability where "harm is caused to some . . . thing in which the possessor has a legally protected interest" (Rest.2d Torts, § 218, subd. (d)), Hamidi has trespassed upon Intel's chattel.

*The unlawful use of another's property is a trespass, regardless of its effect on the property's utility to the owner*

Finally, even if Hamidi's interference did not affect the server's utility to Intel, it would still amount to a trespass. Intel has poured millions of dollars into a resource that Hamidi has now appropriated for his own use. As noted above, "the appropriation of another's property to one's own use, even for a temporary purpose, constitute[s] [a] trespass[]." (Speiser, *supra,* § 23:23, p. 667, fn. omitted.) The use by one party of property whose costs have been paid by another amounts to an unlawful taking of those resources--even if there is no unjust enrichment by the trespassing party.

In *Buchanan Marine Inc. v. McCormack Sand Co.* (E.D.N.Y. 1990) 743 F. Supp. 139 (*Buchanan*), the plaintiff built and maintained mooring buoys [*1384] for use by its own tugboats. The defendants' barges used the buoy over the plaintiff's objection. (*Id.* at pp. 140-141 .) The federal district court found such unlawful use could constitute a trespass to chattels (if the facts were proved), and thus denied the defendants' motion for summary judgment. "[D]efendants' meddling with [the buoy] is either a trespass to a chattel or perhaps a conversion for which [the plaintiff] may seek relief in the form

of damages and an injunction." (*Id.* at pp. 141-142.) There [***66] was an allegation of damage (to the plaintiff's barge, not the buoy itself), which could support a claim for damages, but this was not a prerequisite for injunctive relief. Even if the defendants did not injure the buoys in any way, they still had no right to expropriate the plaintiff's property for their own advantage.

The instant case involves a similar taking. Intel has paid for thousands of computers, as well as the costs of maintaining a server. [9] Like the *Buchanan* defendants, Hamidi has likewise acted as a free rider in enjoying the use of not only Intel's computer system but the extra storage capacity needed to accommodate his messages. Furthermore, Intel's claim, which does not object to Hamidi's speaking independently, [10] only to his use of Intel's property, resembles that of the *Buchanan* plaintiff who "has not sought to prevent others from placing their own mooring buoys in the Harbor," but only the use of the [**325] plaintiff's property. [11] (*Buchanan, supra,* 743 F. Supp. at p. 142.) Hamidi has thus unlawfully shifted the costs of his speaking to Intel. (*Ferguson, supra,* 94 Cal.App.4th at p. 1268; *Blast Fax, supra,* 323 F.3d at p. 652; *Heckel, supra,* 24 P.3d at p. 410.)

> 9  In fact, Intel pays to maintain a high capacity to ensure that the system does not crash (or slow down); if Intel had not preempted such harm, there is no dispute that Hamidi would be liable for damages. As Professor Epstein cogently observes, Intel is thus being penalized for engaging in preemptive self-help. According to the majority, Intel would do better by saving its money and collecting damages after a crash/slowdown.
>
> 10  Intel does not object to Hamidi's transmitting the same message through his Web site, e-mail to employees' home computers, snail mail to their homes, distribution of materials from outside the company's gates, or any other communication that does not conscript Intel's property into Hamidi's service. Intel does object to the use of its property, regardless of its message. Although Intel objected that Hamidi sent antagonistic messages, Intel would presumably also object if Hamidi sent "blank" messages that slowed down both the Intel system and the employees who use it.
>
> 11  As with the hypothetical toothbrush, the *Buchanan* defendants used the buoy for its intended use. (*Buchanan, supra,* 743 F. Supp. at p. 140.)

Moreover, even such free ridership is not necessary to establish a trespass to chattels. Had the *Thrifty-Tel* defendants succeeded in making free telephone calls without authorization, they would stand in the same position as the *Buchanan* defendants. But the record does

not show they ever succeeded in making calls for which another subscriber (or the phone company itself) would have to pay. *Thus, neither injury to the trespassee nor benefit to the* [*1385] *trespasser is an element of trespass to chattel.* "[T]respass to chattel has evolved considerably from its original common law application--concerning the asportation of another's tangible property--to include even the unauthorized *use* of personal property." ( *Thrifty-Tel, supra,* 46 Cal.App.4th at p. 1566.)

As in those cases in which courts have granted injunctions to prevent the delivery of unwanted mail, paper or electronic, Intel is not attempting to *profit* from its trespass action by receiving nominal damages. Rather, it seeks an injunction to *prevent* further trespass. Moreover, Intel suffered the requisite injury by losing a great deal of work product, a harm properly related to the property itself, as well as the money it spent in maintaining the system, which Hamidi wrongfully expropriated.

CONCLUSION

Those who have contempt for grubby commerce and reverence for the rarified [***67] heights of intellectual discourse may applaud today's decision, but even the flow of ideas will be curtailed if the right to exclude is denied. As the Napster controversy revealed, creative individuals will be less inclined to develop intellectual property if they cannot limit the terms of its transmission. Similarly, if online newspapers cannot charge for access, they will be unable to pay the journalists and editorialists who generate ideas for public consumption.

This connection between the property right to objects and the property right to ideas and speech is not novel. James Madison observed, "a man's land, or merchandise, or money is called his property." (Madison, *Property,* Nat. Gazette (Mar. 27, 1792), reprinted in The Papers of James Madison (Rutland et al. edits., 1983) p. 266, quoted in McGinnis, *The Once and Future Property-Based Vision of the First Amendment* (1996) 63 U.Chi. L.Rev. 49, 65.) Likewise, "a man has a property in his opinions and the free communication of them." (*Ibid.*) Accordingly, "freedom of speech and property rights were seen simply as different aspects of an indivisible concept of liberty." ( *Id.* at p. 63.)

The principles of both personal liberty and social utility should counsel us to usher the common law of property into the digital age.

**MOSK, J.** * --The majority hold that the California tort of trespass to chattels does not encompass the use of expressly unwanted [*1386] electronic mail that causes no physical damage or impairment to the recipient's computer system. They also conclude that because a computer system is not like real property, the rules of trespass to real property are also inapplicable to the cir-

cumstances in this case. Finally, they suggest that an injunction to preclude mass, noncommercial, unwelcome e-mails may offend the interests of free communication.

> * Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

I respectfully disagree and would affirm the trial court's decision. In my view, the repeated transmission of bulk e-mails by appellant Kourosh Kenneth Hamidi (Hamidi) to the employees of Intel Corporation (Intel) on its proprietary confidential e-mail lists, despite Intel's demand that he cease such activities, constituted an actionable trespass to [**326] chattels. The majority fail to distinguish open communication in the public "commons" of the Internet from unauthorized intermeddling on a private, proprietary intranet. Hamidi is not communicating in the equivalent of a town square or of an unsolicited "junk" mailing through the United States Postal Service. His action, in crossing from the public Internet into a private intranet, is more like intruding into a private office mailroom, commandeering the mail cart, and dropping off unwanted broadsides on 30,000 desks. Because Intel's security measures have been circumvented by Hamidi, the majority leave Intel, which has exercised all reasonable self-help efforts, with no recourse unless he causes a malfunction or systems "crash." Hamidi's repeated intrusions did more than merely "prompt[] discussions between '[e]xcited and nervous managers' and the company's human resources department" (maj. opn., *ante,* at p. 1349); they also constituted a misappropriation of Intel's private computer system contrary to its intended use and against Intel's wishes.

The law of trespass to chattels has not universally been limited to physical damage. [***68] I believe it is entirely consistent to apply that legal theory to these circumstances--that is, when a proprietary computer system is being used contrary to its owner's purposes and expressed desires, and self-help has been ineffective. Intel correctly expects protection from an intruder who misuses its proprietary system, its nonpublic directories, and its supposedly controlled connection to the Internet to achieve his bulk mailing objectives--incidentally, without even having to pay postage.

I

Intel maintains an intranet--a proprietary computer network--as a tool for transacting and managing its business, both internally and for external [*1387] business communications. The network and its servers constitute a tangible entity that has value in terms of the costs of its components and its function in enabling and enhancing the productivity and efficiency of Intel's busi-

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

ness operations. Intel has established costly security measures to protect the integrity of its system, including policies about use, proprietary internal e-mail addresses that it does not release to the public for use outside of company business, and a gateway for blocking unwanted electronic mail--a so-called firewall.

1  The Oxford English Dictionary defines an intranet as "A local or restricted computer network; *spec.* a private or corporate network that uses Internet protocols. An intranet may (but need not) be connected to the Internet and be accessible externally to authorized users." (OED Online, new ed., draft entry, Mar. 2003, [as of June 30, 2003]; see also Kokka, *Property Rights on an Intranet*, 3-Spring 1998 J. Tech.L. & Pol'y 3, WL 3 UFLJTLP 3 at *3, *6 [defining an intranet as "an internal network of computers, servers, routers and browser software designed to organize, secure, distribute and collect information within an organization," which in large organizations generally includes a wide range of services, including e-mail].) Contrary to the majority's assertion, there is nothing incorrect about characterizing Hamidi's unauthorized bulk e-mails as intrusions onto Intel's intranet.

The Intel computer usage guidelines, which are promulgated for its employees, state that the computer system is to be "used as a resource in conducting business. Reasonable personal use is permitted, but employees are reminded that these resources are the property of Intel and all information on these resources is also the property of Intel." Examples of personal use that would not be considered reasonable expressly include "use that adversely affects productivity." Employee e-mail communications are neither private nor confidential.

Hamidi, a former Intel employee who had sued Intel and created an organization to disseminate negative information about its employment practices, sent bulk electronic mail on six occasions to as many as 35,000 Intel employees on its proprietary computer system, using Intel's confidential employee e-mail lists and adopting a series of different origination addresses and encoding strategies to elude Intel's blocking efforts. He refused to stop when requested by Intel to do so, asserting that he would ignore its demands: "I don't care. I have grown deaf." Intel sought injunctive relief, alleging that the disruptive effect of the bulk electronic mail, including expenses from administrative and [**327] management personnel, damaged its interest in the proprietary nature of its network.

The trial court, in its order granting summary judgment and a permanent injunction, made the following pertinent findings regarding Hamidi's transmission of

bulk electronic mail: "Intel has requested that Hamidi stop sending the messages, but Hamidi has refused, and has employed surreptitious [***69] means to circumvent Intel's efforts to block entry of his messages into [*1388] Intel's system. . . . [P] . . . The e-mail system is dedicated for use in conducting business, including communications between Intel employees and its customers and vendors. Employee e-mail addresses are not published for use outside company business. . . . [P] The intrusion by Hamidi into the Intel e-mail system has resulted in the expenditure of company resources to seek to block his mailings and to address employee concerns about the mailings. Given Hamidi's evasive techniques to avoid blocking, the self help remedy available to Intel is ineffective." The trial court concluded that "the evidence establishes (without dispute) that Intel has been injured by diminished employee productivity and in devoting company resources to blocking efforts and to addressing employees about Hamidi's e-mails." The trial court further found that the "massive" intrusions "impaired the value to Intel of its e-mail system."

The majority agree that an impairment of Intel's system would result in an action for trespass to chattels, but find that Intel suffered no injury. As did the trial court, I conclude that the undisputed evidence establishes that Intel was substantially harmed by the costs of efforts to block the messages and diminished employee productivity. Additionally, the injunction did not affect Hamidi's ability to communicate with Intel employees by other means; he apparently continues to maintain a Web site to publicize his messages concerning the company. Furthermore, I believe that the trial court and the Court of Appeal correctly determined that the tort of trespass to chattels applies in these circumstances.

The Restatement Second of Torts explains that a trespass to a chattel occurs if "the chattel is impaired as to its *condition, quality, or value*" or if "harm is caused to some . . . thing in which the possessor has a legally protected interest." (Rest.2d Torts, § 218 ; subds. (b) & (d), p. 420, italics added.) As to this tort, a current prominent treatise on the law of torts explains that "[t]he defendant may interfere with the chattel by interfering with the plaintiff's access or use" and observes that the tort has been applied so as "to protect computer systems from electronic invasions by way of unsolicited email or the like." (1 Dobbs, The Law of Torts (2001) § 60, pp. 122-123.) Moreover, "[t]he harm necessary to trigger liability for trespass to chattels can be . . . harm to something other than the chattel itself." ( *Id.* at pp. 124-125; see also 1 Harper et al., The Law of Torts (3d ed. 1996 & 2003 supp.) § 2.3, pp. 2:14-2:18.) The Restatement points out that, unlike a possessor of land, a possessor of a chattel is not given legal protection from harmless invasion, but the "actor" may be liable if the conduct af-

fects "some other and more important *interest* of the possessor." (Rest.2d Torts, § 218, com. (e), p. 421, italics added.)

The Restatement explains that the rationale for requiring harm for trespass to a chattel but not for trespass to land is the availability and effectiveness of [*1389] self-help in the case of trespass to a chattel. "Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference." (Rest.2d Torts, § 218, com. (e), p. 422.) Obviously, "force" is not available to prevent electronic trespasses. As shown by Intel's inability to prevent Hamidi's intrusions, self-help is not an adequate alternative to injunctive relief.

The common law tort of trespass to chattels does not require physical disruption to the chattel. It also may apply [***70] when there is impairment to the "quality" or "value" of the chattel. (Rest.2d Torts, § 218, subd. b, p. 420; see also *id.*, com. (e), pp. 421-422 [liability if "intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel"].) Moreover, as we held in [**328] *Zaslow v. Kroenert* (1946) 29 Cal.2d 541, 551 [176 P.2d 1], it also applies "[w]here the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of or damages to the personal property." [2]

> 2  In *Zaslow*, we observed that when the trespass involves "intermeddling with or use of" another's property, the owner "may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use." ( *Zaslow v. Kroenert, supra,* 29 Cal.2d at p. 551.) We did not state that such damages were a requirement for a cause of action; nor did we address the availability of injunctive relief.

Here, Hamidi's deliberate and continued intermeddling, and threatened intermeddling, with Intel's proprietary computer system for his own purposes that were hostile to Intel, certainly impaired the quality and value of the system as an internal business device for Intel and forced Intel to incur costs to try to maintain the security and integrity of its server--efforts that proved ineffective. These included costs incurred to mitigate injuries that had already occurred. It is not a matter of "bootstrapp[ing]" (maj. opn., *ante*, at p. 1359) to consider those costs a damage to Intel. Indeed, part of the value of the proprietary computer system is the ability to exclude intermeddlers from entering it for significant uses that are disruptive to its owner's business operations.

If Intel, a large business with thousands of former employees, is unable to prevent Hamidi from continued intermeddling, it is not unlikely that other outsiders who obtain access to its proprietary electronic mail addresses would engage in similar conduct, further reducing the value of, and perhaps debilitating, the computer system as a business productivity mechanism. Employees understand that a firewall is in place and expect that the messages they receive are from senders permitted by the corporation. Violation [*1390] of this expectation increases the internal disruption caused by messages that circumvent the company's attempt to exclude them. The time that each employee must spend to evaluate, delete or respond to the message, when added up, constitutes an amount of compensated time that translates to quantifiable financial damage. [3]

> 3  As the recent spate of articles on "spam"--unsolicited bulk e-mail--suggests, the effects on business of such unwanted intrusions are not trivial. "Spam is not just a nuisance. It absorbs bandwidth and overwhelms Internet service providers. Corporate tech staffs labor to deploy filtering technology to protect their networks. The cost is now widely estimated (though all such estimates are largely guesswork) at billions of dollars a year. The social costs are immeasurable. . . . [P] 'Spam has become the organized crime of the Internet.' . . . '[M]ore and more it's becoming a systems and engineering and networking problem.' " (Gleick, *Tangled Up in Spam,* N.Y. Times (Feb. 9, 2003) magazine p. 1 [as of June 30, 2003]; see also Cooper & Shogren, *U.S., States Turn Focus to Curbing Spam,* L.A. Times (May 1, 2003) p. A21, col. 2 ["Businesses are losing money with every moment that employees spend deleting"]; Turley, *Congress Must Send Spammers a Message,* L.A. Times (Apr. 21, 2003) p. B13, col. 5 ["Spam now costs American businesses about $ 9 billion a year in lost productivity and screening"]; Taylor, *Spam's Big Bang!* (June 16, 2003) Time, p. 51 ["The time we spend deleting or defeating spam costs an estimated $ 8.9 billion a year in lost productivity"].) But the occasional spam addressed to particular employees does not pose nearly the same threat of impaired value as the concerted bulk mailings into one e-mail system at issue here, which mailings were sent to thousands of employees with the express purpose of disrupting business as usual.

[***71] All of these costs to protect the integrity of the computer system and to deal with the disruptive effects of the transmissions and the expenditures attributable to employee time constitute damages sufficient to establish the existence of a trespass to chattels, even if

the computer system was not overburdened to the point of a "crash" by the bulk electronic mail.

The several courts that have applied the tort of trespass to chattels to deliberate intermeddling with proprietary computer systems have, for the most part, used a similar analysis. Thus, the court in *CompuServe Inc. v. Cyber Promotions, Inc.* (S.D. Ohio 1997) 962 F. Supp. 1015, 1022, applied the Restatement to conclude that mass mailings and evasion of the server's filters diminished the value of the mail processing computer equipment to CompuServe "even though it is not physically damaged by defendants' conduct." [**329] The inconvenience to users of the system as a result of the mass messages "decrease[d] the utility of CompuServe's e-mail service" and was actionable as a trespass to chattels. (*Id.* at p. 1023.)

The court in *America Online, Inc. v. IMS* (E.D.Va. 1998) 24 F. Supp. 2d 548, on facts similar to those in the present case, also applied the Restatement in a trespass to chattels claim. There, defendant sent unauthorized e-mails to America Online's computer system, persisting after receiving notice to desist and causing the company "to spend technical resources and [*1391] staff time to 'defend' its computer system and its membership" against the unwanted messages. (*Id.* at p. 549.) The company was not required to show that its computer system was overwhelmed or suffered a diminution in performance; mere use of the system by the defendant was sufficient to allow the plaintiff to prevail on the trespass to chattels claim.

Similarly, the court in *e Bay, Inc. v. Bidder's Edge, Inc.* (N.D.Cal. 2000) 100 F. Supp. 2d 1058 determined that there was a trespass to chattels when the quality or value of a computer system was diminished by unauthorized "web crawlers," [4] despite the fact that eBay had not alleged any "particular service disruption" (*id.* at p. 1065) or "specific incremental damages" (*id.* at p. 1063) to the computer system. Intermeddling with eBay's private property was sufficient to establish a cause of action: "A trespasser is liable when the trespass diminishes the condition, quality or value of personal property"; "[e]ven if [defendant's intrusions] use only a small amount of eBay's computer . . . capacity, [defendant] has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use another's personal property." (*Id.* at p. 1071; see also, e.g., *Oyster Software, Inc. v. Forms Processing, Inc.* (N.D.Cal., Dec. 6, 2001, No. C-00-0724 JCS) 2001 WL 1736382 at *12 -*13 [trespass to chattels claim did not require company to demonstrate physical damage]; *Register.com, Inc. v. Verio, Inc.* (S.D.N.Y. 2000) 126 F. Supp. 2d 238, 250 ; cf. *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1566-1567 [54 Cal. Rptr. 2d 468] [unconsented electronic access to a computer system constituted a trespass to chattels].)

4  A "web crawler" is a computer program that operates across the Internet to obtain information from the Web sites of others. (*e Bay, Inc. v. Bidder's Edge, supra,* 100 F. Supp. 2d at p. 1061, fn. 2.)

These cases stand for the simple proposition that owners of computer systems, like owners of other private property, have [***72] a right to prevent others from using their property against their interests. That principle applies equally in this case. By his repeated intermeddling, Hamidi converted Intel's private employee e-mail system into a tool for harming productivity and disrupting Intel's workplace. Intel attempted to put a stop to Hamidi's intrusions by increasing its electronic screening measures and by requesting that he desist. Only when self-help proved futile, devolving into a potentially endless joust between attempted prevention and circumvention, did Intel request and obtain equitable relief in the form of an injunction to prevent further threatened injury.

The majority suggest that Intel is not entitled to injunctive relief because it chose to allow its employees access to e-mail through the Internet and [*1392] because Hamidi has apparently told employees that he will remove them from his mailing list if they so request. They overlook the proprietary nature of Intel's intranet system; Intel's system is not merely a conduit for messages to its employees. As the owner of the computer system, it is Intel's request that Hamidi stop that must be respected. The fact that, like most large businesses, Intel's intranet includes external e-mail access for essential business purposes does not logically mean, as the majority suggest, that Intel has forfeited the right to determine who has access to its system. Its intranet is not the equivalent of a common carrier or public communications licensee that would be subject to requirements to provide service and access. Just as Intel can, and does, regulate the use of its computer system by its employees, it should be entitled to control its use by outsiders and to seek injunctive relief when self-help fails.

[**330]  The majority also propose that  Intel has sufficient avenues for legal relief outside of trespass to chattels, such as interference with prospective economic relations, interference with contract, intentional infliction of emotional distress, and defamation; Hamidi urges that an action for nuisance is more appropriate.  Although other causes of action may under certain circumstances also apply to Hamidi's conduct, the remedy based on trespass to chattels is the most efficient and appropriate. It simply requires Hamidi to stop the unauthorized use of property without regard to the content of the transmis-

sions. Unlike trespass to chattels, the other potential causes of action suggested by the majority and Hamidi would require an evaluation of the transmissions' content and, in the case of a nuisance action, for example, would involve questions of degree and value judgments based on competing interests. (See *Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230-1231 [8 Cal. Rptr. 2d 293]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 153, p. 833; *Rest.2d Torts, § 840D*).

II

As discussed above, I believe that existing legal principles are adequate to support Intel's request for injunctive relief. But even if the injunction in this case amounts to an extension of the traditional tort of trespass to chattels, this is one of those cases in which, as Justice Cardozo suggested, "[t]he creative element in the judicial process finds its opportunity and power" in the development of the law. (Cardozo, Nature of the Judicial Process (1921) p. 165.) [5]

> 5    "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV." (Holmes, *The Path of the Law* (1897) 10 Harv.L.Rev. 457, 469.)

The law has evolved to meet economic, social, and scientific changes in society. The industrial revolution, mass production, [***73] and new transportation [*1393] and communication systems all required the adaptation and evolution of legal doctrines.

The age of computer technology and cyberspace poses new challenges to legal principles. As this court has said, "the so-called Internet revolution has spawned a host of new legal issues as courts have struggled to apply traditional legal frameworks to this new communication medium." (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 266 [127 Cal. Rptr. 2d 329, 58 P.3d 2].) The court must now grapple with proprietary interests, privacy, and expression arising out of computer-related disputes. Thus, in this case the court is faced with "that balancing of judgment, that testing and sorting of considerations of analogy and logic and utility and fairness" that Justice Cardozo said he had "been trying to describe." (Cardozo, Nature of the Judicial Process, *supra*, pp. 165-166.) Additionally, this is a case in which equitable relief is sought. As Bernard Witkin has written, "equitable relief is *flexible and expanding*, and the theory that 'for every wrong there is a remedy' [*Civ. Code, § 3523*] may be invoked by equity courts to justify the invention of new methods of relief for new types of wrongs." (11 Witkin, Summary of Cal. Law, *supra*, Equity, § 3, p. 681.) That the Legislature has dealt with some aspects of commercial unsolicited bulk e-mail

(*Bus. & Prof. Code, §§ 17538.4, 17538.45*; see maj. opn., *ante*, at pp. 1363-1364) should not inhibit the application of common law tort principles to deal with e-mail transgressions not covered by the legislation. (Cf. *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297 [65 Cal. Rptr. 2d 872, 940 P.2d 323]; *I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal. Rptr. 438, 702 P.2d 596].)

Before the computer, a person could not easily cause significant disruption to another's business or personal affairs through methods of communication without significant cost. With the computer, by a mass mailing, one person can at no cost disrupt, damage, and interfere with another's property, business, and personal interests. Here, the law should allow Intel to protect its computer-related property from the unauthorized, harmful, free use by intruders.

III

As the Court of Appeal observed, connecting one's driveway to the general system of [**331] roads does not invite demonstrators to use the property as a public forum. Not mindful of this precept, the majority blur the distinction between public and private computer networks in the interest of "ease and openness of communication." (Maj. opn., *ante*, at p. 1363.) By upholding Intel's right to exercise self-help to restrict Hamidi's bulk e-mails, they [*1394] concede that he did not have a right to send them through Intel's proprietary system. Yet they conclude that injunctive relief is unavailable to Intel because it connected its e-mail system to the Internet and thus, "necessarily contemplated" unsolicited communications to its employees. (Maj. opn., *ante*, at p. 1359.) Their exposition promotes unpredictability in a manner that could be as harmful to open communication as it is to property rights. It permits Intel to block Hamidi's e-mails entirely, but offers no recourse if he succeeds in breaking through its security barriers, unless he physically or functionally degrades the system.

By making more concrete damages a requirement for a remedy, the majority have rendered speech interests dependent on the impact of the e-mails. The sender will never know when or if the mass e- [***74] mails sent by him (and perhaps others) will use up too much space or cause a crash in the recipient system, so as to fulfill the majority's requirement of damages. Thus, the sender is exposed to the risk of liability because of the possibility of damages. If, as the majority suggest, such a risk will deter "ease and openness of communication" (maj. opn., *ante*, at p. 1363), the majority's formulation does not eliminate such deterrence. Under the majority's position, the lost freedom of communication still exists. In addition, a business could never reliably invest in a pri-

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

vate network that can only be kept private by constant vigilance and inventiveness, or by simply shutting off the Internet, thus limiting rather than expanding the flow of information. [6] Moreover, Intel would have less incentive to allow employees reasonable use of its equipment to send and receive personal e-mails if such allowance is justification for preventing restrictions on unwanted intrusions into its computer system. I believe the best approach is to clearly delineate private from public networks and identify as a trespass to chattels the kind of intermeddling involved here.

> [6] Thus, the majority's approach creates the perverse incentive for companies to invest less in computer capacity in order to protect their property. In the view of the majority, Hamidi's massive e-mails would be actionable only if Intel had insufficient server or storage capacity to manage them.

The views of the amici curiae group of intellectual property professors that a ruling in favor of Intel will interfere with communication are similarly misplaced because here, Intel, contrary to most users, expressly informed Hamidi that it did not want him sending messages through its system. Moreover, as noted above, all of the problems referred to will exist under the apparently accepted law that there is a cause of action if there is some actionable damage.

Hamidi and other amici curiae raise, for the first time on appeal, certain labor law issues, including the matter of protected labor-related communications. Even assuming that these issues are properly before this court (see [*1395] Cal. Rules of Court, rule 28(c)(1) ), to the extent the laws allow what would otherwise be trespasses for some labor-related communications, my position does not exclude that here too. But there has been no showing that the communications are labor-law protected. [7]

> [7] The bulk e-mail messages from Hamidi, a nonemployee, did not purport to spur employees into any collective action; he has conceded that "[t]his is not a drive to unionize." Nor was his disruptive conduct part of any bona fide labor dispute.

Finally, with regard to alleged constitutional free speech concerns raised by Hamidi and others, this case involves a private entity seeking to enforce private rights against trespass. Unlike the majority, I have concluded that Hamidi did invade Intel's property. His actions constituted a trespass--in this case a trespass to chattels. There is no federal or state constitutional right to trespass. ( [**332] _Adderley v. Florida_ (1966) 385 U.S. 39, 47 [17 L. Ed. 2d 149, 87 S. Ct. 242] ["Nothing in the

Constitution of the United States prevents Florida from even-handed enforcement of its general trespass statute. . . ."]; _Church of Christ in Hollywood v. Superior Court_ (2002) 99 Cal.App.4th 1244, 1253-1254 [121 Cal. Rptr. 2d 810] [affirming a restraining order preventing former church member from entering church property: "[the United States Supreme Court] has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned"]; see also [***75] _CompuServe Inc. v. Cyber Promotions, Inc., supra_, 962 F. Supp. at p. 1026 ["the mere judicial enforcement of neutral trespass laws by the private owner of property does not alone render it a state actor"]; _Cyber Promotions, Inc. v. America Online, Inc._ (E.D.Pa. 1996) 948 F. Supp. 436, 456 ["a private company such as Cyber simply does not have the unfettered right under the First Amendment to invade AOL's private property . . . . "].) Accordingly, the cases cited by the majority regarding restrictions on speech, not trespass, are not applicable. Nor does the connection of Intel's e-mail system to the Internet transform it into a public forum any more than any connection between private and public properties. Moreover, as noted above, Hamidi had adequate alternative means for communicating with Intel employees so that an injunction would not, under any theory, constitute a free speech violation. ( _Lloyd Corp. v. Tanner_ (1972) 407 U.S. 551, 568-569 [33 L. Ed. 2d 131, 92 S. Ct. 2219].)

IV

The trial court granted an injunction to prevent threatened injury to Intel. That is the purpose of an injunction. ( _Ernst & Ernst v. Carlson_ (1966) 247 Cal. App. 2d 125, 128 [55 Cal. Rptr. 626].) Intel should not be helpless in the face of repeated and threatened abuse and contamination of its private computer system. The undisputed facts, in my view, rendered Hamidi's [*1396] conduct legally actionable. Thus, the trial court's decision to grant a permanent injunction was not "a clear abuse of discretion" that may be "disturbed on appeal." ( _Shapiro v. San Diego City Council_ (2002) 96 Cal.App.4th 904, 912 [117 Cal. Rptr. 2d 631] ; see also _City of Vernon v. Central Basin Mun. Water Dist._ (1999) 69 Cal.App.4th 508, 516 [81 Cal. Rptr. 2d 650] [in an appeal of summary judgment, the trial court's decision to deny a permanent injunction was "governed by the abuse of discretion standard of review"].)

The injunction issued by the trial court simply required Hamidi to refrain from further trespassory conduct, drawing no distinction based on the content of his e-mails. Hamidi remains free to communicate with Intel employees and others outside the walls--both physical and electronic--of the company.

For these reasons, I respectfully dissent.

30 Cal. 4th 1342, *; 71 P.3d 296, **;
1 Cal. Rptr. 3d 32, ***; 2003 Cal. LEXIS 4205

George, C. J., concurred.