# EXHIBIT E

## TO THE APPENDIX OF NON-FEDERAL AND UNPUBLISHED AUTHORITIES CITED IN COUPON'S OPPOSITION TO STOTTLEMIRE'S MOTION TO DISMISS

LEXSEE


Caution
As of: Apr 03, 2008

**DAVID PINES et al., Plaintiffs and Respondents, v. W. R. TOMSON et al., Defendants and Appellants**

Civ. No. 68622

Court of Appeal of California, Second Appellate District, Division Three

160 Cal. App. 3d 370; 206 Cal. Rptr. 866; 1984 Cal. App. LEXIS 2549; 1984-2 Trade Cas. (CCH) P66,308

September 27, 1984

**SUBSEQUENT HISTORY:**    [***1] On October 16, 1984, the opinion was modified to read as printed above.

**PRIOR HISTORY:**    Superior Court of Los Angeles County, No. C210776, James P. Natoli, Judge.

**DISPOSITION:**    That portion of the judgment which awards Pines and Aronek damages and paragraph 1 of the trial court's injunctive order, as modified by striking therefrom the third word of the last sentence of paragraph 1, are affirmed. Paragraphs 2 and 3 of the trial court's injunctive order are stricken and those portions of the judgment are reversed. The matter is remanded to the trial court, which is directed to hear respondents' application for attorneys fees for services rendered on this appeal and to allow and fix the reasonable value of those fees. The parties are to bear their own costs on appeal.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellants, owners and operators of a business telephone directory, challenged a decision of the Superior Court of Los Angeles County (California), which granted injunctive and monetary relief to respondent business owners in an action alleging discrimination on the basis of religion contrary to Cal. Civ. Code §§ 51, 51.5 and Cal. Bus. & Prof. Code §§ 16721, 17200 et seq.

**OVERVIEW:** Respondents brought an action against appellants, who owned and operated a business telephone directory that required advertisers to affirm that

they accepted Christ as their savior. Respondents who were Jewish alleged that appellants' refusal of their advertisement request in the directory constituted discrimination on the basis of religion. The trial court found in favor of respondents and awarded injunctive and monetary relief. On appeal, appellants maintained that respondents lacked standing, that a private nonprofit religious corporation was not a business establishment, and that regulation of the content of the directory violated appellants' rights to freedom of speech, religion, and association. The court held that having alleged that they have been damaged by appellants' refusal, respondents had standing. The court affirmed the lower court's order that enjoined appellants' discriminatory business practices against respondents as the order did not unconstitutionally impair protected freedoms. However, the court reversed part of the order that enjoined appellants from publishing certain editorial materials as the order violated appellants' rights to free speech.

**OUTCOME:** The court affirmed the order enjoining appellants' discriminatory practices because appellants' freedom of religion, association, and speech were not constitutionally impaired. The court reversed the order enjoining appellants from publishing certain editorial materials because the order violated appellants' right to free speech.

**CORE TERMS:** religious, advertisement, religion, business establishment, injunction, yellow pages, directory, born-again', discriminatory, advertiser, Civil Rights, business practice, unfair competition, prior restraint, publisher's, listing, publish, nonprofit, general public, italics,

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

advertising, sentiment, editorial, conspiracy, injunctive order, business transaction, injunctive, sex, affiliation, guaranteed

**LexisNexis(R) Headnotes**

*Antitrust & Trade Law > Market Definition > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Advertising > Elements*
[HN1]See Cal. Bus. & Prof. Code § 17200.

*Antitrust & Trade Law > Market Definition > General Overview*
[HN2]See Cal. Bus. & Prof. Code § 17203.

*Antitrust & Trade Law > Market Definition > General Overview*
[HN3]Cal. Bus. & Prof. Code § 17200 proscription of "unfair competition" is not confined to anticompetitive business practice but extends to any unlawful business practice.

*Antitrust & Trade Law > State Civil Action*
[HN4]See Cal. Bus. & Prof. Code § 17204.

*Antitrust & Trade Law > State Civil Action*
*Labor & Employment Law > Discrimination > Religious Discrimination > Federal & State Interrelationships*
[HN5]See Cal. Bus. & Prof. Code § 16721.

*Constitutional Law > Equal Protection > Scope of Protection*
[HN6]See Cal. Civ. Code § 51.

*Constitutional Law > Equal Protection > Scope of Protection*
[HN7]See Cal. Civ. Code § 51.5.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Association*
*Constitutional Law > Equal Protection > Scope of Protection*
[HN8]It is implicit in the right to engage in activities protected by the U.S. Const. amend. I corresponding

right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Association*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness*
[HN9]The right to associate for expressive purposes is not absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.

*Constitutional Law > Equal Protection > Level of Review*
[HN10]As a general proposition, government has a compelling interest in eradicating discrimination in all forms.

*Constitutional Law > Equal Protection > Scope of Protection*
[HN11]While the application of the antidiscrimination laws over U.S. Const. amend. I objections has chiefly occurred in the context of racial or sexual discrimination, California has chosen to broadly interdict discrimination on the basis of religion on the same terms and for the same reasons as discrimination on other invidious bases.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Religion > Establishment of Religion*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Religion > Free Exercise of Religion*
*Labor & Employment Law > Discrimination > Religious Discrimination > Defenses & Exceptions > Religious Organization Exemption*
[HN12]Religious liberty embraces two concepts,-- freedom to believe and freedom to act. The first is absolute, but in the nature of things, the second cannot.

*Constitutional Law > Equal Protection > Scope of Protection*
[HN13]A publication is not a commercial advertisement if it communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose exis-

tence and objectives are matters of the highest public interest and concern.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN14]Any restraint on expression prior to publication bears a heavy presumption against its constitutional validity under the U.S. Const. amend. I.

## SUMMARY:

### CALIFORNIA OFFICIAL REPORTS SUMMARY

In an action by two Jewish businessmen and a Jewish civic organization formed to combat prejudice (the latter acting as a private attorney general), brought against publishers of a "Christian Yellow Pages" that limited advertisements to those placed by persons making affirmations that they were born-again Christians, the trial court found that the publishers' discriminatory conduct on the basis of religion violated the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the proscriptions against conspiracy against trade and unfair competition in Bus. & Prof. Code, §§ 16721 and 17200 et seq., respectively. It awarded the businessmen damages, awarded all the plaintiffs costs and attorney fees, and enjoined defendants from, first, requiring advertisers or listers in the Christian yellow pages to affirm that they were born-again Christians; second, from publishing in the Christian yellow pages any concept statement or editorial policy; and third, from publishing advertisements or material in the Christian yellow pages that required identification of the advertiser's or lister's religious affiliation. (Superior Court of Los Angeles County, No. C210776, James P. Natoli, Judge.)

The Court of Appeal affirmed in part and reversed in part. It held that plaintiffs had standing to bring suit under Bus. & Prof. Code, §§ 17200 et seq. and under Bus. & Prof. Code, §§ 16721 and 16750, and that substantial evidence supported the trial court's award of damages to plaintiff businessmen under the latter sections. It held that publication of the Christian yellow pages was by a "business establishment" within the meaning of the Unruh Civil Rights Act, and involved a "business practice" within the meaning of Bus. & Prof. Code, §§ 17200 et seq. and a "business transaction" within the meaning of Bus. & Prof. Code, § 16721. The first part of the injunction, against limitation of advertisements, did not abridge the publishers' right to free exercise of religion. However, the second part of the injunction violated the free speech rights guaranteed the publishers by both the state and the federal Constitutions; and the third part of the injunction, by protecting rights that were adequately covered by the first part of the injunction, was unneces-

sary to the judgment. (Opinion by Arabian, J., with Klein, P. J., and Danielson, J., concurring.)

## HEADNOTES

### CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports, 3d Series

(1) **Unfair Competition § 8--Actions--Standing to Sue for Injunction.** --Bus. & Prof. Code, § 17200, which defines "unfair competition" for purposes of injunctive relief under Bus. & Prof. Code, § 17203, is not confined to anticompetitive business practice, but rather is applicable to any unlawful business practice; and under Bus. & Prof. Code, § 17204, which includes among those authorized to bring actions for such injunctions "any person acting for the interest of itself, its members or the general public," suit may be brought by any person acting in his own behalf or on behalf of the general public. Thus, two Jewish businessmen and a Jewish civic organization formed to combat prejudice, who alleged that a "Christian Yellow Pages" publisher's practice of limiting advertisements to those placed by bornagain Christians was an unfair business practice causing irreparable injury to members of the general public who were discriminatorily excluded, had standing to bring an action for injunctive relief under Bus. & Prof. Code, § 17200 et seq., either on their own behalf or on behalf of the general public.

(2) **Monopolies and Restraints of Trade § 10--Under Cartwright Act--Remedies of Individuals--Standing to Sue.** --Two Jewish businessmen had standing to bring an action for violations of the "conspiracy against trade statute" (Bus. & Prof. Code, § 16721) against the publisher of a "Christian Yellow Pages" having a policy of limiting advertisements to those placed by born-again Christians, where plaintiffs alleged that as a result of the publisher's discriminatory conduct in violation of § 16721 they had been damaged and were entitled to damages in a specified amount, thus satisfying the provision of the section governing standing (Bus. & Prof. Code, § 16750) that an action may be brought by anyone injured "in his business or property."

(3) **Civil Rights § 2--Definitions and Distinctions--Unruh Civil Rights Act--Business Establishment--Nonprofit Religious Corporation.** --Under Civ. Code, § 51.5, which provides that "No business establishment of any kind whatsoever shall discriminate against . . . refuse to buy from, sell to, or trade with any person . . . because of the race, creed, religion, color, national origin or sex of such person . . .," and under the Unruh Civil Rights Act in general (Civ. Code, §§ 51, 51.5, 52) "busi-

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

ness establishment" has the broadest meaning reasonably possible, including all commercial and noncommercial entities open to and serving the general public. Thus, publishers of a "Christian Yellow Pages" limiting advertisements to those placed by born-again Christians, which clearly had business-like attributes and fit both the commercial and noncommercial aspects of the meaning of "business establishment," were a "business establishment" within the meaning of the Unruh Civil Rights Act, notwithstanding the fact that they operated under the aegis of a nonprofit religious corporation and believed their work was a ministry.

**(4) Unfair Competition § 2--Definitions and Distinctions--Business Practice--Nonprofit Religious Enterprise.** --Publishers of a "Christian Yellow Pages" limiting advertisements to those placed by born-again Christians, which clearly had business attributes, were engaged in a "business practice" as that term is used in the unfair competition statute (Bus. & Prof. Code, § 17200 et seq.), notwithstanding the fact that they operated under the aegis of a nonprofit religious corporation and believed their work was a ministry.

**(5) Monopolies and Restraints of Trade § 6--Under Cartwright Act--Meaning of Business Transaction--Nonprofit Religious Enterprise.** --Publishers of a "Christian Yellow Pages" limiting advertisements to those placed by born-again Christians, which clearly had business-like attributes, were engaged in a "business transaction" as that term is used in the conspiracy against trade statute (Bus. & Prof. Code, § 16721), notwithstanding the fact that they operated under the aegis of a nonprofit religious corporation and believed their work was a ministry.

**(6) Constitutional Law § 53--First Amendment and Other Fundamental Rights of Citizens--Scope and Nature--Freedom of Religion--Requirement of Nondiscriminatory Advertising Policy for Publication by Nonprofit Religious Corporation.** --In an action by two Jewish businessmen and a Jewish civic organization formed to combat prejudice, brought against publishers of a "Christian Yellow Pages" that limited advertisements to those placed by persons making affirmations that they were born-again Christians, the trial court, after finding the publishers' conduct violated the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the proscriptions against conspiracy against trade and unfair competition in Bus. & Prof. Code, §§ 16721 and 17200 et seq., respectively, properly enjoined the publishers from requiring an oath or affirmation of a particular religious belief as a precondition to advertising in the yellow pages. The publishers' right to free exercise of religion was not abridged. Rather, the religious purposes for the yellow

pages asserted by the publishers--to convey the teachings of Christ--were not impeded by the injunction, nor was the express primary purpose--to offer the community an opportunity to do business with Christians--materially served by a requirement that the person placing the ad (but not the proprietor or manager of the business being advertised) be a born-again Christian. Although the injunction infringed on the publishers' right to associate for expressive purposes, the infringement was justified in light of the compelling state interest in eradicating invidious discrimination and in light of the fact that the state's purpose could not be accomplished by less restrictive means.

**(7) Constitutional Law § 55--First Amendment and Other Fundamental Rights of Citizens--Scope and Nature--Freedom of Speech and Expression--Commercial Speech.** --Though commercial speech is afforded less protection than other constitutionally guaranteed expression, speech is not rendered commercial merely because it relates to an advertisement. A publication is not a commercial advertisement if it communicates information, expresses opinion, recites grievances, protests claimed abuses, or seeks financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern.

**(8) Constitutional Law § 55--First Amendment and Other Fundamental Rights of Citizens--Scope and Nature--Freedom of Speech and Expression--Prior Restraint.** --Under the free speech guarantee of Cal. Const., art. I, § 2, subd. (a), expression of one's "sentiments," which include statements of editorial thought, emotion and opinion, is protected from prepublication sanctions. Thus, in an action by two Jewish businessmen and a Jewish civic organization formed to combat prejudice, brought against publishers of a "Christian Yellow Pages" that limited advertisements to those placed by persons making affirmations that they were born-again Christians, the trial court, after finding the publishers' conduct violated the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the proscriptions against conspiracy against trade and unfair competition in Bus. & Prof. Code, §§ 16721 and 17200 et seq., respectively, and after properly enjoining the publishers from continuing their discriminatory advertising policy, erred in enjoining them from printing concept statements or statements of editorial policy. The injunction against such statements was also invalid under the First Amendment. There is a heavy presumption against the federal constitutional validity of any prepublication restraint.

**(9) Injunctions § 1--Territorial Scope of Injunction.** --In accordance with the general rule that a court of equity having jurisdiction of the person of defendant may ren-

der any appropriate decree acting directly on the person, even though the subject matter affected is outside the jurisdiction, a court having jurisdiction of the parties may grant and enforce an injunction, even though the subject matter affected is beyond its territorial jurisdiction, or require defendant to do or refrain from doing anything beyond its territorial jurisdiction which it could require him to do or refrain from doing within the jurisdiction.

**COUNSEL:** David L. Llewellyn, Jr., for Defendants and Appellants.

Weisz & Weisz, Michael B. Weisz, Richard A. Weisz, Justin J. Finger, Jeffrey P. Sinensky and David A. Lehrer for Plaintiffs and Respondents.

Gilbert Gaynor and Fred Okrand as Amici Curiae.

**JUDGES:** Opinion by Arabian, J., with Klein, P. J., and Danielson, J., concurring.

**OPINION BY:** ARABIAN

**OPINION**

[*374] [**867] Introduction

Plaintiffs and respondents David· Pines, George [***2] Aronek, doing business under the fictitious name of Grecian Art Tiles, and [**868] Anti-Defamation League of B'nai B'rith [1] (individually, Pines, Aronek, Grecian Art Tiles and the ADL, and collectively, respondents) brought an action against defendants and appellants W. R. Tomson and the Family of Faith Foundation (individually, Tomson and the Foundation, and collectively, appellants), charging violations of three California statutes which prohibit religious discrimination (Civ. Code, §§ 51, 51.5; Bus. & Prof. Code, § 16721; Bus. & Prof. Code, [*375] § 17200 et seq.). The trial court found for respondents and issued a wide-ranging judgment for injunctive and monetary relief. We affirm in part and reverse in part for the reasons stated below,

1   The Anti-Defamation League of B'nai B'rith (the ADL) is a tax exempt, nonprofit corporation, organized under the laws of the District of Columbia, which maintains a branch office in Los Angeles, California. B'nai B'rith is a civic organization of American Jews. The ADL was organized in 1913 as a section of B'nai B'rith to advance goodwill and mutual understanding among Americans of all religions, races, and creeds and to combat racial and religious prejudice in the United States.

[***3] Facts

Since 1976, Tomson and his successor-in-interest, the Foundation, have owned and operated a business telephone directory called the "Christian Yellow Pages" (the CYP), which will only accept advertisements placed by a person who affirms orally and in writing that he has accepted Jesus Christ as his personal savior and is a "born-again" Christian. [2]

2   The religious oath states: "Advertiser Herewith Acknowledges The Fact That He Has Accepted Jesus Christ As His Personal Lord And Savior And According To The Holy Bible (John 1:13) Knows That He Is A Born-Again Christian."

Each CYP directory contains a full page message from the publishers of CYP, denominated "The Christian Yellow Pages Concept," which states: "The publishers of Christian Yellow Pages hold the Bible to be the Inspired Word of God, the Rule Book for Life which presents Jesus Christ, God's only begotten Son, whose death and bodily resurrection provide forgiveness from sin and eternal life. His indwelling presence through the Holy Spirit gives [***4] power and purpose to our living. It is the Christian's duty and privilege to give this message of hope to the whole world until the return of Jesus Christ for the establishment of His Kingdom.

"In publishing the CYP directory we are often asked 'Who is a Christian?' By Christian we mean those who have accepted the fact that Jesus came to this earth -- died on the cross of Calvary to pay for Our sins -- was resurrected -- and lives Now in the hearts of those who believe.

"Those whose advertisements appear in the CYP directory have declared orally and in writing that this is their position in Christ -- and are standing up and being counted as Christians in our community.

"One of the primary purposes of the CYP directory is to strengthen the Christian community in which it is being published by pointing out some of the many businesses operated by Christians -- therefore offering the entire community the opportunity to do business with Christian business people.

"Please recognize the fact that a Christian businessman advertising [sic] in the CYP directory does not mean that all of his employees are Christians -- nor does it mean that a Christian employee placing an ad in the [***5] directory imply [sic] that his employer is a Christian -- so we urge the user [*376] to contact the individual Christian listed wherever possible, and if indeed the user is a Christian we urge him to identify himself as a fellow Christian -- thereby further uniting the Body of Christ.

"Advertising in the CYP directory does not mean that the advertiser is any cheaper in his prices, nor does it necessarily mean that the quality of his work is any better than his competitor -- what it does mean is that his stand in Christ should guarantee that he is doing his [**869] level best -- that he is honest and fair in his prices -- and that the purchaser should be entitled to and receive courteous -- considerate and Christian treatment in all transactions.

"If we have missed you in this edition and you would like to have been included -- please forgive us -- we tried to contact all Christian people whose names we were able to obtain. Please call or write and you will be contacted before the next edition is published.

"Our prayer is that this directory will be accepted in the Spirit in which it has been published. We ask the Christian community to patronize these Christian [***6] advertisers -- and any other Christian business people that they are able to locate.

"As we have therefore opportunity, let us do good unto all men, especially unto them who are of the household of faith. (Gal: 6:10.)"

Tomson was the sole owner of the CYP logo and federally registered trademark until August 15, 1977, when he transferred to the Foundation all of his rights, interests, duties and obligations in the CYP, including the logo, the trademark and the right to receive royalties from the sale of CYP advertisements or listings. Thereafter, on August 29, 1977, the Foundation was incorporated under the laws of California as a nonprofit religious corporation, with its "National" or home office in Modesto, California. Tomson is president of the Foundation and a member of its board of directors.

The CYP is modeled after the "Yellow Pages" of a telephone company and contains primarily advertisements and listings paid for by business or professional people and offers for sale secular or commercial goods and services. Christian adages and symbols and Biblical quotations occur on most pages of the directories. Each directory is published for one of nine separate geographical regions [***7] in the United States and the advertisements and listings are grouped according to region.

The "Contract of Appointment of Regional Director" between Tomson, as the national director of the CYP, and the CYP regional director for the [*377] region which includes California, requires that the regional director accept orders for advertising space only from persons who qualify as "born-again" Christians.

Respondents Pines and Aronek are partners in Grecian Art Tiles, which imports tiles from Greece, some of which depict Christian images and scenes. On August 15, 1977, Pines and Aronek attempted to place an advertisement of their wares in the CYP. Because they are of the Jewish faith, Pines and Aronek could not and would not sign nor utter the "born-again" Christian oath. For that reason, they were not allowed to place their advertisement in the CYP. Pines and Aronek, joined by the ADL, acting as a private attorney general, brought the instant action against appellants, seeking damages and injunctive relief.

The trial court determined, inter alia, that publication and distribution by Tomson and the Foundation of "The Christian Yellow Pages Concept" in the CYP were acts of discriminatory [***8] business conduct on the basis of religion and acts which aid or incite discriminatory business conduct on the basis of religion; that their refusal to accept advertisements or listings from any person who refused to affirm he is a "born-again" Christian was arbitrary and discriminatory business conduct on the basis of religion; that their conduct and activity in producing, publishing and distributing the CYP and soliciting and selling advertisements and listings was secular commercial conduct performed for profit and, thus, the CYP was a "business establishment" within the meaning of Civil Code sections 51, 51.5 and 52; that their conduct in aiding and inciting discriminatory business conduct on the basis of religion violated Civil Code sections 51, 51.5 and 52; that their required exclusion of persons from "business transactions" on the basis of religion, by means of a policy expressed in a written document, violated Business and Professions Code section 16721; that their conduct [**870] constituted "unlawful and unfair business practices and unfair competition" which violated Business and Professions Code section 17200 et seq.; that their discriminatory conduct "is not protected [***9] activity under the freedom of speech, press, association, or free exercise of religion provisions of the United States Constitution or the California State Constitution; and that their discriminatory conduct caused Pines and Aronek to suffer actual injury and damages in the amount of $ 250.00."

The trial court's judgment awarded Pines and Aronek $ 250 each in damages, awarded Pines, Aronek and the ADL costs and reasonable attorneys fees and enjoined appellants from (1) requiring advertisers or listers in the CYP to affirm they are "born-again" Christians, (2) publishing in the CYP any "concept" statement or editorial policy, as exemplified by "The Christian Yellow Pages Concept," supra, and (3) publishing advertisements [*378] or material in the CYP which requires direct or indirect identification of the advertisers' or listers' religious affiliation. [3] Appellants timely appealed from the trial court's judgment.

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

3   That portion of the trial court's judgment which enjoined Appellants' future conduct was set forth in three separately numbered paragraphs:

"It is Ordered, Adjudged, and Decreed that defendants W. R. Tomson and the Family of Faith Foundation, their officers, agents, servants and employees, as well as agents of any subsidiary or corporation which are controlled by defendants W. R. Tomson or the Family of Faith Foundation or their successors in interest shall be and they are hereby permanently enjoined and restrained from, and shall not engage in, commit, or perform, directly or indirectly, by means whatsoever, any of the following acts:

"1. Require that plaintiffs David Pines and George Aronek, dba Grecian Art Tiles, the Anti-Defamation League of B'nai B'rith, or any member of the general public, in or outside of California, who seeks to place or places an advertisement or listing in any or all of defendants' or Christian Yellow pages, Inc.'s publications, in or outside of California, declare, state, acknowledge, affirm or indicate, in any manner whatsoever, including but not limited to oral or written statements, that said person or persons is a member of any religious faith or adheres to a particular religious belief, affiliation, or theology, including but not limited to those beliefs held by 'born-again' Christians; nor refuse to accept advertisements or listings, in any or all of the defendants' or Christian Yellow Pages, Inc.'s publications, in or outside of California, on the basis of the religious affiliation, beliefs, or theology of the person who seeks to place or places advertisements or listings, or the religious affiliation, beliefs, or theology of any person or persons associated with or employed by the person who seeks to place or places advertisements or listings. Nothing herein shall limit the right of defendants or Christian Yellow Pages, Inc. to exercise reasonable editorial judgment over the content of any advertisements or listings. The foregoing exclusion shall be deemed to include a prohibition against the exclusion from advertisements or listings, based upon the existence or non-existence of any personal religious experience, including the experience described as 'born-again' Christianity.

"2. Publish any concept statement or statement of editorial policy such as exemplified in the concept letter at page 3 of the 1977 edition of the Orange County Christian Yellow Pages . . . or as exemplified at page 4 in the 1978 edition of the Christian Yellow Pages . . . by the language

'In publishing the CYP Directory we are often asked . . .' or at page 11 of the same edition as exemplified by the language '. . . -- what it does mean is that his stand in Christ should . . .', and again in the language at the same site quoted as follows '. . . and Christian treatment . . . .'

"3. Publish advertisements or material of any kind whatsoever, in any of the publications of defendants' or Christian Yellow Pages, Inc., in or outside of California, which requires direct or indirect identification of an advertiser's or lister's religious affiliation, belief or theology in any manner whatsoever, except that advertisers or listers may identify themselves as Christians or use Christian logos or symbols."

[***10] Contentions

Appellant contends:

I. There is insufficient evidence to support the trial court's determination that appellants' conduct and activities violated California statutory law (Civ. Code, §§ 51, 51.5, 52; Bus. & Prof. Code, §§ 16721, 16750; Bus. & Prof. Code, § 17200 et seq.) because:

A. Respondents lacked standing to sue for alleged violations of "the unfair competition" statute, Business and Professions Code section 17200 et [*379] seq., since they were not competitors of the appellants and did not allege the consuming public has been injured by appellants' conduct.

[**871] B. Respondents lacked standing to sue for alleged violations of Business and Professions Code section 16721 since they suffered no demonstrable injury to their "business or property" as required by Business and Professions Code section 16750.

C. A private nonprofit religious corporation which publishes directories of "born-again" Christian business and professional people is not a "business establishment" within the meaning of the Unruh Civil Rights Act, Civil Code sections 51, 51.5 and 52, nor a "business" within the meaning of the "conspiracy against trade" statute, Business and Professions [***11] Code section 16721, or the "unfair competition" statute, Business and Professions Code section 17200 et seq.

D. Even if a private nonprofit religious corporation which publishes directories of "born-again" Christian business and professional people is a "business establishment" within the meaning of the Unruh Civil Rights Act, Civil Code sections 51, 51.5 and 52, for reasons of public policy, the act does not apply to its activities.

II. The trial court's judgment, applying the California antidiscrimination statutes (Civ. Code, §§ 51, 51.5, 52

Page 7

160 Cal. App. 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

and Bus. & Prof. Code, §§ 16721 and 17200 et seq.) to regulate the content of appellants' directories, violates appellants' rights to freedom of speech, press, religion and association under the federal and state Constitutions.

III. The trial court's judgment must be reversed as it is void for vagueness and overbreadth.

Discussion

I. A.

*Respondents had standing to sue appellants for alleged violations of "the unfair competition" statute, Business and Professions Code section 17200 et seq.*

In the forth cause of action of their complaint, respondents Pines, Aronek and the ADL sought injunctive relief under the "unfair competition" statute, [***12] Business and Professions Code section 17200 et seq. (formerly Civ. Code, § 3369, subds. 2-6). Appellants contend respondents lacked standing to sue for alleged violations of that statute because (1) they were not competitors [*380] of the appellants and (2) they did not allege the consuming public has been injured by appellants' conduct. Appellants have misstated both the law and the facts.

**(1)** Business and Professions Code section 17200 provides: [HN1]"As used in this chapter, *unfair competition* shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising . . . ." (Italics added.) Section 17203 provides: [HN2]"Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction."

In *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660], the Supreme Court noted that the section 17200 [HN3]proscription of "unfair competition" *is not confined to anticompetitive business practice but extends to "any unlawful business practice."* ( *Id.,* at pp. 209-210, italics [***13] added.) The court noted that the Legislature apparently intended to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur. ( *Id.,* at p. 210; *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903, 927 [162 Cal.Rptr. 194]; see *People* v. *McKale* (1979) 25 Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731]; *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].)

Section 17204 provides: [HN4]"Actions for injunction pursuant to this chapter may be prosecuted by the Attorney General or any district attorney . . . upon their own complaint or upon the complaint of any board, offi-

cer, person, corporation, or association, or by *any person acting for the interests of itself, its members or the general public.*" (Italics added.) The emphasized language has been construed to mean that "'suit may be brought by any person acting [**872] in his own behalf *or* on behalf of the general public.' [Citations.]" ( *Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 215, italics in original; *Hernandez* v. *Atlantic Finance Co.* (1980) [***14] 105 Cal.App.3d 65, 72 [164 Cal.Rptr. 279].)

Our review of the record does not support appellants' contention that respondents have not alleged injury to the consuming public. In their fourth cause of action, respondents specifically alleged that they were seeking injunctive relief "on behalf of themselves and the general public," that "as a direct and proximate result of defendants' unfair business practice, members of the general public including business persons of all religious faiths other than 'Born-Again' Christians . . . are subject to defendants' discriminatory pattern and practice and excluded from advertising in said periodicals" and that "members of the general public discriminatorily excluded . . . will continue to suffer irreparable injury . . . ."

[*381] We conclude, therefore, that respondents had standing to bring the instant action for injunctive relief either on their own behalf or on behalf of the general public.

I. B.

*Respondents had standing to sue appellants for alleged violations of "the conspiracy against trade" statute, Business and Professions Code section 16721.*

Appellants contend respondents lacked standing to sue for violations of "the [***15] conspiracy against trade" statute, Business and Professions Code section 16721, because they did not demonstrate at trial the requisite injury to their "business or property."

Section 16721, subdivisions (a) and (b), prohibits the exclusion of any person from a business transaction on the basis of an express discriminatory policy *imposed by a third party.* [4] Section 16750 provides that a person injured in "his or her business or property" by anything forbidden or declared unlawful in the chapter, which includes section 16721, may sue therefore [*382] and that such action may be brought "by any person who is injured in his business or property . . . ." [5]

4   Business and Professions Code section 16721 provides: [HN5]"Recognizing that the California Constitution prohibits a person from being disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic ori-

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

gin, and guarantees the free exercise and enjoy-
ment of religion without discrimination or prefer-
ence; and recognizing that these and other basic,
fundamental constitutional principles are directly
affected and denigrated by certain on-going prac-
tices in the business and commercial world, it is
necessary that provisions protecting and enhanc-
ing a person's right to enter or pursue business
and to freely exercise and enjoy religion, consis-
tent with law, be established.

"(a) No person within the jurisdiction of this
state shall be excluded from a business transac-
tion on the basis of a policy expressed in any
document or writing and imposed by a third party
where such policy requires discrimination against
that person on the basis of the person's sex, race,
color, religion, ancestry or national origin or on
the basis that the person conducts or has con-
ducted business in a particular location.

"(b) No person within the jurisdiction of this
state shall require another person to be excluded,
or be required to exclude another person, from a
business transaction on the basis of a policy ex-
pressed in any document or writing which re-
quires discrimination against such other person
on the basis of that person's sex, race, color, relig-
ion, ancestry or national origin or on the basis
that the person conducts or has conducted busi-
ness in a particular location.

"(c) Any violation of any provision of this
section is a conspiracy against trade.

"(d) Nothing in this section shall be con-
strued to prohibit any person, on this [sic] basis
of his or her individual ideology or preferences,
from doing business or refusing to do business
with any other person consistent with law."
[***16]
    5  Business and Professions Code section 16750
provides in pertinent part: "(a) Any person who is
injured in his or her *business or property* by rea-
son of anything forbidden or declared unlawful
by this chapter, may sue therefor . . . to recover
three times the damages sustained by him or her,
interest on his or her actual damages pursuant to
Section 16761, and shall be awarded a reasonable
attorneys' fee together with the costs of the suit.

    "Such action may be brought by any person
who is injured in his *business or property* by rea-
son of anything forbidden or declared unlawful
by this chapter, regardless of whether such in-
jured person dealt directly or indirectly with the
defendant." (Italics added.)

    Appellants urge that since respondents were unable
to prove at trial that they suffered any consequential
damage by reason of appellants' conduct, their standing
was thereby negated.  We find appellants' [**873]
"standing" argument to be completely lacking in merit.
(2) Having alleged that as a direct result of appellants'
discriminatory conduct in violation of section 16721
"plaintiffs [***17] have been damaged and are entitled
to $ 4500," respondents have established standing.  (See
*Burke v. Superior Court (1982) 128 Cal.App.3d 661,
665, fn. 5 [180 Cal.Rptr. 537].)*

    In their reply brief, appellants also urge that respon-
dents have failed to prove a cause of action under section
16721, because the evidence is insufficient to show they
were injured in their "business or property." Appellants
point to the court's explanation for its damage award at
the conclusion of trial as support for their theory that the
court determined respondents suffered no compensatory
or actual damages.  Appellants argue that the court's lan-
guage indicates it intended only to award respondents the
minimum $ 250 statutory penalty required by Civil Code
section 52, subdivision (a), [6] for violations of Civil Code
sections 51 and 51.5.

        6  See footnote 8, *infra.*

    We have reviewed the statements of the trial court at
the time it awarded damages to respondents, [7] and have
concluded that its comments, read in  [*383]  [***18]
context, do not support appellants' theory that the trial
court determined respondents suffered no injury to their
"business or property" within the meaning of Business
and Professions Code section 16750.  Moreover, appel-
lants' theory is contradicted by the trial court's written
findings of fact and conclusions of law in which it spe-
cifically stated that "the discriminatory conduct of defen-
dants . . . proximately caused injury and actual damage to
plaintiffs . . . Pines and . . . Aronek . . .  and each said
plaintiff is entitled to recover the sum of $ 250 from de-
fendants . . . ."

        7  "The Court: I realize the importance of the
    case to all of the parties involved, but I find from
    the evidence that the plaintiffs are entitled to a
    judgment in this matter under the First, Second,
    and Fourth Causes of Action.

        "I find that there is a violation, the conduct of
    the defendants is in violation of the provisions of
    the *Civil Code* sections 51, 51.5, and 52, and also
    in violation of section 16721 of the *Business and
    Professions Code.*

        "I find that the conduct complained of is in
    fact discriminatory and that plaintiffs are entitled
    to injunctive relief to prevent its recurrence.

"With respect to the matter of damages, I award damages to each of the defendants, Pines and Aronek, in the minimum sum specified in the *Civil Code* section, namely, $ 250 each." (Original italics.)

"[Respondents' Attorney]: And may I inquire as to the treble-damages provision of the *Code*, is that something that automatically trebles the damages?

"[Appellants' Attorney]: No, it doesn't.

"The Court: No, I don't believe so. [para. ] From my reading of the *Code* section, $ 250 is the minimum amount of damages where the Court believes that the plaintiff has failed to establish a specific sum of money as damages.

"I appreciate that there was testimony regarding the figure of $ 1,500, but I do not make that award; I awarded instead the $ 250, which is a minimum." (Original italics.)

[***19] Accordingly, we hold that respondents had standing to bring the instant action pursuant to Business and Professions Code sections 16721 and 16750, and that substantial evidence supports the trial court's determination that respondents were entitled to an award of damages under the authority of those sections.

I. C.

The CYP is a "business establishment" within the meaning of the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5), and its activities fall within the meaning of a "business practice" as that term is used in the "unfair competition" statute (Bus. & Prof. Code, §§ 17200 et seq.) and a "business transaction" as that term is used in the "conspiracy against trade" statute (Bus. & Prof. Code, § 16721).

Appellants note that the "unfair competition statute" (Bus. & Prof. Code, [**874] § 17200 et seq.) applies to a "business practice," the "conspiracy against trade" statute (Bus. & Prof. Code, § 16721) applies to a "business transaction," and the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5) applies to "business establishments." They therefore argue that because they do not operate a "business establishment," their activities are not proscribed by those statutes. Appellants' [***20] argument is based on the fact that the CYP is published under the formal aegis of a nonprofit religious corporation and their belief that their work is a "ministry."

The 1959 Unruh Civil Rights Act, Civil Code section 51, emanated from and was modeled upon traditional "public accommodations" legislation. The Unruh Civil Rights Act expanded the reach of such statutes

from common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters, and the like, to include "all business establishments of every kind whatsoever." (See *Marina Point, Ltd.* v. *Wolfson* [*384] (1982) 30 Cal.3d 721, 731 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], cert. den. 459 U.S. 858 [74 L.Ed.2d 111, 103 S.Ct. 129]; and see *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790, 793-794 [191 Cal.Rptr. 320, 662 P.2d 427]; *Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 726-727 [195 Cal.Rptr. 325].)

Civil Code section 51 provides in part: [HN6]"All persons . . . are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal [***21] accommodations, advantages, facilities, privileges, or services in all *business establishments of every kind whatsoever*." (Italics added.)

In 1976 the Legislature added Civil Code section 51.5 to the Unruh Civil Rights Act and amended Civil Code section 52 [8] (which provides penalties for those who violate the Unruh Civil Rights Act), in order to, inter alia, include section 51.5 in its provisions. (See *Review of Selected 1976 California Legislation* (1977) 8 Pacific L.J. 165, 201.) [9]

8   Civil Code section 52 provides in pertinent part: "(a) Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of sex, color, race, religion, ancestry, or national origin contrary to the provisions of Section 51 or 51.5, is liable for each and every such offense for the actual damages, and such amount as may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than two hundred fifty dollars ($ 250), and such attorney's fees as may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51 or 51.5." [***22]

9   Statutes 1976, chapter 366, sections 1, 2, page 1013.

Section 51.5 provides in part: [HN7]"No *business establishment of any kind whatsoever* shall discriminate against . . . refuse to buy from, sell to, or trade with any person . . . because of the race, creed, religion, color, national origin, or sex of such person . . . ." (Italics added.)

(3) (4) (5) Although the phrase "business establishment of every kind whatsoever" has been interpreted by

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

the Supreme Court ( _O'Connor v. Village Green Owners Assn., supra_, 33 Cal.3d 790, 796-797; _Burks v. Poppy Construction Co._ (1962) 57 Cal.2d 463, 468-469 [20 Cal.Rptr. 609, 370 P.2d 313]) and the Court of Appeal ( _Curran v. Mount Diablo Council of the Boy Scouts, supra_, 147 Cal.App.3d at pp. 727-733) in the context of section 51, we are aware of no case which interprets that term in the context of section 51.5. We believe, however, that the Legislature meant the identical language in both sections to have the identical meaning.

In _O'Connor_, the Supreme Court held that the owners association of a condominium development was a "business [***23] establishment" within the meaning of section 51 and that any age restriction established by the association [*385] was invalid. The _O'Connor_ court, quoting from _Burks v. Poppy Construction Co., supra_, 57 Cal.2d at pages 468-469, discussed the scope of the language of section 51: "The [**875] Legislature used the words "all" and "of every kind whatsoever" in referring to business establishments covered by the Unruh Act (Civ. Code, § 51), and the inclusion of these words without any exception and without specification of particular kinds of enterprises, leaves no doubt that the term "business establishments" was used in the broadest sense reasonably possible. The word "business" embraces everything about which one can be employed, and it is often synonymous with "calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain." [Citations.] The word "establishment," as broadly defined, includes not only a fixed location, such as the "place where one is permanently fixed for residence or business," but also a permanent "commercial force or organization" or "a permanent settled position (as in life or business)." [Citation.]'" (33 Cal.3d [***24] at p. 795.)

The _O'Connor_ court noted that the original version of the bill presented to the Legislature, in addition to affording protection in "business establishments," referred specifically to the right "to purchase real property" and to other rights, such as the obtaining of "professional" services. (33 Cal.3d at p. 795; see _Burks v. Poppy Construction Co., supra_, 57 Cal.2d at p. 469.) The final version, however, eliminated specific references and added to the term "business establishments" the words "of every kind whatsoever." (_Ibid._) The deletion of the specific references were explained in _Burks_ and _O'Connor_ on the ground that the Legislature deemed specific references no longer necessary in view of the broad language of the act as finally passed. (_Ibid._)

The Supreme Court stated in _O'Connor_ that the broad scope of business establishments in the final version of the bill "is indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations that may reasonably be found to constitute 'business establishments of every type

whatsoever.'" (33 Cal.3d at pp. 795-796.) Therefore, the [***25] court held that the Unruh Civil Rights Act covered even nonprofit organizations. (_Id.,_ at p. 796.) The court noted: "Indeed, hospitals are often nonprofit organizations, and they are clearly business establishments to the extent that they employ a vast array of persons, care for an extensive physical plant and charge substantial fees for those who use the facilities." (_Ibid._)

Following on the heels of _O'Connor_, the Court of Appeal in _Curran v. Mount Diablo Council of the Boy Scouts, supra_ 147 Cal.App.3d 712, also examined _Burks v. Poppy Construction Co., supra_, 57 Cal.2d 463, and concluded that in _Burks_ the court had determined the Legislature intended [*386] the word "business" in the Unruh Civil Rights Act to include _noncommercial_ as well as commercial entities. (147 Cal.App.3d at pp. 728-729.) Therefore, the _Curran_ court held that the term "business establishments," consistent with the Legislature's intent to use the term in the broadest sense reasonably possible, includes all commercial and _noncommercial_ entities open to and serving the general public. (_Id.,_ at pp. 732-733.) Accordingly, it held that the Boy Scouts is a "business [***26] establishment" within the meaning of the Unruh Civil Rights Act (_id.,_ at p. 733) and under that act, the Boy Scouts are prohibited from arbitrarily discriminating against homosexuals (_id.,_ at p. 734).

In the instant case, appellants urge that they are a nonprofit organization and that their activities in connection with the CYP were noncommercial. While the CYP certainly had "businesslike attributes," [10] as [**876] did the condominium owners association in _O'Connor_ ( _O'Connor v. Village Green Owners Assn., supra_, 33 Cal.3d at p. 796), the CYP "fits both the commercial and noncommercial aspects of the meaning of 'business establishment.'" ( _Curran v. Mount Diablo Council of the Boy Scouts, supra_, 147 Cal.App.3d at p. 730.)

10    Respondents assert in their brief: "CYP's business nature was amply demonstrated by, _inter alia_: (1) its solicitation and sale of commercial advertisements or listings; (2) the substantial and required monetary fee charged for each advertisement or listing; (3) the collection of royalties and the derivation of income from the sale of advertising space (4) the fact that the CYP directories are [patterned] after the telephone companies' 'Yellow Pages' and consist primarily of commercial advertisements or listings that have been paid for by business or professional people and which offer the sale of secular goods and services; (5) the 'Contract of Appointment of Regional Director'; (6) the proprietary history of the CYP operation with W. R. Tomson as National Director; (7)

the commercial use of the Christian Yellow pages logo and federally registered trademark and (8) W. R. Tomson's admissions as to CYP's commercial and economic purpose." (Citations and fn. omitted.)

[***27] We hold, therefore, that the CYP is a "business establishment" within the meaning of the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5) and that its activities fall within the meaning of a "business practice" as that term is used in the "unfair competition" statute (Bus. & Prof. Code, § 17200 et seq.) and a "business transaction" as that term is used in the "conspiracy against trade" statute (Bus. & Prof. Code, § 16721).

I. D.

*Appellants argument that they are entitled to a special "public policy" exception from the Unruh Act is a constitutional argument in disguise.*

Appellants creatively argue that they are entitled to a special "public policy" exception from the Unruh Act. This argument is based on *Marina* [*387] *Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d 721, in which the Supreme Court noted that, while age discrimination against children in housing is generally impermissible under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), in light of the unique housing needs of senior citizens (a problem addressed by both the state and federal governments in specific "'age-conscious'" legislative measures), retirement communities and other housing designed for [***28] senior citizens are excluded from the act's prohibition of housing discrimination against children. ( *Id.,* at pp. 742-743.) Appellants claim that because freedom of religion is a fundamental constitutional value, they are entitled to a similar exemption for their "ministry."

However, the "public policy" exemption for senior citizens housing which was recognized in *Marina Point* had a *statutory,* not a constitutional, basis. Appellants' "public policy" argument has no statutory basis, but is a constitutional argument in disguise, i.e., that religious liberty as guaranteed by the First Amendment warrants an exclusion for appellants from the civil rights laws. As a constitutional argument, we address it as such, rather than under a less rigorous, and in this context, somewhat ill-defined "public policy" analysis.

II.

*Appellants' constitutional freedoms are impaired by that portion of the trial court's order which enjoins their publication of editorial material in the CYP, but not by that portion of the order which prohibits their discriminatory acts.*

The trial court's injunctive order contains three paragraphs. Paragraph 1 enjoins appellants' discriminatory business [***29] practices by prohibiting appellants from requiring an oath or affirmation of a particular religious belief as a precondition to placing an advertisement in the CYP. Paragraphs 2 and 3 enjoin appellants from publishing certain editorial materials.

Appellants assert their freedoms of speech, press, religion and association would all be impaired by enforcement of the trial court's injunction and contend the judgment must be reversed in its entirety. Respondents urge that the trial court's order must be affirmed in toto.

[**877] We have concluded, however, that paragraph 1 of the trial court's order does not unconstitutionally impair protected freedoms and must be upheld, that paragraph 2 of the trial court's order is violative of free speech rights guaranteed by the federal and state Constitutions and must be stricken, and that paragraph 3 of the trial court's order is unnecessary to the judgment and should also be stricken.

[*388] II. A.

*Paragraph 1 of the trial court's injunction, which prohibits appellants' discriminatory business practice of requiring an oath or affirmation of a particular religious belief as a precondition to placing an advertisement in the CYP,* [***30] *does not impair constitutionally protected freedoms.*

(6) Paragraph 1 of the trial court's injunctive order may arguably be said to implicate appellants' First Amendment freedoms of religion and association. A review of the facts, however, shows that appellants have failed to demonstrate that the court's order would materially abridge the free exercise of their religion in any way.

1. *Paragraph 1 does not abridge appellants' right to free exercise of religion.*

Although the trial court specifically found that publication of the CYP was secular commercial conduct which was performed for profit, the court did not make any findings as to the religious or other motivations of appellants. Appellants maintain strenuously, that the overriding purpose of the CYP is religious in nature, that their purpose is "to teach and preach the Gospel and teachings of Jesus Christ," and that the CYP is published "for the purpose of mobilizing Christians to declare and propagate their faith in the workplace and to live their faith as they do their jobs." Indeed, each edition of the CYP directory contains the "Christian Yellow Pages Concept" which declares: "One of the primary purposes of the CYP directory [***31] is to strengthen the Christian community in which it is being published by pointing out some of the many businesses operated by Chris-

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

tians -- therefore offering the entire community the op-
portunity to do business with Christian business people."

Paragraph 1 of the trial court's injunctive order does
not materially interfere with the accomplishment of those
purposes. Nothing in paragraph 1 prevents the proprie-
tors of the CYP or their advertisers from declaring "their
position in Christ" or from "standing up to be counted"
as members of the Christian community. Moreover,
nothing in paragraph 1 prevents advertisers who wish to
do so from identifying themselves as Christians in their
advertisements. Paragraph 1 does not materially interfere
with the freedom of any person to believe in the appel-
lants' version of Christianity, nor with any person's abil-
ity to propagate Christian beliefs.

Paragraph 1 simply enjoins appellants from refusing
advertisements on the ground the person attempting to
place an advertisement is not, or will not affirm that he
is, a "born-again" Christian. Thus, the religious purposes
[*389] appellants have asserted for publishing the CYP
are not impaired [***32] by paragraph 1 of the trial
court's order.

Further, the express "primary" religious purpose of
the CYP, to offer "the entire community the opportunity
to do business with Christian business people," is not
materially served by requiring the person who places an
advertisement in the CYP to affirm he is a "born-again"
Christian.

Nothing in the CYP's present advertising policy of-
fers assurance that the advertisers themselves are in fact
"Christian business people." Appellants do not require
that the proprietors or managers of the businesses adver-
tising in the CYP in fact be Christians; they require only
that the *employee* placing the ad so testify, as the fifth
paragraph of the "Concept" makes plain. That paragraph
states: "Please recognize the fact that a Christian busi-
nessman advertising [*sic*] in the CYP directory does not
mean that all of [**878] his employees are Christians --
nor does it mean that a Christian employee placing an ad
in the directory imply [*sic*] that his employer is a Chris-
tian . . . ." Therefore, the stated "primary" religious pur-
pose of the CYP could more effectively be served by
simply allowing Christian business proprietors to iden-
tify themselves [***33] as such in their advertisements
by word or symbol.

Appellants contend, however, that compelling them
to accept advertisements from non-Christians would
force appellants to subscribe to non-Christian beliefs in
violation of _Board of Education v. Barnette (1943) 319
U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R.
674]_. On the contrary, paragraph 1 does not require ap-
pellants to endorse the religious beliefs, or even the busi-
ness practices, of non-Christian advertisers, or to alter
their own beliefs. It merely requires appellants to *act in*

a nondiscriminatory manner toward all prospective ad-
vertisers. A legal compulsion by court order to refrain
from discriminating against advertisers on the basis of
religion can hardly be characterized as an endorsement.
In any event, appellants can publish whatever disclaim-
ers are necessary to assure that their compliance with the
court order to treat all advertisers equally is not confused
with indorsement. (See _Pruneyard Shopping Center v.
Robins (1980) 447 U.S. 74, 87-88 [64 L.Ed.2d 741, 756,
100 S.Ct. 2035].)_

In finding a law firm's discrimination on the basis of
sex is unlawful under title VII of the Civil Rights
[***34] Act (_42 U.S.C.S. § 2000e et seq._) in _Hishon v.
King & Spaulding (1984) U.S. , [81 L.Ed.2d 59, 68,
104 S.Ct. 2229]_, the United States Supreme Court
stressed that the defendant law firm had not shown how
its ability to engage in First Amendment activities would
be inhibited by a requirement that it consider a woman
lawyer for partnership on her merits.   Similarly, in
_Roberts v. United States Jaycees (1984) U.S. , [82
L.Ed.2d 462, 477, 104 S.Ct. 3244]_, the Supreme Court
[*390] stated defendant Jaycees had failed to show that
application of the Minnesota Human Rights Act to the
Jaycees, to compel them to admit women as full mem-
bers, imposed "any serious burdens" on the male mem-
bers' First Amendment freedoms.

Here, appellants have not shown that application to
them of paragraph 1 of the trial court's injunction would
materially abridge their rights to free exercise of religion.
Thus, we need not undertake a free exercise analysis. [11]

> [11]   Compare this case with _Wisconsin v. Yoder
> (1972) 406 U.S. 205, 218-219 [32 L.Ed.2d 15,
> 27, 92 S.Ct. 1526]_ (which held application of
> compulsory school attendance laws to Amish
> children after eighth grade would gravely endan-
> ger continuance of their religious way of life) and
> _People v. Woody (1964) 61 Cal.2d 716, 720-722
> [40 Cal.Rptr. 69, 394 P.2d 813]_ (which held ap-
> plication of a criminal statute to American Indi-
> ans using peyote in a bona fide religious cere-
> mony would tear out "the theological heart" of
> Native American religion).

[***35] 2. *Paragraph 1, which infringes on appel-
lants' freedom of religious association, is justified by the
compelling government interest in eradicating invidious
discrimination.*

Appellants contend the trial court's order violates
their freedom of religious association.   In response to a
similar contention made by the Jaycees, who were seek-
ing to avoid application to them of the state antidiscrimi-
nation laws, the Supreme Court, in _Roberts v. United
States Jaycees, supra, U.S. [82 L.Ed.2d 462]_, found

that two distinct varieties of associational freedom had to be considered, the "freedom of intimate association and . . . [the] of expressive association." ( U.S. at p. [82 L.Ed.2d at p. 471].)

Freedom of "intimate association" receives protection as "an intrinsic element of personal liberty." ( Roberts v. United States Jaycees, supra, U.S. , [82 L.Ed.2d 462, 472-473].) These highly personal affiliations are exemplified by relationships such as marriage, childbirth, the raising and education of children, and cohabitation [**879] with one's relatives. ( U.S. at p. [82 L.Ed.2d at pp. 472-473.) In the [***36] instant case, appellants operate a telephone directory business which accepts paid listings from business persons engaged in the sale for profit of secular goods and services. Appellants' business has been operated for profit and operates interstate, publishing nine regional editions. Apart from religious creed, appellants apparently employ no criteria, other than financial, to determine which parties are acceptable telephone directory advertisers. Indeed, as discussed, supra, business persons seeking to advertise in the CYP directory need not themselves be Christians. Thus, like the Jaycees in Roberts, appellants' operation lacks the distinctive characteristics which would entitle them to claim their [*391] freedom of "intimate association" has been violated by the trial court's order. (Id., at p. [82 L.Ed.2d at pp. 473-474].)

With regard to the freedom of "expressive association," the Supreme Court stated in Roberts: "An individual's freedom to speak, to worship, and to petition the Government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort [***37] toward those ends were not also guaranteed . . . . [HN8]Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." ( Roberts v. United States Jaycees, supra, U.S. , [82 L.Ed.2d 462, 474].) In view of appellants' express religious purposes in publishing the CYP and "the scriptural teachings of not associating with non-believers," the freedom of "expressive association" is plainly implicated here. Freedom of association "presupposes a freedom not to associate." ( Id., at p. [82 L.Ed.2d at p. 475].)

In the instant case, the consequence of paragraph 1 of the trial court's injunctive order is to compel appellants to do business with -- to "associate" with -- non-Christian advertisers in spite of their religious beliefs. "The [HN9]right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas,

[***38] that cannot be achieved through means significantly less restrictive of associational freedoms." ( Roberts v. United States Jaycees, supra, U.S. , [82 L.Ed.2d 462, 475].) Here, that high standard is satisfied.

[HN10]As a general proposition, "government has a compelling interest in eradicating discrimination in all forms." ( E. E. O. C. v. Mississippi College (5th Cir. 1980) 626 F.2d 477, 488, cert. den. (1981) 453 U.S. 912 [69 L.Ed.2d 994, 101 S.Ct. 3143] [upholding application of civil rights laws to a pervasively sectarian college].) [HN11]While the application of the antidiscrimination laws over First Amendment objections has chiefly occurred in the context of racial or sexual discrimination (see Runyon v. McCrary (1976) 427 U.S. 160 [49 L.Ed.2d 415, 96 S.Ct. 2586]; Hishon v. King & Spaulding, supra, U.S. [81 L.Ed.2d 59]), California has chosen to broadly interdict discrimination on the basis of religion on the same terms and for the same reasons as discrimination on other invidious bases.

Thus, the California statutes at issue here may be viewed as implementing not only the Fourteenth Amendment's promise of equality, [***39] but also the greater guarantee of the California Constitution's equal protection clause, [*392] article I, section 7, subdivision (a), and the guarantee of equality in the workplace and marketplace, provided by article I, section 8, which has no federal counterpart. California's interest in eradicating discrimination on the basis of race or sex is unquestionably "compelling" and is "unrelated to the suppression of ideas . . . ." ( Roberts v. United States Jaycees, supra, U.S. , [**880] [82 L.Ed.2d 462, 475].)

The only question remaining, therefore, is whether the state's interest can be achieved by "less restrictive" means ( Roberts v. United States Jaycees, supra, U.S. , [82 L.Ed.2d 462, 475]) than by the application of paragraph 1 of the trial court's order to appellants. Clearly, it cannot. Paragraph 1 implements the state's interest in ending religious discrimination in business activity by prohibiting the discriminatory business practices of the CYP. Paragraph 1 "responds precisely to the substantive problem which legitimately concerns' the State and abridges no more . . . associational freedom than is necessary [***40] to accomplish that purpose." ( Id., at p. [82 L.Ed.2d at p. 478].)

Paragraph 1 is the sine qua non of the trial court's injunction. Although it undeniably infringes on appellants' freedom of religious association by requiring them to do business with non-Christians despite their preference to the contrary, that infringement is amply justified by the compelling state interest in eradicating invidious discrimination. [HN12]Religious liberty "embraces two concepts, -- freedom to believe and freedom to act. The first is absolute, but in the nature of things, the second

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

cannot." ( *Cantwell v. Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1218, 60 S.Ct. 900].) ·

II. B.

*Paragraph 2 of the trial court's injunction, which restrains statements of editorial opinion prior to publication, violates the free speech guarantees of the California and United States Constitutions.*

Respondents assert that "The Christian Yellow Pages Concept" is nothing more than invidiously discriminatory commercial speech which is not entitled to constitutional protection.    **(7)** While we concede the Constitution affords a lesser protection to commercial speech than to other constitutionally [***41] guaranteed expression ( *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343]), speech is not rendered commercial by the mere fact that it relates to an advertisement. ( *Pittsburgh Press Co. v. Human Rel. Comm'n* (1973) 413 U.S. 376, 384 [37 L.Ed.2d 669, 676, 93 S.Ct. 2553].) [HN13]A publication is not a commercial advertisement if it "'communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support [*393] on behalf of a movement whose existence and objectives are matters of the highest public interest and concern.'" ( At p. 385 [37 L.Ed.2d at p. 677]; quoting from *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 266 [11 L.Ed.2d 686, 698, 84 S.Ct. 710, 95 A.L.R.2d 1412].) Thus, appellants' views, as opposed to its discriminatory practices, [12] are entitled to protection under the free speech guarantees of the California and United States Constitutions.

> 12    The trial court found that appellants' activities in connection with the CYP "was secular commercial conduct . . . performed for profit."

[***42] 1. *Paragraph 2 violates the protection of "sentiments" guaranteed by article I section 2, subdivision (a) of the California Constitution.*

Article I section 2, subdivision (a) of the California Constitution is more definitive and inclusive than its federal counterpart. ( *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].) The section guarantees: "Every person may freely speak, write and publish his or her *sentiments* on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Italics added.)

Analysis of the section shows that it is comprised of three subparts: (1) an affirmation that all persons may freely speak, write and publish their "sentiments," (2) a provision allowing for liability once that right is abused and (3) a prohibition against [**881] laws which in-

fringe freedom of speech or the press.    Only the third subpart is paralleled, more or less, in the federal Constitution ("Congress shall make no law . . . abridging the freedom of speech, or of the press . . ."). (See Comment, *Rediscovering the California Declaration of Rights* (1974) 26 Hastings [***43] L.J. 481, 493.)

**(8)** The first subpart of the section, "[every] person may freely speak, write and publish his or her sentiments on all subjects," is qualified only by the second subpart which provides for responsibility *after the fact* if that right is abused.    Although the section does not use the term "prior restraint," the plain meaning of the first sentence of article I section 2, subdivision (a) is that "sentiments" are protected from any prepublication sanctions, i.e., from all prior restraints. ( *Dailey v. Superior Court* (1896) 112 Cal. 94, 100 [44 P. 458].)

The California Supreme Court's seminal opinion on the meaning of article I, section 2, subdivision (a) was rendered in 1896 in *Dailey v. Superior Court, supra,* 112 Cal. 94. *Dailey* concerned a play entitled "The Crime of a Century" which was being advertised by posters and newspapers in San Francisco.    The play was assertedly based on the facts of a notorious murder for which the accused was soon to be tried in San Francisco.    On complaint of the accused alleging that production of the play would deprive him of a [*394] fair trial, the trial court issued an order prohibiting further production [***44] or advertising.    The Supreme Court reversed the trial court, concluding that "the order made by the trial court was an attempted restraint upon the right of free speech, as guaranteed by the constitution of this state . . . ." ( *Id.,* at p. 100.) The California Supreme Court's discussion of what is now section 2, subdivision (a) of article I is instructive: "The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed.    The right of the citizen to freely speak, write, and publish his sentiments is unlimited, but he is responsible at the hands of the law for an abuse of that right.    He shall have no censor over him to whom he must apply for permission to speak, write, or publish, but he shall be held accountable to the law for what he speaks, what he writes, and what he publishes.    It is patent that this right to speak, write, and publish cannot be abused until it is exercised, and before it is exercised there can be no responsibility.    The purpose of this provision of the constitution was the abolishment of censorship, and for courts to act as censors is directly violative of that purpose.    This provision of the constitution as to freedom of speech [***45] varies somewhat from that of the constitution of the United States, and many state constitutions treating of this question; but, if there is a material difference in the various provisions, it works no harm to this petitioner, for the provision here considered is the broader, and gives him

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

greater liberty in the exercise of the right granted." ( *Id.*, at pp. 97-98.)

In *Wilson v. Superior Court, supra*, 13 Cal.3d 651, a decision which interpreted federal constitutional law, the Supreme Court stated that its interpretation of section 2, subdivision (a) of article I of the California Constitution "is exemplified" by *Dailey* and referred to that "protective provision" as one "more definitive and inclusive than the First Amendment." ( *Id.*, at p. 658.) [13]

[13] *Wilson v. Superior Court, supra*, 13 Cal.3d 651, invalidated a prior restraint under both the federal and state Constitutions but, apart from a brief paragraph mentioning *Dailey*, it rested its analysis on federal case law. (See discussion, *infra*.)

[***46] What then is the scope of the guarantee of the first sentence of article I, section 2, subdivision (a), which protects "sentiments" from prepublication sanctions? Its scope must depend on the meaning of the term "sentiments." In Webster's New World Dictionary (1976), "sentiment" is defined as "1. a complex combination of feelings and *opinions* 2. an *opinion*, etc., often colored by emotion 3. appeal to the emotions, or sensitivity to this 4. maudlin emotion." (*Id.*, at p. 542, italics added.) In *Guglielmi v.* [**882] *Spelling-Goldberg Productions* (1979) 25 Cal.3d 860 [160 Cal.Rptr. 352, 603 P.2d 454], the Supreme Court observed: "It is noteworthy that the California Constitution provides that '[every] person may freely speak, write and publish his [*395] or her sentiments on all subjects . . . .' (Art. I, § 2.) As Webster confirms, 'sentiments' encompasses not only thoughts but the attendant emotions. [Citation.]" ( *Id.*, at p. 867, fn. 8.) Thus, it is plain that the "sentiments" to which article I, section 2, subdivision (a) refers include statements of editorial thought, emotion and opinion. Therefore, consistent with that provision, in this [***47] state statements of editorial opinion may not be restrained prior to publication.

Here, however, the purpose and effect of paragraph 2 of the trial court's injunction is precisely that -- to restrain appellants' statements of editorial opinion -- as it forbids appellants from stating they have a religious purpose in publishing the CYP, from expressing their views as to what kind of treatment consumers should expect from "Christian business people," and from offering their editorial opinion on the question "'Who is a Christian?'" Therefore, paragraph 2 of the trial court's order cannot be reconciled with the plain meaning of article I, section 2, subdivision (a) of the California Constitution and for that reason it must be stricken.

*2. Paragraph 2 is invalid as a prior restraint on speech under the First Amendment.*

[HN14]Any restraint on expression prior to publication bears "'a heavy presumption against its constitutional validity'" under the First Amendment. ( *New York Times Co. v. United States* (1971) 403 U.S. 713, 714 [29 L.Ed.2d 822, 824, 91 S.Ct. 2140]; *Bantam Books, Inc. v. Sullivan* (1963) 372 U.S. 58, 70 [9 L.Ed.2d 584, 593, 83 S.Ct. 631].)

Prior restraints [***48] have been viewed as offensive to the First Amendment since the United States Supreme Court's landmark decision in *Near v. Minnesota* (1931) 283 U.S. 697 [75 L.Ed. 1357, 51 S.Ct. 625]. In *Near*, state law made it unlawful to publish a "'malicious, scandalous and defamatory newspaper, magazine or other periodical'" and empowered state courts to enjoin the publication of such papers. ( At pp. 701-702 [75 L.Ed. at p. 1360].) Near published a weekly newspaper containing articles relating to public officials and others which was virulently antisemitic. ( At p. 724, fn. 1 [75 L.Ed. at p. 1372] (dis. opn. of Butler, J.).) An action was brought and, after trial, the state court permanently enjoined Near and his codefendants "'from producing, editing, publishing, circulating, having in their possession, selling or giving away any publication whatsoever which is a malicious, scandalous or defamatory newspaper, as defined by law,' and also 'from further conducting said nuisance under the name and title of said The Saturday Press or any other name or title.'" ( At p. 706 [75 L.Ed. at p. 1362].) The Supreme Court reversed. Chief Justice Hughes noted the history of prior restraints [***49] both in this country and in England and, drawing [*396] on the commentaries of Blackstone and Justice Story, stated in his opinion that in determining the extent of the First Amendment's protection, "it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication." (At p. 713, see p. 714 [75 L.Ed. at p. 1366].)

Subsequent cases have followed *Near* in refusing to validate court-ordered prior restraints on publication. Thus, in *New York Times v. United States, supra*, 403 U.S. 713, the court held that no prior restraint could issue to prevent publication of the Pentagon Papers, despite a claim that national security would probably be jeopardized. In *Nebraska Press Assn. v. Stuart* (1976) 427 U.S. 539 [49 L.Ed.2d 683, 96 S.Ct. 2791], the Supreme Court reversed a trial court order restraining the news media from publishing or broadcasting accounts of the accused's confessions or admissions or facts strongly implicating him, where there was no showing that alternatives to a prior restraint on the news media would not have sufficiently mitigated the adverse effects [**883] [***50] of pretrial publicity. (Cf. *Dailey v. Superior Court, supra*, 112 Cal. 94.) And, in *Organization for a Better Ausin v. Keefe* (1971) 402 U.S. 415 [29 L.Ed.2d 1, 91 S.Ct. 1575], the Supreme Court reversed an injunction

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

prohibiting the distribution of leaflets attacking the policies of a real estate broker, holding it was an unconstitutional prior restraint.

In *Wilson v. Superior Court, Supra,* 13 Cal.3d 652, a candidate had distributed a newsletter which contained reprints of newspaper articles showing his incumbent opponent had been indicted for various crimes. The newsletter did not reveal that the indictment was six years old nor that the incumbent had been acquitted. The incumbent brought an action to restrain further publication of the newsletter and the trial court issued an injunction to that effect. The California Supreme Court unanimously ruled that the injunction was unconstitutional. The harms sought to be prevented by the injunction were grave -- they included not only defamatory material but were injurious to the electoral process. However, the *Wilson* court noted, "[the] cases establish that 'the substantive evil must be extremely serious [***51] and the degree of imminence extremely high before utterances can be punished.' [Citation.] . . . [If] publication of the Pentagon Papers did not constitute a sufficiently serious threat to justify creation of an exception to the established principles [of the prior restraint doctrine], the circulation of election campaign charges, even if deemed extravagant or misleading, does not present a danger of sufficient magnitude to warrant a prior restraint." ( *Id., at p.* 660.) [14]

14  Both *Organization for a Better Austin, supra,* 402 U.S. 415, and *Wilson* v. *Superior Court, supra,* 13 Cal.3d 652, suggest that prior restraints may be permissible where they otherwise would not be if they are aimed at "private" wrongs. (402 U.S. 415, 418-419 [29 L.Ed.2d 1, 5]; 13 Cal.3d at p. 662.) Although in this case, Pines and Aronek are private parties, the B'nai B'rith joined in the action as a private attorney general. Further, the "public" nature of the wrongs involved is apparent, inter alia, from the facts that the Attorney General or any district attorney or city attorney is empowered to bring an injunctive action for violations of the Unruh Act (Civ. Code, §§ 51, 51.5) under Civil Code section 52, subdivision (c), and the Attorney General or any other public prosecutor, and any person or association "acting for the interest of itself, its members or the general public" may bring an action under Business and Professions Code section 17204 to enjoin violations of Business and Professions Code section 17200.

[***52]  [*397] Respondents urge, however, that publication of the "Christian Yellow Pages Concept" is both discriminatory business conduct by itself and also that it "aids" and "incites" other such unlawful conduct in violation of Civil Code section 52, subdivision (a), and the trial court has so found. That argument does not save paragraph 2 from being stricken as a prior restraint. Peaceful expressions of religious or political opinion cannot be enjoined consistent with the First Amendment.

*Collin* v. *Smith* (7th Cir. 1978) 578 F.2d 1197, cert. den., 439 U.S. 916 [58 L.Ed.2d 264, 99 S.Ct. 291], is instructive. There the courts were asked to prevent prior restraint of a march which the American Nazi Party was seeking to hold in the predominantly Jewish suburb of Skokie, Illinois. The Seventh circuit upheld the Nazi's right to march, holding that the denial of a forum in advance of actual expression is a prior restraint which violates the First Amendment. ( *Id.,* at p. 1207.) The court stated with regard to government control of the content of First Amendment activity: "'[Above] all else, the First Amendment means that government has no power to restrict expression [***53] because of its message, its ideas, its subject matter or its content. [Citations.] To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction [**884] on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." [Citations.]'" ( *Id.,* at p. 1202.)

The court noted that content regulation is not per se invalid. There are established exceptions to the rule, "namely, obscenity, fighting words, and as limited by constitutional requirements, libel." ( *Id.,* at p. 1202.) Likewise, in very narrow circumstances, a government may proscribe content on the basis of imminent danger of a grave substantial evil. (*Ibid.;* see *Brandenburg v. Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed. 430, 433, 89 S.Ct. 1827].) In *Brandenburg, supra,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 434], the Supreme Court stated, "the constitutional [***54] guarantees of free speech and free press do not permit a State to forbid or proscribe [even] advocacy of the use of force or of law violation *except* where such advocacy [*398] is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (Italics added.)

In the instant case, respondents have asserted only that appellants' publication "aids" or "incites" others to discriminate on the basis of religion. That contention does not bring this case within one of the exceptions to the First Amendment prohibition against government control of protected expression.

Moreover, as appellants have pointed out, the CYP advertisers and readers also have protected First

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

Amendment rights.   In *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 756-757 [48 L.Ed.2d 346, 355, 96 S.Ct. 1817], the Supreme Court succinctly stated the principle as follows: "[The] protection afforded is to the communication, to its source and to its recipients both . . . [This] Court has referred to a First Amendment right to 'receive information and ideas,' and that freedom of speech '"necessarily protects the right to receive."'"

Here, [***55] there is no justification for overcoming the presumption that a prior restraint is invalid. Eradication of invidious religious discrimination in business is unquestionably a vital governmental objective. However, the manifestation of that evil -- appellants' unlawful business practice of refusing to deal with those who are not, or who will not affirm they are, "born-again" Christians -- is sufficiently circumscribed by paragraph 1 of the trial court's injunctive order. Unlike paragraph 1, paragraph 2, which prohibits appellants from publishing their opinions, does not respond precisely to that harm.  "[A] free society prefers to punish the few who abuse the rights of speech *after* they break the law than to throttle them and all others beforehand." ( *Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546, 559 [43 L.Ed.2d 448, 459, 95 S.Ct. 1239]; italics in original.)

II. C.

*Paragraph 3 of the trial court's injunction is unnecessary to the judgment and should be stricken.*

Paragraph 3 of the trial court's injunction orders that appellants not "[1] Publish advertisements or material of any kind whatsoever . . . which requires direct or indirect identification [***56] of an advertiser's or lister's religious affiliation . . . [2] except that advertisers or listers may identify themselves as Christians or use Christian logos or symbols."

Paragraph 1 of the trial court's injunction, which we have upheld, prohibits appellants' discriminatory business practice of requiring an oath or [*399] affirmation of a particular religious belief as a precondition to placing an advertisement in the CYP. While paragraph 1 is in force, if appellants were to publish advertisements or material of any kind which require a lister or advertiser to identify his religious affiliation, it would be punishable as contempt. Therefore, the first portion of paragraph 3 is unnecessary to the judgment.

The second portion of paragraph 3, which provides that advertisers or listers may identify themselves as Christians by words [**885] or symbols, adds nothing to their rights under the First Amendment. Thus, it is also unnecessary to the judgment.

We conclude, therefore, that paragraph 3 should be stricken from the trial court's injunctive order as unnecessary to the protection of respondents' First Amendment freedoms.

III.

*Paragraph 1 of the trial court's injunction, [***57] as modified, is not void for vagueness or overbreadth.*

Appellants contend that paragraph 1 of the trial court's injunction must be reversed as void for vagueness and overbreadth. [15]

15  Appellants' contentions of overbreadth and vagueness in regard to paragraphs 2 and 3 of the trial court's order are moot since we have determined those paragraphs must be stricken from the trial court's order.

They posit that the last sentence of paragraph 1 is unintelligible.  We agree and modify the trial court's injunctive order by striking therefrom the third word of the sentence so that the sentence now reads: "The foregoing [] shall be deemed to include a prohibition against the exclusion from advertisements or listings based upon the existence or non-existence of any personal religious experience, including the experience described as 'born-again' Christianity." As thus modified the sentence correctly reflects the intent of the trial court.

Appellants next contend that paragraph 1 of the trial court's order is overbroad [***58] in that it applies to "all of the defendants' . . . publications, *in or outside of California.*" (Italics added.) They assert the trial court lacks jurisdiction to enjoin their publications outside this state.  Appellants' contention lacks merit.  **(9)** "'[In] accordance with the general rule, . . . that a court of equity having jurisdiction of the person of defendant may render any appropriate decree acting directly on the person, even though the subject [*400] matter affected is outside the jurisdiction, a court having jurisdiction of the parties may grant and enforce an injunction, although the subject matter affected is beyond its territorial jurisdiction, or requires defendant to do or refrain from doing anything beyond its territorial jurisdiction which it could require him to do or refrain from doing within the jurisdiction.' [Citations.]" ( *Allied Artists Pictures Corp.* v. *Friedman* (1977) 68 Cal.App.3d 127, 137 [137 Cal.Rptr. 94].)

IV.

*Respondents are entitled to attorneys' fees on appeal.*

Respondents have requested an award of attorneys' fees on appeal pursuant to the provisions of Business and

160 Cal. App. 3d 370, *; 206 Cal. Rptr. 866, **;
1984 Cal. App. LEXIS 2549, ***; 1984-2 Trade Cas. (CCH) P66,308

Professions Code section 16750 and Civil Code section 52. [***59] We have concluded that the reasonable value of the services of respondents' attorneys on the appeal should be fixed and awarded by the trial court. (See Hypolite v. Carleson (1975) 52 Cal.App.3d 566, 589 [125 Cal.Rptr. 221]; Horn v. Swoap (1974) 41 Cal.App.3d 375, 384 [116 Cal.Rptr. 113]; see Le Blanc v. Swoap (1976) 16 Cal.3d 741, 743 [129 Cal.Rptr. 304, 548 P.2d 704]; 4 Witkin, Cal. Procedure (2d ed. 1983 supp.) § 134B, p. 293.)

Conclusion

Oliver Wendell Holmes once remarked, "I long have said that there is no such thing as a hard case. I am frightened weekly, but always when you walk up to the lion and lay hold the hide comes off and the same old donkey of a question of law is underneath." [16]

16  I Holmes -- Pollock Letters 156.

We have been charged in this case with the burden of judicially distinguishing between difficult and opposing views in a field of substantial uncertainty. Our perceived duty has been to narrow the exercise of purported power of one clashing adversary [***60] over the rights of an opponent. [**886] In that light, we have cautiously reviewed any attempted encroachment over another's will or desire.

As the end of the law is peace, we have sought in our resolution to extend a saving hand to this occasion's call by allowing no preferred treatment nor unnecessary relegation of any party to a deferent position.

We have advanced an interpretation of fact and law which results in a standard of what is deemed reasonable and right and fashions a path for greater harmony in the human community.

[*401] While we cannot, except by case-by-case analysis, dictate the morals of the marketplace, we can pronounce that acts of discrimination, practiced ingenuously or ingeniously, cannot stand in this hallowed hall where the injured apply for justice.

We wish to stress that the reversal of paragraphs 2 and 3 of the trial court's injunction will not strip the judgment of its vitality. Nothing in the doctrine of prior restraints prohibits legal sanctions from being taken against those who violate a lawful court order. Paragraph 1 of the injunction, which prohibits appellants' acts of discrimination on the basis of religion, will sufficiently [***61] protect respondents' First Amendment rights.

That portion of the judgment which awards Pines and Aronek damages and paragraph 1 of the trial court's injunctive order, as modified by striking therefrom the third word of the last sentence of paragraph 1, are affirmed. Paragraphs 2 and 3 of the trial court's injunctive order are stricken and those portions of the judgment are reversed. The matter is remanded to the trial court, which is directed to hear respondents' application for attorneys fees for services rendered on this appeal and to allow and fix the reasonable value of those fees. The parties are to bear their own costs on appeal.

# EXHIBIT F

## TO THE APPENDIX OF NON-FEDERAL AND UNPUBLISHED AUTHORITIES CITED IN COUPON'S OPPOSITION TO STOTTLEMIRE'S MOTION TO DISMISS

LEXSEE



Caution
As of: Apr 03, 2008

**THRIFTY-TEL, INC., Plaintiff and Respondent, v. MYRON BEZENEK et al., Defendants and Appellants.**

**No. G013917.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

**46 Cal. App. 4th 1559; 54 Cal. Rptr. 2d 468; 1996 Cal. App. LEXIS 624; 96 Cal. Daily Op. Service 4933; 96 Daily Journal DAR 7831**

**June 28, 1996, Decided**

**PRIOR HISTORY:** [***1] Appeal from a judgment of the Superior Court of Orange County. Super. Ct. No. 685646. Hon. Eleanor Palk, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.)

**DISPOSITION:** That portion of the judgment awarding damages is reversed. The cause is remanded to the superior court for a new trial to determine damages based on defendants' children's tortious conduct before February of 1992. In all other respects, the judgment is affirmed. Each side shall bear its own costs.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant customers appealed the judgment of the Superior Court of Orange County (California), in favor of plaintiff telephone company, arguing that causes of action for fraud and conversion did not lie on these facts, and that plaintiff failed to mitigate and prove its damages. They also argued that the trial court erred in calculating damages, and that Cal. Civ. Code § 1714.1 precluded or limited their damages for the acts of their children.

**OVERVIEW:** Plaintiff telephone company provided services to defendant customers. Defendants' minor children used a home computer to gain entry to plaintiff's confidential code, causing damage. Plaintiff knew of the hacking, but did not contact defendants. Plaintiff filed suit for damages for conversion, fraud, and the value of its services. The trial court awarded damages based on

plaintiff's tariff rate schedule, and defendants appealed. The court held that plaintiff proved trespass to chattel, not conversion, and that defendants were liable. The court ruled that defendants' children's use of the confidential code was misrepresentation on which plaintiff relied, thus giving rise to a fraud claim. The court determined plaintiff had a duty to mitigate its damages, and could not recover for avoidable losses, and that the lower court erred in awarding damages based on the tariff instead of actual damages. The court found that defendants were vicariously liable for the willful torts of their minor children under Cal. Civ. Code § 1714.1. The court therefore reversed that portion of the judgment awarding damages, and remanded for a new trial to determine damages based on the tortious conduct.

**OUTCOME:** The court reversed the portion of the judgment awarding damages to plaintiff telephone company, because plaintiff was required to prove its actual damages, and plaintiff was not due damages for losses it could have avoided through mitigation. It remanded the case for a new trial to determine damages for fraud and trespass to chattel, not conversion, based on the tortious acts of the children of defendant customers.

**CORE TERMS:** telephone, tariff, long-distance, conversion, trespass, misrepresentation, carrier, hacking, unauthorized, authorization, intangible, cause of action, actual damages, chattel, card's, unauthorized use, personal property, confidential, tangible, crack, computer technology, phone calls, teenage, paying, identification, awarding, customer's, complain, network, hacker's

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review*
*Real Property Law > Torts > Trespass to Real Property*
*Torts > Intentional Torts > Conversion > Defenses*
[HN1]It has long been recognized that the court has the power to modify the conclusion of the court below, where the record supports it.

*Contracts Law > Types of Contracts > Personal Property*
*Torts > Intentional Torts > Conversion > Elements*
[HN2]Trespass to chattel, although seldom employed as a tort theory in California, lies where an intentional interference with the possession of personal property has proximately caused injury. Where the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of the personal property, the owner has a cause of action for trespass to chattel, but not for conversion.

*Real Property Law > Torts > General Overview*
*Torts > Intentional Torts > Conversion > General Overview*
[HN3]The electronic signals generated by a computer hacker are sufficiently tangible to support a trespass cause of action.

*Computer & Internet Law > Criminal Offenses > Data Crimes & Fraud*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*
*Criminal Law & Procedure > Criminal Offenses > Property Crimes > Burglary & Criminal Trespass > Criminal Trespass > Elements*
[HN4]A hacker's unauthorized access to a computer is more in the nature of trespass than criminal conversion.

*Torts > Intentional Torts > Conversion > Elements*
[HN5]Trespass to chattel includes the intentional use or intermeddling with a chattel in the possession of another.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN6]A misrepresentation need not be oral; it may be implied by conduct.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Unlawful Acts of Agents > Fraud & Misrepresentation*
*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN7]Misrepresentation is only one element of a fraud cause of action; the plaintiff must also have relied on the misrepresentation to its detriment. California courts recognize indirect reliance. Moreover, the notion that reliance by an agent may be imputed to the principal, even though the misrepresentation was never communicated to the principal, is ensconced in California law.

*Torts > Damages > Mitigation*
[HN8]A plaintiff has a duty to mitigate damages and cannot recover losses it could have avoided through reasonable efforts.

*Contracts Law > Remedies > Liquidated Damages*
[HN9]A contractual provision imposing a penalty is ineffective, and the wronged party can collect only the actual damages sustained.

*Contracts Law > Breach > General Overview*
*Contracts Law > Types of Contracts > General Overview*
*Transportation Law > Carrier Duties & Liabilities > Rates & Tariffs*
[HN10]A suit to collect a tariff is in the nature of a breach of contract action.

*Energy & Utilities Law > Administrative Proceedings > Public Utility Commissions > General Overview*
*Energy & Utilities Law > Utility Companies > Liability*
*Energy & Utilities Law > Utility Companies > Rates > General Overview*
[HN11]Although California Const. art. XII §§ 4 and 6 authorize the Public Utilities Commission (PUC) to establish rates utilities may charge for their services, it is a debatable question as to whether they empower the PUC to liquidate a utility's tort damages against third parties.

*Family Law > Family Relationships & Torts > Tort Liability > Child Torts*
*Family Law > Parental Duties & Rights > Duties > Liability for Minor's Actions*

Page 2

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

*Torts > Vicarious Liability > Family Members > Children & Parents*
[HN12] Cal. Civ. Code § 1714.1 holds parents vicariously liable for the willful torts of their minor children.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Conforming Pleadings to Evidence*
*Evidence > Inferences & Presumptions > General Overview*
*Evidence > Procedural Considerations > Variances Between Pleadings & Proof*
[HN13] A variance between pleading and proof is material only if it actually misled the adverse party to his or her prejudice in maintaining the defense upon the merits. Cal. Civ. Proc. Code § 469.

SUMMARY:

CALIFORNIA OFFICIAL REPORTS SUMMARY

The trial court entered a judgment in favor of a telephone long-distance carrier in its action alleging fraud and conversion theories against the parents of teenage sons who employed computer technology in their efforts to crack plaintiff's access and authorization codes and to make long distance phone calls without paying for them. The sons had made unauthorized calls in November 1991 and February 1992. Plaintiff learned of the calls in November 1991, but did not notify defendants until filing its complaint in April 1992. Also, plaintiff presented no evidence of actual losses but instead presented evidence of the company's own "unauthorized use" tariff on file with the Public Utilities Commission. The trial court awarded plaintiff damages based on this tariff. (Superior Court of Orange County, No. 685646, Eleanor M. Palk, Temporary Judge. *)

    * Pursuant to California Constitution, article VI, section 21.

The Court of Appeal reversed the portion of the judgment awarding damages for unauthorized calls made in February 1992, remanded the matter for a new trial to determine damages based on defendants' children's tortious conduct before February 1992, and affirmed the judgment in all other respects. The court held that, even if the facts did not support a verdict of conversion as the property taken was intangible, the evidence supported a verdict of trespass to chattels. The court also held that the evidence supported a judgment for fraud, since the sons misrepresented that they were authorized users of the access codes, and plaintiff's computerized network, acting as plaintiff's agent, relied on that misrepresentation. It further held that plaintiff was not entitled to damages

for unauthorized calls in February 1992, since plaintiff failed to contact defendants or prevent a recurrence until filing suit, thereby failing to meet its duty to mitigate damages. The court also held that the trial court erred in awarding damages based on the company's own "unauthorized use" tariff, instead of requiring plaintiff to prove actual damages. (Opinion by Crosby, Acting P. J., with Sonenshine and Rylaarsdam, JJ., concurring.)

HEADNOTES

CALIFORNIA          OFFICIAL          REPORTS
HEADNOTES
Classified to California Digest of Official Reports

(1a) (1b) Telecommunications § 12--Telephones--Actions--Long-distance Carrier's Action for Unauthorized Computer Access to Make Long-distance Telephone Calls--As Conversion: Conversion § 2--Acts Constituting: Trespass § 3--Trespass to Personal Property. --In a telephone long-distance carrier's action against the parents of teenage sons who employed computer technology in their efforts to crack plaintiff's access and authorization codes and to make long-distance phone calls without paying for them, the trial court did not err in entering judgment in favor of plaintiff in its cause of action for conversion. Although courts have traditionally refused to recognize as conversion the unauthorized taking of intangible interests that are not merged with, or reflected in, something tangible, it was not necessary to determine whether the intangible computer access code, which was never reduced to paper or reflected on a computer disk, and the tie-up of plaintiff's system were properly the subjects of conversion. The evidence supported the verdict on a trespass theory. Plaintiff pleaded and proved a claim for trespass to personal property, and defendants were properly liable under that label. Trespass to chattel, although seldom employed as a tort theory in California, lies where an intentional interference with the possession of personal property has proximately caused injury. The chief importance of the tort now is that there may be recovery for interferences with the possession of chattels that are not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he or she interfered.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 613.]

(2) Appellate Review § 162--Disposition--Modification. --An appellate court has the power to modify the conclusion of the court below, where the record supports it.

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

**(3) Telecommunications § 12--Telephones--Actions--Long-distance Carrier's Action for Unauthorized Computer Access to Make Long-distance Telephone Calls--As Fraud: Fraud and Deceit § 3--False Representations.** --In a telephone long distance carrier's action against the parents of teenage sons who employed computer technology in their efforts to crack plaintiff's access and authorization codes and to make long-distance phone calls without paying for them, the trial court did not err in entering judgment in favor of plaintiff in its cause of action for conversion. The sons' use of the confidential access code was the legal equivalent of a misrepresentation that they were authorized users of its services. A misrepresentation need not be oral; it may be implied by conduct. Courts have held that an individual's use of another's bank card and confidential personal identification number was an implied misrepresentation as to the individual's identity. The same logic applied to this case. Further, plaintiff relied on the misrepresentation. Although no human received and acted on the misrepresentation, California courts recognize indirect reliance, and the notion that reliance by an agent may be imputed to the principal, even though the misrepresentation was never communicated to the principal, is ensconced in California law. Plaintiff's computerized network acted as an agent or legal equivalent. Plaintiff depended on the access code to identify the boys as authorized users of the system. That reliance was detrimental because their access, in effect, permitted them to steal plaintiff's services.

**(4) Telecommunications § 12--Telephones--Actions--Long-distance Carrier's Action for Unauthorized Computer Access to Make Long-distance Telephone Calls--Mitigation of Damages.** --In a telephone long-distance carrier's action against the parents of teenage sons who, in November 1991 and February 1992, employed computer technology in their efforts to crack plaintiff's access and authorization codes and to make long distance phone calls without paying for them, the trial court erred in awarding damages for unauthorized calls in February 1992, where plaintiff knew of the unauthorized use of the access codes in November 1991 but failed to contact defendants or prevent a recurrence until filing suit in April 1992. A plaintiff has a duty to mitigate damages and cannot recover losses it could have avoided through reasonable efforts. Contacting defendants by telephone or letter was not complex, doubtful, or expensive. It must be presumed that either simple expedient would have averted the second hacking episode.

**(5) Telecommunications § 12--Telephones--Actions--Long-distance Carrier's Action for Unauthorized Computer Access to Make Long-distance Telephone Calls--Measure of Damages--Carrier's Tariffs.** --In a

telephone long-distance carrier's action against the parents of teenage sons who employed computer technology in their efforts to crack plaintiff's access and authorization codes and to make long-distance phone calls without paying for them, the trial court erred in awarding damages based on the company's own "unauthorized use" tariff on file with the Public Utilities Commission (PUC), instead of requiring plaintiff to prove actual damages. A plaintiff may not satisfy its burden to prove damages merely by producing a formula or figure that in the abstract purports to represent the average damages suffered as a consequence of similar torts. In this case, actual damages were readily calculable. If plaintiff was able to determine an average loss for computer trespass, then it was able to produce evidence showing with reasonable certainty any damages caused by the sons. Moreover, the court's requiring plaintiff to prove actual damages would not interfere with the PUC's performance of its duties in violation of Pub. Util. Code, § 1759. The tariff did not represent the result of a reasonable endeavor to estimate a fair average compensation for any loss that might be sustained by a customer's bypass of plaintiff's billing mechanism. If an amount calculated pursuant to the tariff was disproportionate to the anticipated damages, it would constitute a penalty. A contractual provision imposing a penalty is ineffective, and the wronged party can collect only the actual damages sustained. Furthermore, although Cal. Const., art. XII, §§ 4 and 6, authorize the PUC to establish rates utilities may charge for their services, it is not clear that they empower the PUC to liquidate a utility's tort damages against third parties.

**(6) Telecommunications § 12--Telephones--Actions--Long-distance Carrier's Action for Unauthorized Computer Access to Make Long-distance Telephone Calls--Parents' Liability for Children's Unauthorized Use of Telephone System.** --In a telephone long-distance carrier's action against the parents of teenage sons who employed computer technology in their efforts to crack plaintiff's access and authorization codes and to make long-distance phone calls without paying for them, the trial court did not err in awarding damages against the parents. Although plaintiff failed to mention Civ. Code, § 1714.1 (parent's civil liability for minor's acts), in its complaint, plaintiff expressly invoked § 1714.1 in its trial brief, and thus defendants had adequate notice of the theory before trial. Also, even if the sons' friends participated in the scheme, the friends acted in concert with the sons and whatever losses plaintiff suffered arose from the use of the family's computer. The evidence indicated that one son knowingly permitted his friends to use the computer to gain access to plaintiff's computer and the son knew this was wrong. Thus, the trial court correctly determined his conduct to be intentional and willful. Further, it was of no consequence that plaintiff

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

did not plead a conspiracy between the children and their friends or seek to amend the complaint after trial to conform to proof. A variance between pleading and proof is material only if it actually misled the adverse party to his or her prejudice in maintaining the defense upon the merits. That did not occur in this case, as defendants knew plaintiff sued them based on their sons' conduct.

**COUNSEL:** William R. Roush for Defendants and Appellants.

Smith, Barab & Simpson, Martin J. Barab, Larry B. Vaughan and Gita Nassiri for Plaintiff and Respondent.

Peter Arth, Jr., and Evelyn C. Lee as Amici Curiae, upon the request of the Court of Appeal.

**JUDGES:** Opinion by Crosby, Acting P. J., with Sonenshine and Rylaarsdam, JJ., concurring.

**OPINION BY:** CROSBY

**OPINION**

[*1563] [**471] **CROSBY, Acting P. J.**

A telephone long-distance carrier prevailed on fraud and conversion theories against Myron and Susan Bezenek--whose teenage sons [1] employed computer technology in their efforts to crack plaintiff's access and authorization codes and make long distance phone calls without paying for them--garnering a judgment, including [***2] attorney fees, just shy of $ 50,000. Defendants challenge the court's determination that causes of action for fraud and conversion lie on these facts and complain of plaintiff's failure to mitigate and prove damages. They also contend that the court erred in calculating damages based on the company's own tariff on file with the Public Utilities Commission (PUC). Finally, defendants argue Civil Code section 1714.1 precludes damages based on conduct by a minor who is not their child and, in any event, limits damages to no more than $ 10,000.

> [1] For convenience, we will refer to defendants as "the Bezeneks" and their children, Ryan and Gerry, by their given names.

I

Thrifty-Tel, Inc., provides long-distance telephone services. Subscribers' telephones are programmed with a confidential access code and a six-digit authorization code that directs calls into Thrifty-Tel's computerized switching network. [2] An unauthorized user who knows both an access and an authorization code can make long-distance calls without [***3] being charged for them.

> [2] Subscribers also presumably had an assigned set of numbers that permitted access to Thrifty-Tel's long-distance network from other phones, but this case does not involve the theft of those numbers or any card or document bearing them.

[*1564] A friend of the Bezeneks' children knew a confidential Thrifty-Tel access code. During a three-day period in November 1991, Ryan, Gerry and some friends, using the Bezeneks' home computer and modem, gained entry into Thrifty-Tel's system with the code and conducted manual random searches for a six-digit authorization code. They made approximately 90 calls, consuming roughly 24 minutes of telephone time during the first 2 days. On the following day, Ryan and Gerry continued the search alone, making 72 manual attempts to identify an authorization code over an almost 16-minute period.

Through its internal security system, Thrifty-Tel learned of the computer hacking almost immediately. And by late November, the carrier identified the Bezeneks' [***4] home as the source. Although Thrifty-Tel had the Bezeneks' address and telephone numbers, it failed to contact them concerning the matter.

After a three-month hiatus, the Bezenek children resumed manual searches for an authorization code. After several days and apparently some frustration with the slow pace, Ryan acquired computer software to expedite the quest. On February 18, 1992, he used the program to access Thrifty-Tel's system and conducted rapid-fire random number searches. He ran the program between six and seven hours, generating over one thousand three-hundred calls. Because Thrifty-Tel is a small carrier with relatively few telephone lines, Ryan's automated calling overburdened the system, denying some subscribers access to phones lines.

Still, Thrifty-Tel did not contact or complain to the Bezeneks. Instead, it filed this action on April 1, 1992, seeking damages for conversion, fraud, and reasonable value of services. The April Fools' Day lawsuit provided the Bezeneks' first notice of their sons' computer hijinks. In a trial to the court, defendants unsuccessfully sought judgment on the conversion and fraud causes of action, arguing those remedies were not available [***5] on these facts. ( Code Civ. Proc., § 631.8.)

Thrifty-Tel offered no explanation for its failure to complain to the Bezeneks after the November 1991 hacking episode. It presented no evidence of any actual losses, either. Rather, plaintiff simply relied on the "unauthorized usage" tariff in its PUC-approved rate schedule to establish damages. That [**472] tariff, in effect, liquidates Thrifty-Tel's damages for computer hacking by imposing a $ 2,880 per day surcharge, a $ 3,000 "set

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

up fee," and a $ 200 per hour labor fee. It also provides for attorney fees and costs [*1565] incurred to collect the tariff. [3] Based upon this tariff, the trial court awarded plaintiff $ 33,720 in damages and nearly $ 14,000 in attorney fees and costs.

3   Indeed, the Thrifty-Tel officer primarily responsible for drafting the tariff testified it represents the average cost of identifying computer hackers and lost revenues when customers switch to another long-distance system because hacking impeded their phone use.

II

(1a) Defendants [***6] first contend the unauthorized use of confidential codes to gain computer access does not give rise to a cause of action for conversion. They rely on the historical underpinnings of the tort, which provided a remedy for the loss of intangible property interest, but only if those interests are reflected in something tangible that can be physically taken. ( *Moore v. Regents of University of California* (1990) 51 Cal. 3d 120, 134 [271 Cal. Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903].) For example, the value of a stock certificate is not the cost of the paper, but the intangible interest it represents. When the certificate is stolen or placed in another's name without the owner's permission, the value of the loss is not the cost of the paper--a tangible--but the worth of the stock--an intangible. ( *Payne v. Elliot* (1880) 54 Cal. 339.) Similarly, an individual who misappropriates a floppy disk which contains trade secrets, protected formulas, or customer lists can be liable for conversion. And the damages are the value of the information on the disk, not the de minimis price of the disk. (See, e.g., Prosser & Keeton on Torts (5th ed. 1984) § 15, pp. 91-92 and *Schneider v. Union* [***7] *Oil Co.* (1970) 6 Cal. App. 3d 987, 993 [86 Cal. Rptr. 315].)

Courts have traditionally refused to recognize as conversion the unauthorized taking of intangible interests that are not merged with, or reflected in, something tangible. ( *Adkins v. Model Laundry Co.* (1928) 92 Cal. App. 575, 583 [268 P. 939] [business goodwill]; *Olschewski v. Hudson* (1927) 87 Cal. App. 282, 286-288 [262 P. 43] [competitor's customer route]; *Faircloth v. A.L. Williams & Associates* (1992) 206 Ga.App. 764 [426 S.E.2d 601, 604-605] [unpaid commissions not evidenced by a receipt or certificate]; *Matzan v. Eastman Kodak Co.* (1987) 134 A.D.2d 863 [521 N.Y.S.2d 917, 918] [no protected interest in an idea].) And Dean Prosser has cautioned against scuttling conversion's tangibility requirement altogether, recommending instead the use of other remedies to protect intangible interests. (Prosser & Keeton on Torts, supra, § 15, p. 92.) [4]

4   One commentator does recommend dispensing with the tangibility limitation. (Comment, *The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine* (1991) B.Y.U. L.Rev. 1681, 1714-1715.) But even that author notes numerous other legal theories might be employed concerning the misappropriation of or interference with intangibles. ( *Id.* at p. 1700.)

[***8]   Whether the intangible computer access code, which was never reduced to paper or reflected on a computer disk, and the tie-up of Thrifty-Tel's system [*1566] could be the subjects of conversion presents an issue of first impression in California--and apparently most everywhere else as well. [5] However, it is not necessary to resolve the question because the evidence supports the verdict on a trespass theory.

5   In analogous circumstances at least two New York trial courts have held the unauthorized use of a telephone access code, without more, does not amount to the possession of stolen property because the codes are intangible. (See *People v. Tansey* (1992) 156 Misc.2d 233 [593 N.Y.S.2d 426, 429-430]; *People v. Molina* (1989) 145 Misc.2d 612 [547 N.Y.S.2d 546, 549]; but see *People v. Johnson* (1990) 148 Misc.2d 103 [560 N.Y.S.2d 238, 243-244].)

This very point was argued in the trial court, where defense counsel essentially conceded Ryan and Gerry trespassed, but maintained the mislabeling [***9] of the cause of action as one for conversion was fatal. (2) Not so: "[HN1]It has long been recognized that this court has the power to modify the conclusion of the court below, where the record supports it." ( *Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal. App. 3d 272, 279 [234 Cal. Rptr. 395].) [**473] (1b) Thrifty-Tel pleaded and proved a claim for trespass to personal property, and the defendants are properly liable under that label.

[HN2]Trespass to chattel, although seldom employed as a tort theory in California (indeed, there is nary a mention of the tort in Witkin's Summary of California Law), lies where an intentional interference with the possession of personal property has proximately caused injury. [6] (See, e.g., *Itano v. Colonial Yacht Anchorage* (1968) 267 Cal. App. 2d 84, 90 [72 Cal. Rptr. 823].) Prosser notes trespass to chattel has evolved considerably from its original common law application--concerning the asportation of another's tangible property--to include even the unauthorized *use* of personal property: "Its chief importance now," according to Prosser, "is that there may be recovery . . . for interferences with the possession of chattels which are not sufficiently [***10] important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has

interfered. Trespass to chattels survives today, in other words, largely as a little brother of [*1567] conversion." [7] (Prosser & Keeton on Torts, *supra*, § 14, pp. 85-86, fn. omitted; see also *Zaslow v. Kroenert* (1946) 29 Cal. 2d 541, 551 [176 P.2d 1] ["Where the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of . . . the personal property, the owner has a cause of action for trespass" to chattel, but not for conversion].) [8]

6    At early common law, trespass required a physical touching of another's chattel or entry onto another's land. [HN3]The modern rule recognizes an indirect touching or entry; e.g., dust particles from a cement plant that migrate onto another's real and personal property may give rise to trespass. (See *Wilson v. Interlake Steel Co.* (1982) 32 Cal. 3d 229, 232-233 [185 Cal. Rptr. 280, 649 P.2d 922]; *Roberts v. Permanente Corp.* (1961) 188 Cal. App. 2d 526, 529 [10 Cal. Rptr. 519].) But the requirement of a tangible has been relaxed almost to the point of being discarded. Thus, some courts have held that microscopic particles ( *Bradley v. American Smelting and Refining Co.* (1985) 104 Wn.2d 677 [709 P.2d 782, 788-789]) or smoke ( *Ream v. Keen* (1992) 314 Or. 370 [838 P.2d 1073, 1075]) may give rise to trespass. And the California Supreme Court has intimated migrating intangibles (e.g., sound waves) may result in a trespass, provided they do not simply impede an owner's use or enjoyment of property, but cause damage. ( *Wilson v. Interlake Steel Co., supra,* 32 Cal. 3d at pp. 233-234.) In our view, the electronic signals generated by the Bezenek boys' activities were sufficiently tangible to support a trespass cause of action. [***11]

7    Apparently no California decision has applied a trespass theory to computer hacking. But the Indiana Supreme Court has recognized in dicta that [HN4]a hacker's unauthorized access to a computer was more in the nature of trespass than criminal conversion. ( *State v. McGraw* (Ind. 1985) 480 N.E.2d 552, 554 [51 A.L.R.4th 963].) And the State of Washington, in an effort to curtail hacking, has made unauthorized computer access a criminal offense under the rubric, "computer trespass." (See, e.g., *State v. Riley* (1993) 121 Wn.2d 22 [846 P.2d 1365, 1373].)

8    Likewise, the Restatement Second of Torts section 217 includes in the definition of [HN5]trespass to chattel the intentional use or "intermeddling" with a chattel in the possession of another. ( *Id.* at § 217(b).)

III

(3) Plaintiff's cyber-fraud cause of action also applies a hoary common law theory to computer-age facts. The Bezeneks maintain they cannot be liable for fraud because the computer machinations did not constitute a misrepresentation and there was no evidence of reliance by Thrifty-Tel. Au contraire, asserts plaintiff: [***12] Ryan and Gerry's use of the confidential access code was the legal equivalent of a misrepresentation that they were authorized users of its services, and plaintiff relied to its detriment on that misrepresentation when its computer automatically granted them access to the network. Plaintiff's point is well taken.

[HN6]A misrepresentation need not be oral; it may be implied by conduct. (See, e.g., *Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal. App. 3d 145, 151 [117 Cal. Rptr. 525] and Prosser & Keeton on Torts, *supra*, § 106, p. 736.) We are aware of no decision holding the unauthorized use of a telephone access code constitutes misrepresentation. But decisions in analogous circumstances support that conclusion. For example, in *State v. Hamm* (Mo.Ct.App. 1978) 569 S.W.2d 289, the defendant used the bank card and personal identification number (PIN) of another person to steal cash at an automatic teller machine. [**474] Rejecting the assertion he made no misrepresentation, the court noted defendant's use of the card and confidential PIN was an was an implied misrepresentation as to his identity. ( *Id.* at pp. 290-291.) [9] The same logic applies here.

9    See also *In re Berz* (Bankr.N.D.Ill. 1994) 173 Bankr. 159, 162 (use of a credit card is an implied representation to the issuer that the holder has both the intent and the ability to pay the issuer) and *Johnson v. State* (Ala.Crim.App. 1982) 421 So.2d 1306, 1310 (nonsubscriber's unauthorized charging of calls to subscriber's telephone number is an implied misrepresentation).

[***13] [HN7]

But misrepresentation is only one element of a fraud cause of action; the plaintiff must also have relied on the misrepresentation to its detriment. [*1568] True, no human at Thrifty-Tel received and acted on the misrepresentation. But California courts recognize indirect reliance. ( *Geernaert v. Mitchell* (1995) 31 Cal. App. 4th 601, 605-606 [37 Cal. Rptr. 2d 483].) Moreover, the notion that reliance by an agent may be imputed to the principal, even though the misrepresentation was never communicated to the principal, is ensconced in California law. (See, e.g., *Grinnell v. Charles Pfizer & Co.* (1969) 274 Cal. App. 2d 424, 441 [79 Cal. Rptr. 369]; *Toole v. Richardson-Merrell Inc.* (1967) 251 Cal. App. 2d 689, 707 [60 Cal. Rptr. 398, 29 A.L.R.3d 988].)

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

We view Thrifty-Tel's computerized network as an agent or legal equivalent. In this regard, *State v. Hamm, supra,* 569 S.W.2d 289 is again persuasive. There, the defendant argued a bank did not detrimentally rely on his misrepresentation in an automatic teller machine via the unauthorized use of someone else's bank card and PIN. Rejecting this contention, the court noted, "The machine was so programmed that [***14] no money would be paid out without the insertion of the appropriate card and the corresponding personal identification numbers. When those items were supplied, the response was programmed so as to pay out the money. No difference can be perceived whether the bank gave approval after the presentation of those identification items or whether it programmed its acceptance upon those conditions in advance. In either case, the bank equally relied upon the presentation of the card and personal identification." (*Id.* at p. 291.) [10] Here, Thrifty-Tel depended on the access code to identify the boys as authorized users of the system. That reliance was detrimental because their access, in effect, permitted them to steal plaintiff's services.

10  Cf. *In re Brawner* (Bankr.N.D.Ill. 1991) 124 Bankr. 762, 765 (use of a credit card implies a representation on which card's *issuer* reasonably relies in extending credit).

IV

(4) At least four months before Thrifty-Tel sued, it knew the hacking occurred in the Bezenek [***15] home. But plaintiff neither notified the Bezeneks nor attempted to prevent a recurrence. Myron Bezenek's testimony that he would have stopped it immediately had he been advised of his children's activities was, not surprisingly, unrebutted. Accordingly, the Bezeneks complain plaintiff failed to mitigate its damages and insist they should not be liable for any losses suffered in the February 1992 escapade. We agree.

[HN8]A plaintiff has a duty to mitigate damages and cannot recover losses it could have avoided through reasonable efforts. (*Shaffer v. Debbas* (1993) 17 Cal. App. 4th 33, 41 [21 Cal. Rptr. 2d 110].) Citing *Service v. Trombetta* (1963) 212 Cal. App. 2d 313, 320 [28 Cal. Rptr. 68], Thrifty-Tel's only response is [*1569] that mitigation does not " 'require a complex series of doubtful acts and expenditures.' " Picking up the telephone to reach out and touch the Bezeneks or sending them a letter was complex, doubtful, or expensive? Based on Myron Bezenek's unchallenged testimony, we must presume that simple expedient would have averted the second hacking episode. Accordingly, Thrifty-Tel is not entitled to recover damages for the February 1992 event.

V

(5) Because [***16] the judgment presumably included damages attributable to the February 1992 incident, the judgment must be reversed and the matter remanded for a new trial on damages. But, as mentioned in part [**475] I, Thrifty-Tel presented no evidence at trial of actual damages. ( Civ. Code, § 3333.) It simply placed the unauthorized-use tariff in evidence and demonstrated it spent a certain number of labor hours to track down the invasion of its system. Defendants insist this falls short of a plaintiff's burden to prove actual damages. ( *Fields v. Riley* (1969) 1 Cal. App. 3d 308, 313 [81 Cal. Rptr. 671].)

We know of no authority--and Thrifty-Tel cites none--suggesting a plaintiff may satisfy this burden merely by producing a formula or figure that in the abstract purports to represent the average damages suffered as a consequence of similar torts. Indeed, to assess damages based on a statistical average might be unfair. For example, the facts here indicate the actual damages resulting from hacking may vary dramatically depending upon the hacker's method: The damage flowing from the boys' manual efforts were likely modest compared to that caused by the automated barrage in February, 1992. Thus, a [***17] damage award based on this relatively draconian tariff might produce a windfall in instances of de minimis hacking. (Cf. *Smith v. County of Los Angeles* (1989) 214 Cal. App. 3d 266, 292 [262 Cal. Rptr. 754] [". . . the award of damages should be sufficient to make the [plaintiff] whole but not result in a windfall"].) Nor can Thrifty-Tel claim actual damages were not readily calculable: If it is able to determine an average loss for computer trespass, then surely it is able to produce evidence showing with reasonable certainty any damages caused by Ryan and Gerry in November 1991.

Nevertheless, Thrifty-Tel claims we *must* apply the PUC-approved tariff, insisting that to do otherwise would "interfere with the commission in the performance of its official duties" in violation of Public Utilities Code section 1759. We were troubled enough by this contention to solicit additional briefing and an amicus curiae brief from the PUC. The PUC's submission was particularly helpful and, perhaps surprisingly, did not support Thrify-Tel. There we were told, "The []PUC respectfully submits that [*1570] its procedure for reviewing rates proposed by a non dominant interexchange [***18] carrier (NDIEC) does not assure that its unauthorized-use tariff bears a reasonable relationship to damages actually sustained by the company and would not, in every case, be a proper measure of liquidated damages." The PUC explained, "In 1984, the []PUC authorized firms to compete against AT&T in the long-distance (interexchange) telephone market. The new competitors were deemed to lack sufficient market share to maintain unreasonably high rates. Accordingly, their proposed initial tariff rates

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

would be effective one day after filing and subsequent tariff revisions would become effective five days after filing. Complaints about the terms and conditions of the service of these carriers would be subject to the jurisdiction of the Commission."

From these facts the PUC reached the following conclusion, with which we agree: "It cannot be held, as a matter of law, that the unauthorized use tariff represents the result of a reasonable endeavor by the NDIEC and consumers to estimate a fair average compensation for any loss that may be sustained by a customer's bypass of the telephone company's billing mechanism. If the amount calculated pursuant to the tariff is disproportionate to the [***19] anticipated damages, it will be defined as a 'penalty.' [HN9]A contractual provision imposing a penalty is ineffective, and the wronged party can collect only the actual damages sustained. ( *Perdue v. Crocker National Bank* (1985) 38 Cal. 3d 913, 930 [216 Cal. Rptr. 345, 702 P.2d 503].) Whether the tariff collects fair average compensation or constitutes a penalty should be determined by the trier of fact."

Thus, we need not pass on whether the PUC properly approved Thrifty-Tel's tariff or whether the tariff is reasonable; we merely hold the superior court erred in awarding contract or tort damages based on that tariff instead of requiring plaintiff to prove actual damages. [HN10]A suit to collect a tariff is in the nature of a breach of contract action. (*South Bay Transportation Co. v. Gordon Sand Co.* (1988) 206 Cal. 3d 650, 660-661 [233 Cal. Rptr. 753].) Whether Thrifty-Tel's hacking tariff is a valid liquidated damages provision for a breach of contract claim is not before us: The trial court ruled against Thrifty-Tel on its quasi-contract [**476] cause of action, and Thrifty-Tel did not pursue a protective appeal.

We also note that even if the PUC intended unauthorized-use [***20] tariffs to apply to *tort* claims against third parties, and it tells us it did not, that would only be true of AT&T for the reasons noted above. Also, the courts might well have jurisdiction notwithstanding Public Utilities Code section 1759. Although we need not, and do not purport to, decide that issue because the discussion in the previous section seems equally applicable here, section [*1571] 1759 deprives the courts of jurisdiction only as to acts undertaken by the commission "in the performance of its official duties" and not acts in ex cess of its jurisdiction. ( *Stepak v. American Tel. & Tel. Co.* (1986) 186 Cal. App. 3d 633, 641-642 [231 Cal. Rptr. 37]; see also *Cellular Plus, Inc.* v. *Superior Court* (1993) 14 Cal. App. 4th 1224, 1245-1247 [18 Cal. Rptr. 2d 308].) And the PUC does not have jurisdiction over all matters that simply have some bearing upon regulated utilities. (*Masonite Corp.* v. *Pacific Gas & Electric Co.* (1976) 65 Cal. App. 3d 1, 7 [135 Cal. Rptr. 170].)

[HN11]Although article XII, sections 4 and 6 of the California Constitution authorize the commission to establish *rates* utilities may charge for their services, it is a debatable [***21] question as to whether they empower the PUC to liquidate a utility's tort damages against third parties. (See, e.g., *Bondanza v. Peninsula Hospital & Medical Center* (1979) 23 Cal. 3d 260 [152 Cal. Rptr. 446, 590 P.2d 22].) Our search of the Public Utilities Code for any statute permitting the commission to exercise such a power has been in vain. [11] Similarly, we have located no decision that implies such authority. [12]

> [11]    Plaintiff suggests Public Utilities Code section 451 somehow authorizes the PUC to liquidate a utility's tort damages. We think not. Section 451 does not mention the commission. Rather, it simply states that utilities' charges for services must be just and reasonable. And Thrifty-Tel here is not seeking payment for services; it is seeking damages on a tort claim.
>
> [12]    Two California cases have held the PUC can limit the damages a third party may recover from a utility on a tort claim. (See *Colich & Sons v. Pacific Bell* (1988) 198 Cal. App. 3d 1225, 1234 [244 Cal. Rptr. 714]; *Trammell v. Western Union Tel. Co.* (1976) 57 Cal. App. 3d 538, 553-554 [129 Cal. Rptr. 361].) But neither case involved the liquidation of a utility's damages against a third party. And they justified their conclusions that a utility's liability may be limited by noting that any large tort judgment ultimately would be passed on to the utility's ratepayers, frustrating the strong public policy favoring uniform and reasonable rates. Those concerns simply have no bearing here: a telephone company damaged by hackers can protect itself and its ratepayers simply by suing the hackers and proving actual damages.

[***22] VI

(6) The Bezeneks raise the several issues concerning [HN12] Civil Code section 1714.1, which holds parents vicariously liable for the willful torts of their minor children. They first complain they had no inkling plaintiff intended to rely upon Civil Code section 1714.1 until "after trial." But section 1714.1 is expressly invoked in plaintiff's trial brief. The Bezeneks' notice of the theory before trial negates the claim that its absence from the complaint prejudiced them. ( *Robertson v. Wentz* (1986) 187 Cal. App. 3d 1281, 1292 [232 Cal. Rptr. 634].)

In addition, the Bezeneks claim they are not liable under Civil Code section 1714.1 for the hacking of their children's friends. But they never [*1572] acted alone. They acted in concert with the Bezenek boys, and whatever losses plaintiff suffered arose from use of the

46 Cal. App. 4th 1559, *; 54 Cal. Rptr. 2d 468, **;
1996 Cal. App. LEXIS 624, ***; 96 Cal. Daily Op. Service 4933

Bezenek computer. The evidence indicates Ryan know-ingly permitted his friends to use the Bezeneks' computer to gain access to Thrifty-Tel's computer and Ryan knew this was wrong. Thus, the trial court correctly determined his conduct to be intentional and willful. ( *Saunders v. Superior Court* (1994) 27 Cal. App. 4th 832, 845-846 [33 Cal. Rptr. 2d 438].)

[***23]  It is of no consequence that plaintiff did not plead a conspiracy between the Bezenek children and their friends or seek to amend the complaint after trial to conform to proof. [HN13]A variance between pleading and proof is material only if it "actually misled the ad-verse party to his [or her] prejudice in maintaining [the] . . . defense upon the merits." ( Code Civ. Proc., § 469; [**477]  see also *Walker v. Belvedere* (1993) 16 Cal. App. 4th 1663, 1669-1670 [20 Cal. Rptr. 2d 773].) That did not occur here: the Bezeneks knew plaintiff sued them based on their sons' conduct; and Myron Bezenek testified he learned from his sons "what had transpired and who was involved and how they went about doing it" well before trial.

Finally, defendants also note Civil Code section 1714.1 limits parents' damages to $ 10,000 for each tort committed by their children. They suggest their sons' hacking efforts were all part of a continuous course of conduct amounting to a single tort for which no more

than $ 10,000 may be awarded. Because we have con-cluded plaintiff did not properly prove damages--let alone damages in excess of $ 10,000--we decline to reach this issue. [13]

> 13  The parties cite (and we have found) no cases interpreting Civil Code section 1714.1's "each tort" language. However, there would appear to be at least three ways to apply that provision here. The boys may have committed a new tort each time they dialed Thrifty-Tel's access code. Alternatively, each episode of hacking--from when they turned the computer on until they switched it off--might be a separate tort. Or, as defendants suggest, the entire course of conduct--including the November 1991 and February 1992 attempts to crack Thrifty-Tel's authorization code--could be viewed as a single tort.

[***24]  That portion of the judgment awarding damages is reversed. The cause is remanded to the supe-rior court for a new trial to determine damages based on defendants' children's tortious conduct before February of 1992. In all other respects, the judgment is affirmed. Each side shall bear its own costs.

Sonenshine, J., and Rylaarsdam, J., concurred.